

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 21, 2024

**BY ECF**
The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Whitehead</u>, S1 22 Cr. 692 (LGS)

Dear Judge Schofield:

    The Government respectfully opposes the motion filed by non-party Eric Lach to quash a trial subpoena (the "Subpoena") served on him by the Government. (*See* Dkt. 147 (the "Motion")). The Subpoena seeks limited testimony from Mr. Lach at the upcoming trial in the above-referenced case, specifically: "testimony necessary to authenticate on-the-record statements made by [defendant] Lamor Whitehead to Eric Lach that were subsequently quoted in the article 'The Mayor and the Con Man' from the January 14, 2023 issue of *The New Yorker*" (the "Article").[1] Mr. Lach's testimony is the only available means for presenting the highly relevant admissions made by the defendant to Mr. Lach, and is therefore significant to the Government's proof at trial. In short, the law requires Mr. Lach's testimony, and the Motion should be denied.

### I. Overview of the Relevant Charge

    As relevant here, the defendant is charged in Count Two of the Superseding Indictment ("S1 Indictment") with attempting to defraud an individual identified therein as "Victim-2." Victim-2 has a pending criminal case in another federal district and is not being called by the Government as a witness at trial.

    As alleged in the S1 Indictment, the defendant attempted to obtain approximately $500,000 and interests in certain real estate from Victim-2 by falsely claiming that New York City Mayor Eric Adams would perform favors for the defendant—but only if the money and property were in the defendant's possession and name. (*See* S1 Indictment ¶¶ 4, 10). By way of example, the defendant's misrepresentations to Victim-2 included:

- On or about April 29, 2022, the defendant met with Victim-2 and asserted that he would meet with Adams in the coming weeks and that Adams would "tell [the defendant] where the money is." The defendant claimed that if he told Adams "I'm doin' real estate . . . this is what

---

[1] Available at https://www.newyorker.com/news/our-local-correspondents/how-eric-adams-started-mentoring-a-con-man (last visited Feb. 20, 2024).

I need," that it was "a done deal." The defendant said that Adams would help him obtain permission from the City to operate residential housing as affordable housing—without actually operating as affordable housing—and that the defendant had "the key to the City." The defendant further stated that in order for Adams to take action, the real estate would need to be in the defendant's name.[2]

- On or about May 5, 2022, the defendant and Victim-2 discussed a particular property that Victim-2 was negotiating to purchase, which was subject to a stop-work order. The defendant insisted that if the property were in his name, he would be able to get the order lifted: "I gotta show . . . when I go to E [Eric Adams] . . . I own this right here, I need this up, off." He continued: "I can't come to him no other way . . . I'll take care of that. That's easy. . . Anything with that? Boom." The defendant went on to say that he had to get the property "shifted over to us, and I, and I'll take it from there. . . . I'll deal with the Mayor's office . . . But I got, we gotta have ownership. I gotta be able to say, 'yo, yo, E [Eric Adams], I own this . . . This is what's goin on.'"[3]

- In text messages sent in or about May 2022, the defendant repeatedly pressed Victim-2 to wire the defendant $500,000, claiming that the money was urgently needed because "The Meeting has been [set] for Friday with the Mayor and we are still struggling to get things done! What are we really doing?" The defendant later texted Victim-2, complaining of Victim-2's failure to wire the $500,000, writing: "As I'm preparing for this meeting today I'm so glad that you showed me you really wanted to sabotage me and my business . . . One day you will really need me! And the meeting I set up today with you know who ! Watch this now!"[4]

### II. The Article, the Testimony Sought, and Lack of Alternatives to Compelled Testimony

On January 14, 2023, *The New Yorker* published the Article, which directly quotes on-the-record statements the defendant made to Mr. Lach (the "Quoted Statements"). These statements were made to Mr. Lach after the defendant was aware he was under investigation but *before* he was indicted; *before* he was arrested on the original indictment in this case; and *before* he came to learn through discovery in this case that his conversations with Victim-2 had been recorded. Specifically, the defendant was quoted in the Article as saying: (1) "Everybody is trying to connect me and the Mayor with some fiduciary experience. We don't talk about real estate. We don't talk about stocks. We don't talk about none of that. We talk about life"; (2) "We never did no real estate. We never did anything. I never did one business transaction at all with Eric"; and (3) that Adams "was a mentor. He's helped me as a man. And that's it." The Subpoena seeks Mr. Lach's limited testimony about the fact that the defendant did in fact make these statements to him, as quoted in the Article.

---

[2] *See* GX 102 (April 29, 2022 recording) and GX 102-T at 2-6 (draft transcript of GX 102 clips).

[3] *See* GX 105 (May 5, 2022 recording) and GX 105-T at 2-4, 6-7 (draft transcript of GX 105 clips).

[4] *See, e.g.*, GX 351-09, GX 351-12 (chat excerpts between the defendant and Victim-2).

2

Before issuing the Subpoena to Mr. Lach, the Government: (1) sought a stipulation from the defense that the defendant made the Quoted Statements, or agreement to admit at trial a redacted copy of the Article reflecting only the Quoted Statements, both of which the defense declined; (2) sought voluntary testimony from Mr. Lach, which he ultimately refused to provide;[5] and (3) invited counsel for *The New Yorker* to consider disclosing the existence of potential alternative sources of proof for the Quoted Statements, including any contemporaneous recordings, about which *The New Yorker* declined to comment.

### III.  Argument

#### A.  Applicable Law

Although a party can move to quash a subpoena based on privilege, privileges are disfavored and construed narrowly, "because they contravene a fundamental principle of our jurisprudence that the public has a right to every man's evidence," and because "they are in derogation of the search for truth." *Von Bulow by Auersperg v. Von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (internal quotation marks and citations omitted). The party moving to quash a subpoena bears the burden of establishing the protection of a privilege. *Id.* at 144.

Courts have recognized a *qualified* journalists' privilege. *See generally Branzburg v. Hayes*, 408 U.S. 665 (1972) (holding that a journalist does not have an absolute privilege under the First Amendment to refuse to appear and testify before a grand jury to answer questions relevant to an investigation); *see also In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982). The privilege can always be overcome on a sufficient showing; how demanding a showing is required depends on whether the information is "confidential." *Compare, e.g.*, *United States v. Cutler*, 6 F.3d 67, 71 (2d Cir. 1993) (to overcome qualified journalists' privilege, information from a confidential source must be "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources"), *with, e.g.*, *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999) (where "the protection of confidential sources is not involved…the privilege is narrower," and "more easily overcome," namely by showing "likely relevance to a significant issue in the case" and that the materials "are not reasonably obtainable from other available sources").

Where, as here, a party in a criminal case seeks a reporter's testimony to confirm statements that were made on the record and published, the lesser showing "required by *Gonzales*" applies. *United States v. Treacy*, 639 F.3d 32, 43 (2d Cir. 2011). "[C]ourts in this and other circuits routinely permit journalists to testify at trial where, as here, they are called solely to confirm statements that were made in a published newspaper article." *United States v. Treacy*, 603 F. Supp. 2d 670, 672 (S.D.N.Y. 2009) (collecting cases), *aff'd* 639 F.3d 32; *accord United States v. Markiewicz*, 732 F. Supp. 316, 317 (N.D.N.Y. 1990) (denying motion to quash where subpoenas

---

[5] As noted in the Motion, *The New Yorker* also offered to provide the Government with an affidavit as to the authenticity of the statements quoted in the Article. Unfortunately, as the Government explained to counsel for *The New Yorker* in pre-filing discussions, such an affidavit would be insufficient because, without a stipulation between the parties, only live testimony would satisfy the defendant's right under the Confrontation Clause to cross-examine Mr. Lach.

3

"merely [sought] to have the reporters testify that the defendants made the statements reported in the newspapers"); *S.E.C. v. Seahawk Deep Ocean Tech., Inc.*, 166 F.R.D. 268, 269 (D. Conn. 1996) (denying motion to quash subpoena that had been issued "for only one purpose: to ask [the reporter] to verify that one of the defendants . . . in fact made the statements [the reporter] attributed to him in a published newspaper article").

### B. Discussion

Mr. Lach contends that the Subpoena fails the "likely relevance" test because: (1) the Quoted Statements are "ambiguous" as to the nature of the defendant's relationship with Mayor Adams; (2) given the Government's position that the defendant has lied in other public statements, "it is all the more likely" that the Quoted Statements are also false and therefore not probative; (3) the Quoted Statements lack relevance to claims made to Victim-2 "seven months earlier," because they were made after the defendant knew he was under investigation; and (4) the Quoted Statements are "duplicative and cumulative" of other evidence of the defendant's intent to defraud. (*See* Mot. at 4-5). These arguments fail under the facts and the law.

To begin, the Subpoena is narrowly tailored to seek only non-confidential, published information. Because the Subpoena does not seek testimony concerning confidential sources or other confidential information, the "qualified privilege protecting" journalists "from the compelled disclosure of even nonconfidential materials" is more easily overcome in this case. *Treacy*, 639 F.3d at 42. Where, as here, the Government seeks testimony in a criminal case confirming the authenticity of statements that have already been published, the testimony need only be "of *likely relevance* to a significant issue in the case," and "*not reasonably obtainable* from other available sources." *Gonzales*, 194 F.3d at 36 (emphases added). As described below, the Government can readily make the required showing here, so there is no basis to quash the Subpoena.[6]

*First*, the testimony sought pursuant to the Subpoena is "likely relevan[t]" to a key issue underlying Count Two, namely, whether the defendant intended to defraud Victim-2 when he claimed to be able to obtain real-estate-related meetings and favors from Mayor Adams. Intent to defraud is an "essential element" of Count Two, as reflected in the Court's Preliminary Charge. As such, the Government bears the burden of establishing beyond a reasonable doubt that the defendant acted with "fraudulent intent and the consequent lack of good faith" in his April and May 2022 dealings with Victim-2. (*See* Court's Prelim. Charge at 5). The Quoted Statements, made in December 2022, are highly probative, direct evidence that the defendant acted with intent to defraud when he told Victim-2—just months before—that he could obtain favors from Mayor Adams, or was meeting with Mayor Adams, relating to real-estate business. Indeed, the Quoted Statements amount to blanket admissions by the defendant that he and the Mayor never discussed real estate; that they never did real estate or other business transactions; and that they never shared anything other than a mentor-mentee relationship.

---

[6] Mr. Lach also complains that the Subpoena violates DOJ policy. (Mot. at 2). But the regulation he cites makes clear that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States." *See* 28 C.F.R. § 50.10(t). In any event, the Government has complied with DOJ policy.

4

While such statements might be *even stronger* evidence if they were made in April or May 2022, the "likely relevance" standard is easily met here. Contrary to Mr. Lach's contention, that the Quoted Statements were made after the defendant became aware that he was under investigation does not negate their relevance. While the defendant may have believed that revealing the truth of his relationship with Mayor Adams to Mr. Lach would be in his best interest based on his then-understanding of the Government's investigation, he did so *before* understanding the Government's charging theory and *before* learning in discovery that his conversations with Victim-2 were recorded. The fact that the defendant made the Quoted Statements at any time after his dealings with Victim-2, and before he could tailor those statements to the specific charges and evidence against him, has a strong "tendency to make a fact"—*i.e.*, that he knowingly and intentionally lied to Victim-2 about his relationship with Mayor Adams—"more or less probable than it would be without the evidence." *See* Fed. R. Evid. 401 ("Test for Relevant Evidence"). Although the Government has other, circumstantial evidence of the defendant's intent to defraud, the defendant's own words are uniquely strong proof and are not cumulative. In short, the Quoted Statements are, at a minimum, "likely relevan[t]" to a significant issue in this case. *See Treacy*, 639 F.3d at 42-43.

Further, Mr. Lach is simply incorrect in saying that "the Government believes Whitehead's other statements to Lach, published in the very same article, are lies." (*See* Mot. at 2). With the exception of a blanket denial of the allegations in the Indictment that the defendant made to Mr. Lach through counsel, the Government seeks to admit as true *all* of the statements made by the defendant that are quoted in the Article. Mr. Lach is likewise wrong to suggest that the Government's attempt to admit relevant out-of-court statements by the defendant for their truth is somehow undermined by the Government's attempts to preclude the defendant from offering his own hearsay statements. (*See* Mot. at 3). Such efforts are routine and merely reflect the operation of the Federal Rules of Evidence, which make otherwise inadmissible hearsay statements by a defendant admissible when offered against him. *See* Fed. R. Evid. 801(d)(2) (excluding statements by a party opponent from the definition of hearsay).

*Second,* the Quoted Statements cannot be obtained from any other admissible source. As is often the case when a defendant makes on-the-record statements to the press, the reporter is "the only available witness who can adduce this non-cumulative, admissible evidence." *See Treacy*, 639 F.3d at 673. Here, as far as the Government has been able to determine, Mr. Lach and the defendant are the only witnesses to the Quoted Statements. Despite Mr. Lach's suggestion that the need for testimony could simply be resolved if the defendant testified (*see* Mot. at 6), the defendant has an absolute right under the Fifth Amendment against compelled testimony at trial, and certainly will not testify during the Government's case-in-chief. And as explained above, the Government has been unable to secure a stipulation or other admissible evidence in lieu of Mr. Lach's testimony. Mr. Lach's reference to the existence of other evidence of the defendant's intent to defraud generally—rather than authentication of the Quoted Statements specifically—is misplaced. (*See* Mot. at 6). The proper inquiry is whether the information available *from Mr. Lach* could reasonably be obtained elsewhere. *See Treacy*, 603 F. Supp. 2d at 672 ("In considering whether to override a journalist's claim of privilege, courts look to . . . the ability of the subpoenaing party to obtain the information from another source."); *Markiewicz*, 732 F. Supp. at 322 (explaining that "the government cannot obtain the sought after testimony from other sources"). It cannot.

5

*Finally*, under the circumstances here, the mere specter of cross-examination into confidential source information or reporting practices for aspects of the Article not at issue and not otherwise the subject of appropriate cross-examination is not a basis for denying the Subpoena, or for requiring a showing beyond the "likely relevance test." (*See* Mot. at 3-4). The narrow scope of the Subpoena is consistent with *Treacy*, in that it will limit direct examination to authenticating the defendant's Quoted Statements. *See Treacy*, 639 F.3d at 43 ("[B]y restricting the questions the Government could ask on direct examination, the district court protected the privilege, tailoring the questions to the showing of relevance and necessity made by the Government."). Specifically, the Government proposes limiting direct examination to the following essential inquiries: (1) whether in or about December 2022 and January 2023, Mr. Lach was a staff reporter for *The New Yorker*; (2) whether Mr. Lach had on-the-record conversations with the defendant at that time; (3) whether the defendant made statements to Mr. Lach that he subsequently reported in the Article; (4) with respect to each of the Quoted Statements, what specifically did Mr. Lach say to the defendant and what specifically did the defendant say in response; and (5) to the extent described in the Article, the circumstances under which the defendant made the Quoted Statements to Mr. Lach. With the direct examination so limited, cross-examination will naturally be limited as well by the "ordinary rules regarding the scope of direct and relevance, *see* Fed. R. Evid. 611(b)." *Id.* at 44 (once the Government overcomes the qualified journalistic privilege to compel reporter testimony, the defense can cross-examine the reporter "as he would any other witness"). Here, the Government anticipates the Court will limit the scope of cross to: (1) appropriate questions about Mr. Lach's interactions *with the defendant*, and (2) permissible questions regarding Mr. Lach's credibility. So limited, there will be little risk that Mr. Lach will need to answer questions that implicate any sources other than the defendant himself, who provided statements on the record and is therefore not a confidential source. Under those facts, *Treacy* is clearly satisfied, and *Baker*—the case relied upon principally by Mr. Lach—does not require a different result. *See generally Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012) (applying state journalist's shield law in civil case, under which heightened statutory standard was applied to request for non-confidential source information per state law).

Because the Quoted Statements are likely relevant to a significant issue at trial, and cannot be obtained from any other source, and because the testimony will be narrowly tailored to focus on non-confidential information, the Motion to Quash the Subpoena should be denied.

    Respectfully submitted,

    DAMIAN WILLIAMS
    United States Attorney

By: /s/ *Jessica Greenwood*
    Jane Kim / Jessica Greenwood / Derek Wikstrom
    Assistant United States Attorneys
    Tel.: (212) 637-2038 / 1090 / 1085