**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

          v.                                      Case No. 22-CR-692 (LGS)

Lamor Whitehead,

                            Defendant.

-------------------------------------------------------------------- X

## <u>SENTENCING MEMORANDUM ON BEHALF OF LAMOR WHITEHEAD</u>

 

Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
New York, NY 10022
212.939.9539

Attorney for Lamor Whitehead

Dated:  June 3, 2024

To:    Honorable Lorna G. Schoenfeld
       Assistant United States Attorney Jane Kim
       Assistant United States Attorney Jessica Greenwood
       Assistant United States Attorney Derek Wikstrom
       US Probation Officer Simone B. Belgrave

# TABLE OF CONTENTS

I.      RELIEF SOUGHT

II.     INTRODUCTION AND SUMMARY OF CASE

      A.  SUMMARY

         THE PLEA OF GUILTY

III.    ARGUMENT

      A.  SENTENCING PURSUANT TO 18 U.S.C. § 3553(a)

IV.    HISTORY AND CHARACTER OF THE DEFENDANT

V.     SENTENCING REQUEST

VI.    ATTACHED CHARACTER LETTERS

# I.  <u>RELIEF SOUGHT</u>

Defendant Lamor Whitehead, by and through his attorney of record Dawn M. Florio, Esq. pursuant to 18 U.S.C. § 3553(a) hereby respectfully submits this Memorandum requesting the Court sentence Mr. Whitehead to a non-guideline sentence of supervised release, which is justified by the circumstances and factors to be considered, and is sufficient, but not greater, than necessary to comply with the purposes of sentencing.

# II.  <u>INTRODUCTION AND SUMMARY OF THE CASE</u>

This Memorandum is respectfully submitted on behalf of our client, LAMOR WHITEHEAD, who is scheduled for sentencing on June 17, 2024 at 10:00 AM. Provided herein is pertinent background and legal argument for your Honor's consideration in determining the appropriate sentence.

## A.  <u>SUMMARY</u>

Lamor Whitehead was arrested on December 19, 2022 and released on a $500,000 Personal Recognizance Bond. On March 7, 2023 Mr. Whitehead was charged in a five count superseding indictment. Count One of the indictment charged Mr. Whitehead with making material misrepresentations to Victim-1 in order to obtain $90,000 from her in violation of 18 U.S.C. § 1343. Count Two charged Mr. Whitehead with making material misrepresentations to Victim-2 in interstate communications in an attempt to convince Victim-2 to transfer money or property to him in violation of 18 U.S.C. §§ 1343 and 1349. Count Three charged Mr. Whitehead with using threats of force to attempt to obtain $5,000 from a business owned by Victim-2 in violation of 18 U.S.C. § 1951. Count Four charged Mr. Whitehead with stating to federal law enforcement that he only owned one cell phone when he knew that he owned another cellphone in violation of 18 U.S.C. § 1001. Count Five charge Mr. Whitehead with making material misrepresentations through interstate wires in order to attempt to obtain a $250,000 business loan in violation of 18 U.S.C. § 1343.

**Procedural Posture**

The Defendant appeared before the Honorable Katharine H. Parker, Magistrate Judge, and pled not guilty to the superseding indictment S1 on March 17, 2023. On February 26, 2024 a jury trial commenced before the Honorable Lorna G. Schoenfeld, District Judge. The trial concluded on March 11, 2024 with a conviction on all counts. Probation calculated the offense level as 31 and the criminal history category of II. The guideline range at this level is 121 to 151 months' imprisonment. Probation grouped Count One, Two, Four, and Five into Group One, and Count Three into Group Two. Probation recommended a below guidelines sentence of 90 months for Count One, Two, Three, and Five and 60 months for Count Four to run concurrently resulting in a total sentence of 90 months.

## III.    ARGUMENT

### A.    SENTENCING PURSUANT TO 18 U.S.C. § 3553(a):

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Perez, 397 F.3d 103 (2d Cir. 2005), the sentencing court must consider all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Those factors are, in relevant part:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentenced imposed:

    a.  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b.  To afford adequate deterrence to criminal conduct;

    c.  To protect the public from further crimes by the defendant; and

    d.  To provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established for the applicable
category of defendant as set forth in the Guidelines;

(5) Any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentencing disparities among defendants with
similar records who have been found guilty of similar conduct;

(7) The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A sentencing court is permitted to find all the facts appropriate for determining a sentence, whether or not that sentence falls within the Guidelines. See Perez, 397 F.3d at 114-15.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. Pursuant to the Booker remedial opinion, and as further explained in subsequent Supreme Court cases, the sentencing court is to apply the factions as set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." United States v. Kimbrough, 123 S.Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The district court need not presume the Guidelines range is reasonable, and it must make an individualized evaluation of the facts and circumstances before it. In so doing, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. Rita v. United States, 127 S.Ct. 2456, 2465 (2007). The court is "free to make its own reasonable application of the §

3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." <u>Kimbrough</u>, 128 S.Ct. at 577 (Scalia, J., concurring).

In addition the heightened risk to inmates in federal correctional facilities during the COVID-19 pandemic exposed serious problems within our prisons and jails which warrant consideration. In <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2209 (2015) Justice Kennedy, concurring, called for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant. <u>See Id.</u>. In <u>United States v. Mateo</u>, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) the Honorable Victor Marerro, a District Judge in the Southern District of New York, granted a downward departure where the defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case." Judge Marerro also stated that "potential conditions of confinement that a particular defendant is likely to encounter while in custody after sentencing" merit consideration, citing to <u>Koon v. United States</u>, 518 U.S. 81 (1996). <u>See also</u> <u>United States v. Lara</u>, 905 F.2d 599, 601 (2d Cir. 1990) (upholding a downward departure grounded on defendants potential for victimization in prison).

### B. <u>CALCULATION OF GUIDELINE RANGE</u>

The offense level as calculated by Probation is incorrect. The most reasonable calculation of the offense level is laid out below.

As a first matter we do agree with Probation's grouping analysis. Pursuant to U.S.S.G. § 3D1.2(d) Counts One, Two, and Five are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm. Pursuant to U.S.S.G. § 3D1.2(c) Count Four is grouped with Counts One, Two, and Five. Counts One, Two, Four, and Five comprise Group One. Because the Guideline for Count Three is U.S.S.G. § 2B2.3 this guideline is excluded

from being grouped with Counts One, Two, Four, and Five under U.S.S.G. § 3D1.2(d). Therefore Count Three comprises Group Two.

    a.  **Group One**

    **Base Offense Level:** 7 (U.S.S.G. § 2B1.1(a)(1))

    **Specific Offense Characteristics:** +6 as the loss amount is more than $40,000 and less than $95,000 (U.S.S.G. § 2B1.1(b)(1)(d))

    **Adjusted Offense Level (Group One):** 13

    b.  **Group Two**

    **Base Offense Level:** 18 (U.S.S.G. § 2B3.2(a))

    **Adjusted Offense Level (Group Two):** 18

Regarding the grouping analysis units are assigned pursuant to U.S.S.G. § 3D1.4(a), (b), and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

Group Two has one Unit. Group One has one half unit. This results in 1.5 units, which increases the offense level by one point. This results in an offense level of 19. At criminal history category II this results in a guideline range of 33-41 months.

The discrepancy with Probation primarily comes from two main elements: loss amount and the idea of a threat of violence with regards to the attempted extortion charge.

Regarding loss amount Probation calculated the loss amount as follows:

**Fundera:** $250,000.00

**ConnectOne Bank:** $1,000,000.00

**Homebridge Financial Services:** $1,300,000.00

**Bethpage Federal Credit Union:** $500,000.00

**FM Home Loans:** $4,150,000.00

**Victim-1:** $85,000.00

**TOTAL:** $7,285,000.00

The defense disagrees with this loss amount. While the commentary to the Sentencing Guidelines states that the loss is the greater of actual or intended loss this is just the commentary, and at least one Circuit Court, the Third Circuit in United States v. Banks, 55 F.4th 246 (3d Cir. 2022), has held that "loss" most readily means *actual* loss. In this case the actual only loss for which Mr. Whitehead was convicted is the $85,000.00 loss to Victim-1. Additionally it should be noted that, even if the Court were to look to the intended loss, rather than the actual loss, Probation's calculation would still be excessive. Mr. Whitehead was convicted of the conduct related to Victim-1, in Count One, and Fundera, in Count Five. This means that the conduct Mr. Whitehead was actually charged with and convicted of would result in an intended loss of $335,000.00. If the Court uses intended loss it should be that intended loss which was actually in the case. The alleged intended loss to ConnectOne Bank, Homebridge Financial Services, Bethpage Federal Credit Union, and FM Home Loans was uncharged conduct admitted pursuant to the Government's Motions in Limine, not substantive conduct for which Mr. Whitehead was charged. The inclusion of a large amount of uncharged conduct, which the Government did not have to prove beyond a reasonable doubt, increases the loss amount by nearly $7,000,000.00 above that which was actually charged, without providing any of the procedural or due process protections that Mr. Whitehead would have received were they charged at trial. While some courts have upheld such an approach, but see e.g. United States v. Witte, 515 U.S. 389 (1995), the question remains what is consistent with the dictates of Booker, and it's command to impose a sentence sufficient, but not greater than necessary. In this case the use of this

uncharged conduct, and the denial of those protections which would have existed had it been charged, inflates the offense level in an unjust manner that is inconsistent with Mr. Whitehead's rights under the due process clause of the Constitution. As discussed *infra* the current guideline system for economic and white-collar offenses results in an exponential increase in offense level based primarily off of loss or intended loss, rather than the actual culpability of the defendant. This injustice would be exacerbated in this case by the application of the calculations used by Probation. It should be noted that in <u>United States v. Deutsch</u>, 987 F.2d 878 (2d Cir, 1993), which was favorably cited by the Court regarding the calling of Brandon Belmonte (March 5, 2024 Transcript, Page 525, Lines 1-12), the appeals court dealt with a similar issue related to the calculation of the loss amount. In <u>Deutsch</u> the appeals court disagreed with the guideline calculation the district court employed, which resulted in an intended loss amount of $114,000 when in reality the loss was actually $34,000. The flawed analysis employed by the district court totaled up all potentially fraudulent checks in that case, rather than looking to the actual amount of the loss which occurred. A similar analysis to that employed, correct, by the appeals court would result in the above stated loss calculation, at most $335,000.

Regarding the two level enhancement in Group Two Mr. Whitehead should not be given a two point enhancement under U.S.S.G. § 2B3.2(b)(1). This states that the level should be increased by two if the offense "involved an express or implied threat of death, bodily injury, or kidnapping[.]" Mr. Whitehead testified at his trial and stated that he was upset about the fact that his wife's vehicle had not been fixed yet, and was yelling at Mr. Belmonte regarding that. The section of the transcript in the PSR supports this interpretation. Mr. Whitehead is clearly stating that some people think that because he is a bishop they can take advantage of him, and that he refuses to be taken advantage of. The statement "I will hurt you" is clearly in the context of stating that, just because he is a bishop does not mean that he is someone who can be taken advantage of. This is a more general statement, consistent with things in the transcript like "I step to my business," rather than a direct threat of harm to Mr. Belmonte.

This analysis results in an offense level of 19. At criminal history category II this results in a guideline range of 33-41 months.

### C. CRIMINAL HISTORY CATEGORY

The defense concurs that, under the Guidelines, Mr. Whitehead has a criminal history category of II, with three criminal history points from a 2006 Suffolk County case for identity theft. Mr. Whitehead was convicted after a trial, however he has always maintained his innocence, and that he was wrongly convicted. Mr. Whitehead challenged those convictions, as well as the sentencing, on appeal. Mr. Whitehead's sentence was reduced as a result of these appeals, as the court imposed an illegal sentence. This sentence reduction resulted in Mr. Whitehead being released from prison before the rest of his appeals could be completed. Were these appeals to have been completed and successful Mr. Whitehead would have been fully exonerated.

Probation mentions that this case involved as many as 57 victims, however that is not accurate. The case involved less than 10 victims, however there were numerous duplicitous or lesser included counts as to each victim. 23 of those counts were dismissed before trial, and Mr. Whitehead was acquitted on 17 of the remaining 34 counts.

While this conviction is counted for three criminal history points under the Guidelines it should be noted that this case involves conduct that is close to 20 years old, quite remote in time.

### D. SHADOW GUIDELINES

We urge the Court to look towards the American Bar Association's "Shadow Guidelines" in this case, an alternative approach to the guidelines as they relate to financial and white-collar crimes. The current guidelines are unjust, and result in exorbitant guideline calculations. In fact, as stated in Rise of ABA Task Force's 'Shadow Sentencing Guidelines', published in Volume 255, No. 64 of the New York Law Journal, the then chair of the United States

Sentencing Commission, the Honorable Patti B. Saris[1], "effectively conceded… that the guidelines are 'fundamentally broken' in high-loss cases." In this case the loss amount results in an increase of 18 levels. For comparison if a defendant in a kidnapping case "sexually exploited" their victim the offense level would only increase by 6 levels. U.S.S.G. §2A4.1(b)(5). The intended loss amount calculated by probation of $7.285 million is considered more aggravating under the guidelines than a kidnapper who sexually assaults their victim. This issue becomes especially clear in the instant case where the actual loss amount is $85,000.

We would urge this Court to look towards the American Bar Association's approach to sentencing in white collar crimes, what is often called the "Shadow Guidelines,"[2] as the Federal District Court for the Eastern District of New York did in United States v. Faibish, 12-CR-265 (ENV) (E.D.N.Y. Jul. 16, 2015), where the Defendant was convicted after trial of conspiracy to commit bank and securities fraud, bank fraud, and making false statements to the Securities and Exchange Commission[3]. In Faibish the district court stated "considering these alternate models, and applying common sense, the Court finds that a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon Faibish's sentencing range beyond any reasonable proportion to his crimes." At sentencing on March 10, 2016 the Court stated that like "a whole host of judges who have said so publicly and scores of others who have… grumbled about it privately,… the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table." Sentencing Transcript, United States v. Faibish, 12-cr-265 (E.D.N.Y. March 10, 2016) at 23:2-7. The Court continued that "while the

---

[1] Her Honor was chair of the Sentencing Commission from 2010 to 2017, and currently sits as the Chief Judge of the United States District Court for the District of Massachusetts.
[2] These guidelines were developed in 2013 by an ABA task force that included The Honorable Jed S. Rakoff, Senior United States District Judge for the Southern District of New York; The Honorable John Gleeson, then a United States District Judge for the Eastern District of New York, now retired; and The Honorable Gerard Lynch, Senior United States Circuit Judge for the Court of Appeals for the Second Circuit.
[3] In Faibish the loss amount was calculated as $32 million. The Shadow Guidelines have also been applied in other cases, see e.g. United States v. Rivernider, 10-CR-222 (D. Conn. 2013).

current guidelines system does not provide a reasonable way to… try to provide fair and just punishment… the ABA task force guidelines certainly significantly move in that direction." Id. at 23:20-25. Employing an alternative offense level analysis under the ABA task force guidelines the Court calculated an offense level of 26[4] and a sentencing range of 63 to 78 months, which the Court concluded was "fairly reflective of what a court is required to do under Section 3553(a)," and that following the Shadow Guidelines was "what is most reasonable here." Id. at 54:2-3, 10-11. After this calculation the Court sentenced the defendant, who faced a maximum of life in prison under the guidelines, with a statutory maximum of 80 years (960 months), to a sentence of 63 months. Such an approach is warranted here, where the guideline range calculated by Probation calls for a sentence of more than 10 to 14 years in prison on the basis of nearly $7 million in losses which were not part of the charged conduct. Such a result is clearly unjust in this case.

An analysis under the Shadow Guidelines results in the following calculation:

**Base Offense Level:** 7 (U.S.S.G. § 2B1.1(a)(1))

**Specific Offense Characteristics:** +4 as the loss amount is more than $20,000 but less than $100,000 (U.S.S.G. § 2B1.1(b)(1)(d))

**Specific Offense Characteristics:** +0 for Moderate Culpability as the culpability is covered by the loss amount

**Specific Offense Characteristics:** +2 levels for Low Victim Impact, as the harm to the victim is covered by the loss amount and restitution

**Adjusted Offense Level (Group One):** 13

Under the Shadow Guidelines this would result in an guideline range for Group One of 15-21 months.

---

[4] Calculated at a base offense level 7, adding 12 levels for loss, 3 levels for a victim enhancement, and 4 levels for culpability, resulting in an offense level of 26

## IV. HISTORY AND CHARACTER OF THE DEFENDANT

LAMOR WHITEHEAD is 46 years old and was born in Brooklyn, New York. He has completed his high school diploma and some college. Mr. Whitehead has additionally completed his studies in theology and is an ordained pastor. In 2022 Mr. Whitehead received two honorary Doctor of Philosophy (Ph.D.) degrees, one in Theological Studies and one in Business/Management/Real Estate, from Harvest Christian University. Mr. Whitehead is legally married to Asia Whitehead, and has three biological children, in addition to helping raise Mrs. Whitehead's daughter from a prior marriage. Prior to his incarceration Mr. Whitehead was the Presiding Bishop of Leaders of Tomorrow International Ministry in Brooklyn, New York, and holds the rank of Chief Apostle.

Lamor Whitehead was born to Arthur Miller and Faith Patricia Whitehead in 1978. Faith Whitehead is 73 years old and lives in New Jersey. She is retired, and previously worked for the New York City Department of Education as a school bus driver and administrative staff. Arthur Miller owned a construction company and worked as a community activist until he was tragically killed by the New York City Police Department (NYPD) in June of 1978, when Lamor Whitehead was just six weeks old[5]. Reports from the time stated that Arthur Miller was attacked and beaten by 16 police officers, one of whom choked him to death with a nightstick. Arthur Miller was a beloved activist in his community who had founded the Four Block Association, a group that received a federal grant to hire local residents as a trained neighborhood watch. Current New York City Mayor Eric Adams stated in 2020 that "Mr. Millers death really started a tidal wave of energy around Black activism." In 2014 then Brooklyn Borough President Eric Adams declared an "Arthur Miller Day" in Brooklyn to celebrate Mr. Whitehead's father and his works in the community. It should be noted that, statistically, when Lamor Whitehead lost his father he became 279% more likely to carry a gun and twice as likely to end up in prison[6].

---

[5] A father was choked to death by the NYPD 42 years ago. His family never recovered. John Sarlin, CNN, June 21, 2020. https://www.cnn.com/2020/06/21/us/arthur-miller-death-nypd/index.html

[6] Harper C, McLanahan SS. (2004) Father Absence and Youth Incarceration. Journal of Research on Adolescence.; Allen, A. N., & Lo, C. C. (2012). Drugs, guns, and disadvantaged youths: Co-occurring behavior and the code of the street. Crime & Delinquency, 58(6), 932-953.

Lamor Whitehead has three maternal half-siblings. Chrisone Anderson, age 56, resides in New Jersey and is a registered nurse. Derrick Whitehead, age 40, resides in Springfield and owns a juice bar. Dwayne Whitehead died in 1981 at the age of 10 when he was crushed by a truck while playing in a junkyard. Mr. Whitehead has a number of paternal half-siblings.

Lamor Whitehead has two children from a prior relationship with Ieshah Mapp. Jaidyn L. Whitehead is 16 years old and is a high school student on the varsity basketball team. Soriah Whitehead is nine years old and is a student, she is additionally enrolled in dance school.

In 2019 Lamor Whitehead married Asia Whitehead (nee Dosreis), they have one child together, two year old Brook-Lynn Whitehead. Additionally Mr. Whitehead helps raise Mrs. Whitehead's child from a prior relationship, 16 year old Heaven Dosreis. Heaven has graduated early from high school and plans on going to college. This case comes at a time in his children's social and emotional development where they are particularly in need of their father.

Lamor Whitehead grew up in a poor household in Crown Heights, a rough neighborhood. Without his father Lamor's mother did the best that she could to support the family, but they needed public assistance programs and food stamps just to get by. Lamor Whitehead's neighborhood was quite rough when he was growing up. Even from a young age it was common to see violence and crime occurring around you. Lamor Whitehead's maternal grandmother, Mary Whitehead, was an integral part of his upbringing. Lamor's grandmother, who he described as his best friend, passed away in December of 2023 at the age of 108. Lamor's uncles, Robert Whitehead and Lavelle Cochran were important figures in his life. Both military veterans they did their best to instill a sense of discipline, and to fill the void left by his father's tragic and senseless murder at the hands of the NYPD.

While Lamor Whitehead never got to know his father he did inherit his love for Brooklyn and his community, organizing outreach efforts through his church. Mr. Whitehead was one of the

first faith leaders to become involved with the NYPD's Ceasefire program[7], which seeks to reach out to individuals at high risk of being the victims or perpetrators of violence to help keep young New Yorkers safe, while avoiding criminal charges. Also known as a Group Violence Intervention (GVI) program Ceasefire is an evidence based approach to reducing violence. A core part of that approach is community members with moral authority delivering a credible message against violence through face to face meetings. Individuals such as Mr. Whitehead are essential to the three-pronged approach Ceasefire uses, and to the reductions in violence that have followed the implementation of these programs. Mr. Whitehead worked with Ceasefire throughout Brooklyn including in the 75, 77, 79 precincts, Police Service Area (PSA) 2, PSA 3, Bushwick, and the Marcy Projects to help keep Brooklyn and Brooklynites safe. He additionally has worked on gun buyback programs, and numerous other community initiatives. These include the 2014 A Night of Worship to Save Our Youth rally at Barclays Center; the Before and After Makers for Teens and Domestic Violence Victims; and Battered 2 Beautiful, a domestic violence survivors event hosted at Brooklyn Borough Hall with then Brooklyn Borough President Eric Adams[8].

In September of 2023 Mr. Whitehead and his church spent $25,000 on buying school supplies for less fortunate children. Around Thanksgiving of 2022 Mr. Whitehead and his church helped those in need in the Bronx, going to a grocery store in a poor area and paying for everyone's Thanksgiving dinner meal, donating over $20,000. Mr. Whitehead and his church have done similar acts on prior Thanksgivings, doing turkey giveaways so everyone can have a turkey dinner on Thanksgiving, and around Christmas, buying toys for poor children so that they can wake up to a present from Santa Claus under the tree on Christmas morning. Videos on YouTube and Facebook document a number of these events including the 2014 Toy Giveaway at PS 191[9], the 2022 Back to School Giveaway at

---

[7] https://nnscommunities.org/strategies/group-violence-intervention/;
https://www.nyc.gov/site/nypd/bureaus/administrative/collaborative-policing.page
[8] A list of those awards and events, along with copies of them, was provided to Probation.
[9] https://www.youtube.com/watch?v=4U6HrtEs-g4

Cookies[10], the 2013 Leaders of Tomorrow Turkey Giveaway[11], his speech at Battered to Beautiful[12], and more.

Lamor Whitehead has additionally created a number of initiatives to offer children mentoring opportunities and the ability to look at potential future employment. He began one initiative that partnered with restaurants to help children by teaching them to cook once Home Economics courses were removed from most school curriculums. He began another with the NYPD to help children foster positive relationships with police and end the cycle of violence. Yet another was done with hospitals to allow children to shadow medical professionals and doctors to help inspire them to pursue careers in medicine. Another brought kids to tapings of the Black Entertainment Television (BET) Network show 106 & Park, a music show, to allow children to be exposed to the opportunities that can exist in the entertainment industry as well.

Lamor Whitehead graduated from Sheepshead Bay High School, where he was a star point guard on the basketball team. After graduating high school Mr. Whitehead attended Shaw University in Raleigh, North Carolina on a basketball scholarship. Shaw University was the second Historically Black College and University (HBCU) established in the southern United States. In 1998 Mr. Whitehead transferred to Eastern New Mexico University (ENMU) in Portales, New Mexico, also on a basketball scholarship. Mr. Whitehead left ENMU when he injured his knee and transferred to Farmingdale State College in New York, again on a basketball scholarship. Mr. Whitehead ceased his studies at Farmingdale after an on campus incident where he was attacked with a knife, suffering serious injuries.

While incarcerated on a case out of Suffolk County[13] Mr. Whitehead, who had always been a man of faith, dedicated his life to being a man of God, completing the Rising Hope Theology

---

[10] https://www.facebook.com/BishopLMWhitehead/videos/the-give-back-chief-apostle-the-right-reverend-dr-lamor-m-whitehead-shut-down-co/434550135215268/?mibextid=WC7FNe&rdid=gphZvXJvk80IbcAn
[11] https://www.youtube.com/watch?v=p-PXFhxW0BY
[12] https://www.youtube.com/watch?v=ZLKHjKt1rVY
[13] Mr. Whitehead has insisted that those convictions were erroneous, and challenged them in court. The sentence for that matter was modified as a result of a successful appeal, resulting in Mr. Whitehead being released before the appellate process could finish. Additionally New York State's "Clean Slate Act," which became law last year, will likely result in the automatic sealing of this conviction when that act goes into effect in November of this year.

Seminary. When he was released Mr. Whitehead founded the Leaders of Tomorrow International Ministry, with the goal of building a modern church community that helps to do good works in the community. Leaders of Tomorrow International Ministry seeks to bridge the gap between the church, youth, politics, and the justice system. Numerous judges in Manhattan and Brooklyn have allowed individuals who had community service as a part of a sentence or diversionary program to complete that community service with Mr. Whitehead's church to avoid jail time. Mr. Whitehead has additionally donated his money and time to a number of homeless and battered women's shelters throughout Brooklyn and has had his church conduct outreach and charity programs at those shelters. Mr. Whitehead additionally gained enough signatures to get on the ballot in the 2021 primary for Brooklyn Borough President.

Lamor Whitehead is a licensed New York State Chaplain and certified marriage and funeral officiant. He was first ordained as a minister in 2006 by Bishop Albert Jamison of Pleasant Grove Baptist Church. In 2014 Mr. Whitehead was ordained as a Pastor and Bishop. Mr. Whitehead founded his church, Leaders of Tomorrow International Ministry, in 2013 with a group of 43 people who were meeting for a bible study. Mr. Whitehead felt that he had the ability to help people obtain spiritual liberty, educational development, and economic awareness while pursuing positive changes in their life. Mr. Whitehead focuses on helping his congregants empower themselves.

Mr. Whitehead helped with numerous stop the violence initiatives, initiatives for at risk youth, and other community improvement efforts. Through this work Mr. Whitehead has received a number of awards and citations. These include a Certificate of Ordination, Certificate of Marriage Officiant Registration, Certificate of Ordination as an Elder of the Gospel of Jesus Christ, a certificate granting him the rank of Presiding Bishop, and another granting him the rank of Chief Apostle. Mr. Whitehead also received numerous citations for his good works in the community from state legislators, state senators, city council members, Mayor Eric Adams, and more.

The letters of character included with this motion illustrate that Lamor Whitehead is a valued member of his community who poses no risk to the community, nor appreciable risk of re-offending.

Yvette Brignol, a member of Mr. Whitehead's congregation, speaks about how Mr. Whitehead's sermons have helped her deal with Post Traumatic Stress Disorder (PTSD) that Ms. Brignol has suffered since being injured while working as a rescue worker on September 11th. Aneesha Glanton Ross, a long-time friend, states that Lamor Whitehead is a kind and helpful human being with a heart of gold, who would give you the clothes off his back. Jules Marles, a member of the congregation, states that Mr. Whitehead is a well-mannered gentleman who has worked to do good works in his community. Mack and Texeria Jackson state that Lamor Whitehead is reliable, generous, compassionate, trustworthy, kind, and, above all, a person of integrity. They speak of how Lamor Whitehead was there for them when Ms. Jackson had to undergo an emergency radical nephrectomy (kidney removal) for kidney cancer. E. Angel Crawford says that Lamor Whitehead is a man of exceptional character with an unwavering dedication to his community. Chantelle Wilson, a pastor at Mr. Whitehead's church, speaks about how Lamor Whitehead has constantly displayed qualities like positive energy, honesty, kindness, and a strong work ethic, and how he is always willing to help those in need. Vaughn Bruton speaks of how Lamor Whitehead is dedicated to giving back to his community.

Gaelle Ladouceur speaks about how Lamor Whitehead helped her when she was in need, giving her money for groceries when the fridge was empty and helped her when she was in an abusive relationship. Erin Gannie states that Lamor Whitehead is a truthful and trustworthy man of integrity and honor. Stoldia Ducrepin states that Lamor Whitehead, whom she has known for more than 25 years, is a leader who cares about his community and has worked tirelessly to help his community, from organizing food drives to youth mentorship programs, to initiatives to support the homeless.

Bishop Darryl L. Hill, Senior Pastor of The Power House Church, states that Lamor Whitehead is a man of great moral character who has demonstrated unwavering integrity, compassion, and dedication to serving his community.

## A. History of Drug Abuse, Mental Health Issues, Physical Condition

Lamor Whitehead has no history of substance use or abuse. He was a star athlete when younger, and did not want to take any substances that could cloud his mind or impact his play.

Mr. Whitehead has reported mental health struggles in the past. The instant case has been a significant stressor. Additionally Mr. Whitehead likely has Post Traumatic Stress Disorder (PTSD) as a result of being robbed at gunpoint on a livestream.

On July 24, 2022 three armed individuals, Say-Quan Pollack, Juwan Anderson, and Shamar Leggette[14], broke into Mr. Whitehead's church in Brooklyn during a service which was being livestreamed. During this livestream, broadcast worldwide, these three individuals robbed Mr. Whitehead and his wife at gunpoint. They pointed a gun in the face of Mrs. Whitehead and the Whiteheads' daughter, who was only eight months old at the time. After this incident Mr. Whitehead and his family received threats on social media. Approximately one month later an unknown individual actually came to Mr. Whitehead's home and attempted to enter the home. Shortly thereafter Mrs. Whitehead moved herself and the children out of the home as, in the wake of the robbery, the threats, and this individual trying to break in, Mrs. Whitehead felt unsafe. This incident has caused significant distress to Mr. Whitehead.

Additionally Mr. Whitehead was recommended to counseling as a child due to issues related to the death of his father, Arthur Miller, who was killed by the NYPD in June of 1978, just weeks after Mr. Whitehead was born.

Mr. Whitehead has a scar from his neck to his abdomen as a result of being cut when an individual attacked him when he attended Farmingdale State College. The slash required 100 stitches.

---

[14] Mr. Pollack has pled guilty and is awaiting sentencing. Mr. Andersons' case remains pending. Mr. Leggette was killed in late January in a shootout with Federal Marshalls who were attempting to arrest him.

# V. HARSH CONDITIONS AT MDC

Under 18 U.S.C. 3553(a), the District Court can consider harsh conditions of the Defendant's pre-trial confinement which may merit mitigation. Numerous District Courts have agreed that the Metropolitan Detention Center ("MDC") is a facility which is harsh and inhumane and this warrants consideration for mitigation. The conditions in the MDC are shocking and unacceptable.

The Second Circuit has held that "pre-sentencing confinement conditions may in appropriate cases be a permissible basis for a downward departure." See, United States v. Francis, 129 F. Supp. 2d 612 (S.D.N.Y. 2001) (departing one level because of harsh conditions of pre-trial confinement). Likewise, District Courts have mitigated or departed downward on the grounds of the harsh conditions of the MDC, and previously MCC, while awaiting trial or sentencing. See, United States v. Mendola, S2 03 Cr. 449. (the Court took into consideration the harsh conditions of Mendola's confinement at MCC and departed from the recommended sentence by 10 months.) See also, United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); United States v. Hernandez-Santiago, 92 F. 3d 97, 101 (2nd Cir. 1996) (the court departed three levels based on 22 months of harsh confinement in the facility); United States v. Lara, 905 F.2nd 599 (2nd Cir. 1990) (the district court departed from a guideline of 121 – 151 months, imposing the minimum sentence of 60 months. This decision relied in part, on consideration of the defendant's harsh confinement while awaiting trial and sentencing. See e.g. United States v. Carty, 264 F.3d 191 (2d Cir. 2001) (holding, per curium, that abnormally harsh presentence conditions can be grounds for a downward departure), United States v. Mateo, 299 F.Supp.2d 20l (S.D.N.Y. 2004) (downward departure of nine levels where denial of medical attention and sexual harassment of a female inmate "inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration proscribed by the Guidelines"); United States v. Speed Joyeros, 5.A., 204 F. Supp. 2d 412, 441

(E.D.N.Y 2002) (Judge Weinstein downwardly departing because of, inter alia, "the physical deterioration of the defendant" while in pretrial custody).

The Supreme Court recognized that because pre-trial confinement is an administrative, as opposed to judicial form of detention, the confinement must not rise to the level of punishment or otherwise violate the constitutional rights of those detained. See, Bell v. Wolfish, 441 U.S. 520, 537 (1979). Judge Weinstein of the Eastern District observed, "[t]he inevitable consequences of pre-trial incarceration, particularly when prolonged beyond a short period, are undeniably severe." See, United States v. Gallo, 653 F Supp.2d 320 (E.D.N.Y. 1986).

In Gaston v. Coughlin, 249 F.3d 156, 164-165 (2nd Cir. 2001), the Second Circuit held that rodent infested units and the presence of human waste in and around cells can constitute cruel and unusual punishment. Former Eastern District of New York Chief Judge Jack Weinstein also determined that inhumane conditions and lengthy pre-sentence detention conditions can violate due process. The unusually harsh conditions at MDC deprive pre-trial inmates of their constitutional rights and have not kept up with contemporary standards of decency. They represent substantially harsher conditions from those the Defendant would have experienced if he had been designated to a federal prison camp or low security prison. In other words, during the period that the Defendant has been incarcerated, he has been punished more than a similarly situated offender who serves the same time of detention at a minimum-security prison.

These conditions were highlighted in 2021 by the former Chief Judge of the Southern District of New York, the Honorable Judge Colleen McMahon[15]. According to a transcript of the April 29th, 2021 sentencing in United States v. Days, 19-CR-00619 obtained by the Washington Post and New York Daily News Judge McMahon stated that there is "no excuse for the conditions" in the MDC and MCC and that the "treatment of… prisoners, the inmates, in the last 14 months have been nothing short, in my opinion, of inhumane, cruel and harsh, and unreasonably unjust."[16] Judge McMahon

---

[15] Judge McMahon stepped down as Chief Judge when she took senior status on April 10, 2021.
[16] Shayna Jacobs, Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions (May 7, 2021) https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-

called the conditions "as disgusting [and] inhuman as anything I've heard about [in] any Columbian prison."[17] Judge McMahon continued saying "[t]he single thing in the five years that I was Chief Judge of this court that made me the craziest was my complete and utter inability to do anything meaningful about the conditions at the MCC… and the MDC, two federal correctional facilities located in the City of New York that are run by morons."[18]

In May of 2021 the New York Post reported on a sentencing before the Honorable Judge J. Paul Oetken wherein Judge Oetken likewise highlighted the brutal and inhumane conditions at these facilities, stating that the conditions were "extraordinarily harsh" and that the frequent lockdowns impose conditions that are "basically like solitary confinement." Inmates have limited programming, next to no family visits, and severely limited ability to meet with lawyers. Judge Oetekn further stated that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served… [s]o I think having served 24 months is equivalent to having served three years."[19] In the time that Mr. Whitehead has been incarcerated at the MDC the facility has been on lockdown for the overwhelming majority of his time there. In <u>United States v. Chavez</u>, 22-CR-303-JMF (S.D.N.Y.), Dkt. 31, Judge Furman issued a 19 page opinion calling out the terrible conditions in this facility. Judge Furman specifically highlighted constant lockdowns which are tantamount to solitary confinement, ignored medical orders, and inhumane housing which exposes inmates to visible mold, contaminated drinking water, and vermin infestation.

Simply put the conditions that Lamor Whitehead has experienced since being remanded are unacceptable at even the best of times. The conditions that Mr. Whitehead and other inmates have described are deplorable, unacceptable, and shocking to the conscience.

---

acd3-24b44a57093a_story.html; IN HER OWN WORDS: Federal Judge slams 'morons' running NYC Federal Jails (May 7, 2021) https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html
[17] *Id.*
[18] *Id.*
[19] Stephen Rex Brown, NYC federal jail is so bad inmates get 'time and a half': Judge (May 24, 2021) https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html

The MDC is frequently on lockdown, sometimes for more than a week at a time. On these occasions inmates are confined to a 6 foot by 10 foot cell with another individual for up for 24 hours a day. On weekends inmates are frequently unable to leave their cells at all due to understaffing. These issues have persisted since Mr. Whitehead arrived at the MDC. He was locked down for four consecutive days almost immediately upon his arrival at the facility, and unable to call anyone to coordinate getting his affairs in order.

The MDC is dirty and inmates live in squalor. Due to the frequent lockdowns, and the fact that the facility is overcrowded, social distancing is impossible if an inmate gets sick. During the fall and winter it is cold in the facility and inmates are not given sufficiently warm clothing or blankets. Mr. Whitehead has not been provided a mattress.

There is a lack of structure in the religious services department. There is a denial of religious services and inmates are often unable to attend services due to understaffing. Mr. Whitehead has been denied religious services, as have numerous inmates, and the Chaplin states that there are, in essence, no religious services in the MDC at this time.

The medical department is understaffed and those staff are not properly trained. It can take an inmate more than one month to see medical staff after making a "sick call," if they see medical staff at all. Most sick calls are dismissed with minimal inquiry. The dental department is understaffed and improperly trained. Dental calls can take months to be answered.

There is a lack of programs and educational opportunities within the MDC. The maximum level of security is imposed on pre-trial detainees.

In addition, the facility and its conditions are shocking and unsanitary. In the MDC there is no washing machine or dryer readily available. Inmates may only wash their clothes and exchange bedding once per week. Inmates have reported that during the lockdowns inmates have sometimes had to go weeks without being able to do laundry, as a result they must wear dirty underwear and sleep on dirty bedding. Computer terminals are rarely cleaned. Due to limited cleaning supply access, inmates are constantly in danger of transmitting diseases in shared areas. There are mice and rodents

in and around inmates' property. Rodents climb over inmates' clothing, belongings, and food often leaving feces. Cockroaches and other vermin infest the facility, food is frequently swarmed by flies, and inmates have reported finding cockroaches in their food. The food served to inmates is often expired, many times far past the expiration date. Recently the New York Daily News reported that food being served to inmates was often infested with maggots[20]. In the weeks that Mr. Whitehead has been in the MDC he has already lost over five pounds due to a lack of unspoiled and edible food.

The sinks in most of the cells are broken. Toilets expel water onto the floor, leaving a foul odor and spreading bacteria. Toilets which are broken often remain unrepaired for substantial periods of time. Water is often shut off for hours at a time while inmates are locked in their cells; as a result, inmates cannot take a shower or wash their hands. Toilets frequently do not flush, requiring inmates to cover toilets with a towel to block the smell of urine and feces. When they do flush they may only flush twice every 45 minutes, which often requires inmates to deal with the smell of urine and feces even when toilets are working.

There have been numerous days where toilets were unusable due to plumbing issues. At times when the water is turned off inmates have been forced to urinate or defecate in buckets and bags. Cells have a contaminated odor of human waste and sewage; the odor causes nausea, discomfort, and vomiting. This odor makes it difficult for inmates to peacefully rest.

Showers are consistently without regulators and/or showerheads. Floors in the showers are damaged; they have sharp edges and mold. Shower curtains are rarely replaced or washed, and are usually torn and covered in mildew. Tattered shower curtains allow water to splash on the floor outside the showers causing the floors within to be slippery and dangerous. Water temperature is generally uncontrollable, on occasion exceeding 170 degrees Fahrenheit; these excessive temperatures have caused burns on several occasions.

---

[20] John Annese, Maggot-infested meals being served to inmates at Brooklyn federal jail, lawyers say (March 30, 2024) https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/

There is a lack of cleaning and hygiene supplies. Inmates are forced to purchase bars of soap to wash their hands. Toilet paper is supposed to be issued once a week, but there have been instances where weeks have gone by without the issuance of toilet paper. Cleaning supplies are rarely issued for in-cell use, and those that are issued are of poor quality. Spray bottles are rarely operable and cleaning solutions appear to be diluted. Gloves are not provided for cleaning the bathrooms, forcing inmates attempting to maintain a clean living environment to touch human waste with bare hands. Spills and flooding are cleaned up with blankets and jumpsuits that staff then require inmates to use.

There are no means of ventilation in the bathrooms. Due to this lack of ventilation, condensation builds up on the ceiling and drops down onto the clothes and inmates alike. The MDC has ineffective and damaged ventilation and duct systems, limiting free flow of clean air. Vent covers are caked with dust and grime. Dust frequently falls onto inmates and their food when in common areas. Poor ventilation significantly increases the transmissibility of respiratory viruses such as COVID-19.

Barbers do not have proper training and practice unsanitary work habits. Inmates have complained of being cut while receiving haircuts, and that barbers leave blood and skin particles between clippers and blades.

Living conditions in the MDC are unsafe and unacceptable. Cells housing two inmates on a more than temporary basis measure a mere 44 sq. ft.. Elevators are unstable and constantly in need of repair. Electrical outlets and wiring are damaged or nonfunctional. Inmates are afforded only one light, and a thin blanket even on the coldest of days or when the air conditioning (AC) is on full blast.

Likewise, there are issues with staff and staffing. During the morning and afternoon hours there have been occasions where just one Corrections Officer is responsible for 96 inmates. It is reported that counselors knowingly allow bullying and harassment within the population. Correctional Officers make vulgar comments, including the use of racial slurs, fostering an unsafe and volatile environment. In November of 2023, as Judge Furman stated in Chavez, it appeared that the facility was only at 55% of its full staffing level. There is no duress alarm system in areas without

consistent staff coverage in violation of Policy Statement 1600.06. Almost as soon as Mr. Whitehead entered the facility it went on lockdown as a loaded and operable firearm was found in an inmates cell. Such an incident shows that the staff are either incompetent or complicit in the introduction of dangerous contraband, including weapons and drugs, into the facility.

Counsel believes that these facts regarding the shocking and inhumane conditions at the MDC warrant mitigation. On these grounds, it is respectfully requested that the defendant's harsh pre-sentence confinement be taken into consideration pursuant to 18 U.S.C. 3553(a). It has been reported that the MDC failed a recent inspection. The conditions of confinement warrant mitigation and create extraordinary circumstances such that Mr. Whitehead be granted release pending appeal.

### A. Motion for Bail Pending Appeal

The Defendant additionally moves, separately but as part of this filing, for bail pending appeal. 18 U.S.C. § 3143(b) states that a person who had been found guilty and sentenced to a term of prison shall be detained unless there is clear and convincing evidence that person is not likely to flee or pose a danger to the safety of any other person or the community, that the appeal is not for the purpose of delay and raises a "substantial question" of law or fact likely to be successful. This is excepting those who have been found guilty of a violent offense, which the Court determined that Mr. Whitehead was here. However the conditions of confinement, see also Chavez, are extraordinary reasons which warrant release.

There are such "substantial question[s]" here. In United States v. Randell, 761 F.2d 122, 134 (2d Cir. 1985) the Second Circuit stated that the phrase "a substantial question of law or fact likely to result in reversal or an order for a new trial" "cannot reasonably be construed to require the district court to predict the probability of reversal…. Instead, the language must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal." Id., citing United States v. Miller, 753 F.2d 19, 23-24 (3d Cir. 1985). In essence the question is not how likely the appeal is to result in reversal or a new trial, but if the appeal was resolved in the appellant's favor if there would likely be a reversal or a new trial. "In short, under the Second Circuit's ruling, the defense

must show a question that is more than merely nonfrivolous, but need not rise to the level of establishing likelihood of success." Bail Pending Appeal in the Second Circuit, Evan T. Barr, New York Law Journal, April 16, 2012[21]. Such a substantial question exists here. If, for example, any of the matters raised in the Rule 33 motion filed by the defense were to be resolved in Mr. Whitehead's favor then it is likely that a new trial would be ordered, as that relief specifically was sought. For example if an appeals court were to determine that Mr. Whitehead should have been able to call Mr. Belmonte there is a substantial likelihood that a new trial would be ordered.

Therefore, combined with the conditions in the MDC, Mr. Whitehead is a candidate for release pending appeal, and should be granted release pending appeal.

## VI. SENTENCING REQUEST

Based on all the factors set forth above, I ask that the Court sentence Lamor Whitehead to a sentence of supervised release. While below the recommendation of Probation this sentence is appropriate given the history and character of the Defendant as well as the nature and circumstances of the offense.

a. Nature and Circumstances of the Offense, History and Character of the Defendant

18 U.S.C. § 3553(a)(1) states that the court shall consider the nature and circumstances of the offense as well as the history and character of the defendant. These factors warrant mitigation. Mr. Whitehead has been a pillar of his community for years through his work with his church and his charitable works in the community. Lamor Whitehead's prior criminal record consists of convictions from almost 20 years ago, the majority of which receive zero criminal history points due to their age. Lamor Whitehead poses no serious risk of re-offending.

---

[21]
https://www.friedfrank.com/uploads/siteFiles/Publications/Bail%20Pending%20Appeal%20in%20the%20Second%20Circuit.pdf

Additionally the significant media attention in this case shows that the requested sentence is appropriate. The first thing anyone sees when they look up Mr. Whitehead's name is press about this case. This renders Mr. Whitehead essentially incapable of working in any kind of public facing or investing role, depriving him of a source of income which he had for close to 20 years. This case will follow Mr. Whitehead forever in a way which a case without such press attention would not.

    b. <u>Seriousness of Offense Conduct, Promotion of Respect for Law, Provision of Just Punishment</u>

18 U.S.C. § 3553(a)(2)(A) states that a sentence imposed shall reflect the seriousness of the offense conduct, promote respect for the law, and provide just punishment. While below the guideline range the requested sentence is far from trivial. As discussed *supra* the guideline range is driven by a loss amount far beyond the actual loss in this case. Additionally the requested sentence is appropriate given the media around this case. No individual would look at the situation Mr. Whitehead finds himself in, including having his public image decimated in the press, as anything less than severe. The requested sentence would be a just punishment for Mr. Whitehead, which in turn promotes respect for the law. The exercise of mercy, when warranted as it is in this case, is core to the law being viewed as an instrument worthy of respect.

Additionally, were Mr. Whitehead to reoffend, he would be subject to a violation of supervised release proceeding which could result in significant prison time. This is a significant sentence, especially combined with the restrictive conditions of supervised release. These conditions include that Mr. Whitehead be unable to incur new credit charges or open lines of credit without permission, as well as submitting himself, any property, papers, or electronic device or communications to a search at essentially any time.

    c. <u>Affording Adequate Deterrence to Criminal Conduct</u>

Under 18 U.S.C. § 3553(a)(2)(B) a sentence must provide adequate deterrence to criminal conduct. Mr. Whitehead desires to use this trying time to better himself and find a

way to move forward through this trying time. This understanding and desire shows that a sentence of supervised release does provide adequate deterrence. The impact this conduct has had on Mr. Whitehead shows that the requested sentence is appropriate. Any individual who were to look at the position Mr. Whitehead finds himself in would certainly consider that a deterrent.

    d.  <u>Protecting the Public from Further Crimes by the Defendant</u>

Under 18 U.S.C. § 3553(a)(2)(C) the sentencing judge must take into account the need for a sentence imposed to protect the public from further crimes by the defendant. There is no appreciable risk of further criminal conduct by the defendant, who has spent the past decade as a pillar of his community doing charity work. While Mr. Whitehead has a criminal history category of II it should be noted that these convictions are quite remote in time, almost 20 years old, and that there are significant legal issues with those convictions.

    e.  <u>Provision of Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner</u>

18 U.S.C. § 3553(a)(2)(D) states that the court should take into account the need for a sentence imposed to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. These needs are best served by supervised release.

The correctional treatment and rehabilitation of Mr. Whitehead is best served by letting him return to the community and continue his good works in his community and his church. A sentence of supervised release would serve to provide correctional treatment in the most effective manner under these circumstances. 18 U.S.C. § 3553(a)(2)(D).

    f.  <u>The Kinds of Sentences Available</u>

Regarding 18 U.S.C. § 3553(a)(3) there is no prohibition on a sentence of supervised release.

g. <u>Kinds of Sentence and Sentencing Range</u>

The guideline range for this case as calculated by Probation is 121 to 151 months'. While Probation calculated a different guideline range from the Defense, supervised release is an appropriate sentence for the reasons discussed above. As a result, the requested sentence would not be prohibited by 18 U.S.C. § 3553(a)(4)(A). This is not a case regarding a violation of probation or supervised release, so 18 U.S.C. § 3553(a)(4)(B) does not apply.

h. <u>Pertinent Policy Statements</u>

Counsel has not uncovered any applicable policy statement under 18 U.S.C. § 3553(a)(5) that would impact the requested sentence.

i. <u>Avoidance of Unwarranted Sentencing Disparities</u>

The requested sentence is warranted in this case, and therefore avoids any unwarranted sentencing disparities as contemplated by 18 U.S.C. § 3553(a)(6).

According to the Sentencing Commission's Data Analyzer between 2015 and 2023 there were 184 individuals in criminal history category II sentenced in the Southern District of New York for fraud offenses primarily under U.S.S.G. § 2B1.1. The average sentence length was 24 months. Importantly only four individuals, just 2.2%, received a sentence of over 10 years in prison. A guideline sentence here would be rare, a sentence in line with the Government's Pimentel letter would be unique.

The analysis of sentencing data by Probation carries a higher average and median sentence due to its consideration of the inflated intended loss amount, the analysis undertaken here is more appropriate in this case as the actual loss amount is $85,000, significantly less than that of probation.

It should also be noted that reporting on the change of plea hearings for the individuals who robbed Mr. Whitehead indicates that those individuals plea agreements have a guideline range of around 7 years, or 84 months. Probation's requested sentence in this case would

result in Mr. Whitehead doing more time than the individuals who robbed him, his wife, his daughter, and his church at gunpoint on a livestream.

As a result of these considerations the requested sentence is not an unwarranted disparity.

    j.  <u>Restitution</u>

18 U.S.C. § 3553(a)(7) requires the Court to consider the need to provide restitution. Assuming the Court orders restitution in the amount requested by Probation allowing Mr. Whitehead to return to the community, and find gainful employment will allow him to best make restitution.

## VI. CONCLUSION

We strive to strike a balance between the interests of society and the rights of the individual. Each case is different. Congress has made it clear that we are not to function as machines in purely technical terms. We respectfully ask this honorable Court to see this Defendant on individual terms, human terms, and sentence him accordingly. When the nature and character of Lamor Whitehead is taken into account along with the sentencing factors, and the PSR, to the degree it is considered, it becomes evident that a sentence of supervised release is fitting for the seriousness of the crime and is also consistent with 18 U.S.C. § 3553(a), which calls for a sentence sufficient, but not greater than necessary.

Respectfully yours,

*Dawn M. Florio*

Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
New York, NY 10022
212.939.9539

Attorney for LAMOR WHITEHEAD