UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | **S1 22 Cr. 692 (LGS)** |
| LAMOR WHITEHEAD, | |
| Defendant. | |

## THE GOVERNMENT'S SENTENCING SUBMISSION

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jessica Greenwood
Jane Kim
Derek Wikstrom
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 3

    A. The Defendant's Crimes .............................................................................................. 3

      1. The Loan Frauds ....................................................................................................... 3

      2. The Pauline Anderson Fraud ..................................................................................... 4

      3. The Brandon Belmonte Extortion and Fraud ............................................................ 6

      4. The Defendant's Lies to the FBI ............................................................................... 8

    B. The Defendant's Ongoing Lies ..................................................................................... 8

      1. The Defendant's Lies on the Stand ........................................................................... 8

      2. The Defendant's Lies to the Public ........................................................................... 9

      3. The Defendant's Violation of the Protective Order ................................................. 10

      4. The Defendant's False Statements About His Finances, Including to the Probation Office
      and the Court ............................................................................................................. 12

    C. The Defendant's Remand ............................................................................................ 13

DISCUSSION ...................................................................................................................... 13

    I. The Applicable Guidelines Range is 151 to 188 Months ............................................. 14

    A. The Guidelines Calculation ......................................................................................... 14

    B. The Defendant Abused His Position of Trust .............................................................. 16

    C. The Probation Office Correctly Calculated the Loss Amount ..................................... 17

    D. The Probation Office Correctly Applied a Two-Point Enhancement for the Threats of
    Physical Violence to Belmonte ........................................................................................ 20

    II. A Sentence of 151 Months' Imprisonment Is the Appropriate Sentence in this Case ......... 21

    A. Applicable Law ........................................................................................................... 21

    B. Discussion ................................................................................................................... 22

      1. The Nature, Circumstances, and Seriousness of the Offenses and the Need for Just
      Punishment ................................................................................................................ 23

      2. The Needs to Promote Respect for the Law and Deter Crime .................................. 26

      3. The History and Characteristics of the Defendant .................................................... 31

      4. The Applicable Guidelines Range ............................................................................ 33

      5. The Defendant's Attacks on the Conditions of Confinement at the MDC are Irrelevant
      or Unfounded ............................................................................................................. 35

III. A Fine Within the Guidelines Range Is Warranted ............................................................ 37

IV. The Defendant Must Pay Restitution, Forfeiture, and a Special Assessment ................... 38

V. There Is No Basis for Bail Pending Appeal ...................................................................... 39

CONCLUSION .......................................................................................................................... 40

## PRELIMINARY STATEMENT

Lamor Whitehead, the defendant, is a career conman and liar who has been committing frauds for over 20 years to finance his extravagant lifestyle. On March 11, 2024, Whitehead was convicted, following a jury trial, of all five counts of Indictment S1 22 Cr. 692 (LGS) (the "Indictment"), for defrauding a church parishioner, defrauding lenders, attempting to defraud a businessman, attempting to extort a businessman, and lying to federal agents. In committing these crimes, the defendant abused his position of power and trust as a religious leader, lied about his finances, doctored numerous bank statements, and threatened victims, among other things, in order to obtain over $7.2 million. Whitehead held himself out as a wealthy and successful "real estate investor," and "prophet," who, in actuality, purchased his palatial home and an investment property through fraud and with fraud proceeds, reported annual incomes to the Internal Revenue Services ("IRS") of between $5,000 and $13,000 in tax years 2017 through 2019, and now claims he has only $181.54 in the bank. Despite his prior arrests, four criminal convictions, and lengthy prison sentences, the defendant has remained undeterred from committing crimes. Even after the Indictment was filed, the defendant brazenly lied under oath before the jury and this Court. He has continued to lie to the public even after the jury's guilty verdicts, including by making patently false allegations about this prosecution and the evidence that proved his guilt beyond a reasonable doubt. He even tried to sell discovery materials online, in violation of the Court's Protective Order, to further profit from his crimes. Whitehead's crimes—for which he has shown an utter lack of remorse—have substantially harmed numerous victims and the community at large, including hard-working individuals and church parishioners, lenders, and financial institutions.

The Government respectfully submits this memorandum in advance of Whitehead's sentencing, and in response to his June 3, 2024, sentencing submission.[1] The applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is in dispute—in the Government's view, the range is 151 to 188 months' imprisonment, but the Probation Office has calculated an applicable Guidelines range of 121 to 151 months' imprisonment. For the reasons set forth below, however the Court resolves the Guidelines dispute, 151 months in prison is the sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. In addition, the Court should impose a fine and order restitution and forfeiture, as set forth below. The extraordinary leniency requested by the defendant, who seeks an effective sentence of four weeks in prison and a term of supervised release, fails to address his repeated crimes, the needs for specific and general deterrence, the seriousness of the offense, and the needs for just punishment and to promote respect for the law. Further, there is no basis for bail pending appeal under 18 U.S.C. § 3143(b)(1) and (2).[2]

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Whitehead's sentencing; "Dkt." refers to entries on the Court's docket; "Def. Mem." refers to the defendant's sentencing submission (Dkt. 221); "Tr." refers to the transcript of the March 2024 trial in this case; "GX" refers to Government Exhibits received in evidence at the trial. Unless otherwise noted, case text quotations omit internal quotation marks, citations, alterations, and footnotes.

[2] A Victim Impact Statement from Pauline Anderson is attached as Exhibit A. Under the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(4), Pauline and Rasheed Anderson have the right to be reasonably heard at sentencing, and accordingly, the Government respectfully requests that the Court allow the Andersons to speak at sentencing.

## BACKGROUND

### A.   The Defendant's Crimes

#### 1.   The Loan Frauds

In June 2018, Whitehead began committing a series of virtually identical frauds against a variety of banks and other lenders. The first of these frauds was charged in Count Five of the Indictment. As the jury found at trial, Whitehead submitted a fraudulent application seeking a $250,000 business loan to the loan broker Fundera, which passed the application to PayPal, a potential lender. Whitehead's fraudulent application claimed that a company he owned, Anointing Management Service LLC, earned $6,000,000 in annual revenue and had an average bank balance of $1,000,000. The application was accompanied by doctored Wells Fargo bank statements that falsely reflected that Anointing Management Service had millions of dollars in the bank. (PSR ¶¶ 15, 46).

PayPal identified the application as fraudulent and did not issue the defendant a loan. (PSR ¶ 46). Other lenders were not as lucky. The defendant's loan fraud continued—using the same shell corporation, and the same phony bank statements, with the same fake, inflated balances—for years. He submitted similar and overlapping falsified Wells Fargo statements, and made similar false claims about his and his entities' earnings, to at least five other lenders over the course of about four years. (*See* GX 605).

In February 2019, Whitehead applied for a mortgage loan on the mansion in Paramus, New Jersey, that he still owns today. That application, like the Fundera/PayPal application, was supported by a series of fraudulent Wells Fargo statements for Anointing Management Service. But unlike the Fundera/PayPal application, that application was successful—the mortgage lender issued Whitehead a $1.3 million dollar mortgage, in reliance on the defendant's fraudulent application. (PSR ¶¶ 47-48).

3

In October 2021, Whitehead applied for a home equity line of credit on the same Paramus home, this time from a different lender. This application, just like the defendant's original mortgage application, was fraudulent. This time, Whitehead also submitted falsified IRS forms. And the fraud again worked: Whitehead received a $500,000 home equity line of credit based on the false application. (PSR ¶ 49).

In November 2021, Whitehead submitted another fraudulent loan application, to another lender. This application, like the others, used phony Wells Fargo bank statements and false claims that Anointing Management Service was a multi-million-dollar business. And based on this application, Whitehead received a $4.15 million commercial loan. (PSR ¶ 50). He used that loan to buy a building in Hartford, Connecticut, that is now in foreclosure proceedings. (PSR ¶ 131).

In addition to these loan applications, which netted Whitehead almost $6 million in fraud proceeds, Whitehead also submitted a fraudulent application for another $1,000,000 home equity line of credit (PSR ¶ 51) and attempted to defraud another lender by sending a fraudulent proof of funds email attaching another phony Wells Fargo statement (PSR ¶ 52). All told, the defendant's loan frauds involved a total actual plus intended loss of more than $7,000,000, most of which was actual loss. (PSR ¶ 54). Nor has Whitehead paid back the lenders he defrauded out of almost $6 million—the mortgages on both of his properties and the home equity line of credit he fraudulently obtained on his mansion remain outstanding, and he reported to the Probation Office that he is not making payments. (PSR ¶¶ 130-32).

### 2. The Pauline Anderson Fraud

Not content resting on his multimillion-dollar loan frauds, Whitehead also defrauded one of his parishioners, Pauline Anderson, out of $90,000. Ms. Anderson met the defendant in January 2020 through her son, Rasheed Anderson. Mr. Anderson was a volunteer member of the

defendant's church staff, and he brought his mother to a Sunday service at Whitehead's church in Brooklyn. (PSR ¶ 20).

After seeing her son buy a home, with Whitehead's encouragement, Ms. Anderson began seeking, and relying on, advice from the defendant about potentially purchasing a home of her own. She decided to withdraw money from her retirement account to fund a downpayment, and made a plan to withdraw $50,000. But when she called the financial institution that held her retirement funds, Whitehead joined her on the call, and urged Ms. Anderson to withdraw $100,000 instead of the $50,000 she had planned. At Whitehead's urging, Ms. Anderson did so. (PSR ¶¶ 20-22).

Then, Whitehead stole most of that money. The defendant arranged for Ms. Anderson to speak to two potential lenders, both of whom told her that she did not qualify for a home loan. When she reported this to Whitehead, he responded by offering to get Ms. Anderson a home. He told her that if she gave him the money that she had withdrawn from her retirement account, he would use it to buy her a home. Relying on that representation, Ms. Anderson gave Whitehead $90,000, by check, in November 2020. (PSR ¶¶ 23-25).

Almost immediately after receiving Ms. Anderson's money, Whitehead began spending it on himself. He used it to buy luxury goods—to shop at Polo and Louis Vuitton; to make car payments to BMW; to buy furniture, groceries, and food delivery; to pay for travel; and to make substantial cash withdrawals and transfers via payment applications like CashApp. By early 2021, the defendant had spent most of Ms. Anderson's money on these personal expenditures. And Whitehead did little or nothing to help Ms. Anderson find a home. (PSR ¶¶ 26-27).

When, in May 2021, Ms. Anderson asked for her money back, Whitehead could not pay it back. He no longer had it. So he made a series of increasingly ridiculous fraudulent statements to

Ms. Anderson. He told her that there was a contract that allowed him to keep the money; he told her that he had invested the money so it was tied up; and he claimed that he was not able to pay her back until after his campaign for Brooklyn Borough President ended. These were all lies. In reality, there was no contract; Whitehead had spent, not invested, the money; and there was no bar on his paying her back during his political campaign, nor did the defendant pay Ms. Anderson back after he lost the election. When Whitehead's lies did not cause Ms. Anderson to back off her request for reimbursement, or quiet her suspicions, he began threatening her. Whitehead threatened lawsuits, threatened to come after Ms. Anderson's and her son's jobs, and claimed that God would harm the Andersons. (PSR ¶¶ 30-31).

### 3. The Brandon Belmonte Extortion and Fraud

The defendant was also convicted of attempting to defraud and extort Brandon Belmonte. The extortion, charged in Count Three, occurred earlier in time: in February 2022, the defendant brought his wife's Mercedes-Benz G-Wagen into a body shop Belmonte owned. (PSR ¶ 40). In connection with that work, Whitehead claimed that Belmonte owed him $5,000; Whitehead made violent threats to try to collect on that purported debt. (PSR ¶ 40).

Angel Fernandez, who worked as Belmonte's driver, testified that he saw a nearly physical altercation between the defendant and Belmonte at Belmonte's body shop. (PSR ¶ 42). Fernandez saw Whitehead screaming and cursing at Belmonte. (PSR ¶ 42). The defendant was swinging his arms and looked as though he was going to hit Belmonte. (PSR ¶ 42). Later, Whitehead effectively confirmed this account, by making adoptive admissions of statements Belmonte made in recorded conversations. Specifically, in an April 29, 2022 recording, Belmonte told the defendant: "[Y]ou got in my face and I thought you were gonna crack me. I was convinced you were gonna crack me." (PSR¶ 42). The defendant responded by laughing. (PSR ¶ 42).

In March and April 2022, Whitehead repeatedly demanded $5,000 from Belmonte, including through text messages and phone calls, and threatened Belmonte with harm if he did not pay, stating he would "hurt" Belmonte. (PSR ¶ 40). For example, in a recorded conversation on April 23, 2022, the defendant repeatedly threatened violence to Belmonte if Belmonte did not pay the $5,000. Whitehead said, among other things, that Belmonte was not "gonna play with me," and told Belmonte "I will hurt you." (PSR ¶ 41). Whitehead went on to say "there's guns in my church" (PSR ¶ 41)—effectively threatening to shoot Belmonte if he did not pay. Belmonte ultimately delivered $5,000 to the defendant, using cash supplied to him by the FBI. (PSR ¶ 43).

Thereafter, as charged in Count Two, Whitehead attempted to defraud Belmonte. Belmonte was acting at the direction of the FBI at the time, and agreed to wear recording devices to meetings with the defendant, and also created recordings of certain communications with the defendant himself. In those recordings, the defendant told Belmonte, among other things, that he had "the key to the City," and that New York City Mayor Eric Adams would "tell me where the money is." (PSR ¶ 34). The defendant claimed that the mayor would help the defendant obtain permission from New York City to operate residential housing as affordable housing, without actually doing so (PSR ¶ 34), and to get stop-work orders lifted on real estate development projects (PSR ¶ 35). In exchange, the defendant told Belmonte that Belmonte would need to transfer ownership of real estate holdings to the defendant. (PSR ¶¶ 34-35). The defendant also sought to have Belmonte give the defendant $500,000. (PSR ¶ 36).

But the defendant's claims that he could obtain favors from the mayor were false. Although the defendant had a mentoring relationship with Mayor Adams, he knew he could not obtain favors from the mayor, who would not assist the defendant with personal disputes, would not take action for the defendant, and would not even attend the defendant's birthday parties. (PSR ¶ 37). In fact,

in February 2022, approximately two months before the defendant told Belmonte about his reported influence over the mayor, the defendant wrote to the mayor complaining about his lack of access and his inability to get a meeting; the mayor did not respond. (PSR ¶¶ 38-39).

### 4. The Defendant's Lies to the FBI

On the morning of June 8, 2022, FBI agents went to Whitehead's Paramus home to execute a search warrant. The warrant authorized the seizure of cellphones on the defendant's person, and agents seized one phone, with a call number ending -3314, from Whitehead based on the warrant. While speaking with Whitehead in the driveway of his home, the agents repeatedly asked the defendant whether he had other cellphones. Whitehead repeatedly told the agents that he did not. He claimed that when he repeatedly went into his home to make phone calls or retrieve information, he was using his daughter's phone, not his own. And he said that he did not have another cellphone. Those were false statements. In truth, Whitehead's other cellphone, with a call number ending -9839, was right inside his house that morning. (PSR ¶ 44). Those lies were material, because, among other things, had Whitehead told the truth, the FBI would have been able to obtain a subsequent warrant that same day to seize the other phone. Instead, the FBI obtained a second search warrant to seize the phone later that month.

### B. The Defendant's Ongoing Lies

### 1. The Defendant's Lies on the Stand

At trial, the defendant testified. He committed perjury, by lying to the jury and to the Court while under oath. (PSR ¶ 62). For example:

- The defendant testified under oath that he did not submit the fraudulent loan application to Fundera/Paypal or any of the fraudulent Wells Fargo bank statements to various lenders. As the jury found in convicting the defendant on Count Five, and as the trial evidence overwhelmingly established, these statements are false. (PSR ¶ 62(c)).

- The defendant testified under oath that he never had any conversation with Pauline Anderson about money (or anything). (PSR ¶ 62(d)). This statement is false. In actuality,

the testimony of Pauline and Rasheed Anderson, as corroborated by cellphone records, establish that the defendant participated in multiple conversations with Pauline Anderson about money, including the call with Ms. Anderson and TransAmerica on July 22, 2020.

- The defendant testified under oath that he did not file his taxes for tax years 2017 through 2022 because his identity had been stolen, and that any tax documents would have been prepared by his accountant, Israel Velasquez. (PSR ¶ 62(e)). These statements are false. Documents obtained from the IRS, including certain documents received after the jury's guilty verdict, establish that the defendant did, in fact, file tax documents for tax years 2017 through 2019, and that these documents had been self-filed by the defendant, not filed by an accountant. (PSR ¶ 62(e)).[3]

### 2.  The Defendant's Lies to the Public

Of course, the defendant has the right to claim innocence, including post-conviction. In speaking publicly about the case, however, both before, during, and after trial, the defendant has repeatedly made statements that are simply false. And the defendant has repeatedly, and falsely, claimed that the investigation and charges against him were motivated by race and/or politics, and were for the purposes of retaliation because, according to the defendant, the defendant would not provide information about Adams. (PSR ¶ 64). For example:

- On or about March 10, 2023, in a media interview after his arrest in this case, the defendant falsely alleged this case to be:

  > [A]n attack on a black man and this is more a political attack. The world knows that myself and the now-Mayor Eric Adams are very close… I'm collateral damage. I'm a young black pastor that come from a broken home. My father was beaten and strangled to death by 16 police officers because of the color of his skin…I was sent away to prison back in 2008, illegally, fake search warrants, all different type of things that we black men have to go through, it's just the real life. We talk about how the police kill black men, but we don't talk about how court documents and court paperwork and

---

[3] Whitehead also testified under oath that FBI Special Agent Thomas Ford asked the defendant to be an "informant" for the FBI and to assist in an investigation into Eric Adams, and threatened to make the defendant's life a "living hell" if he refused; and that Special Agent Ford also threatened to throw the defendant to the floor if he did not open his cellphone during the execution of a search warrant. (PSR ¶¶ 62(a) & 62(b)). These statements were false as well. But because the false testimony discussed above is clear from the trial record, the Government is not requesting a *Fatico* hearing to prove that these additional statements were false.

> prosecution kill black men. And they not only destroy us financially, but they kill our credibility. And this is what you are seeing happening to me right now.

(PSR ¶ 64(a)).

- On or about March 12, 2024, the day after the jury's guilty verdicts, the defendant posted a video on social media falsely claiming that he was wrongfully convicted and that he was being retaliated against because he would not provide information against Adams. (PSR ¶ 64(b)). The defendant falsely alleged: "This wasn't about me… I was not going to be an informant for the FBI against New York City Mayor Eric Adams." (PSR ¶ 64(b)).

- On or about April 18, 2024, the defendant made false statements in a podcast interview, including the following: (i) the defendant falsely stated that while executing a search warrant for his cellphone, the FBI told him that they wanted him to "help [them] with the mayor"; (ii) while executing a search warrant for the defendant's phone, the FBI told the defendant: "we're going to slam you on the floor and we're gonna put your face there, or we're gonna bend your fingers to make you open the phone"; (iii) an FBI agent "lied on six warrants to the judge"; and (iv) "The FBI didn't have nothing on me" and so the FBI had to "orchestrate" and turn [Ms. Anderson's] civil case into a criminal matter…since I'm not working with the FBI to take down the mayor, they made this into a criminal matter."

The defendant's allegations are patently false and belied by both the facts established at trial and by the procedural history of this case. Notably, the defendant did not file any motions alleging selective prosecution. Nor could he have—such a motion would have failed, because there is not a shred of evidence that the defendant was prosecuted because of race, politics, and/or as retaliation.

### 3. The Defendant's Violation of the Protective Order

Following his conviction, Whitehead went so far as to try to sell "exclusive paperwork" (*i.e.*, materials produced by the Government to the defendant), in violation of the Court's Protective Order. (Dkt. 24). On April 30, 2024, the defendant posted a video to YouTube entitled "Fight for Justice: Bishop Whitehead Exposes Alleged FBI Misconduct" (the "Video").[4] In the

---

[4] The Video was previously available at https://www.youtube.com/watch?v=b_6IYI3Pt2E, but was taken down by the defendant. The Government created a copy of the Video before the defendant took it down, and can provide it to the Court upon request.

Video, the defendant read from and waved around multiple documents that were produced in discovery subject to the Protective Order in this case. For example, about 18 and a half minutes into the Video, Whitehead extensively read from an FBI 302 documenting an interview with one of his victims. And approximately 25 minutes into the Video, Whitehead read from another 302 of an interview of the victim. There were other documents, including search warrants and search warrant return documents, that Whitehead likewise waved around and directly quoted from during the video. Under the Protective Order, the defendant was prohibited from using the documents for any purpose other than to defend the case, and was not permitted to publicly disclose them on YouTube.

The defendant's remarks in the Video make clear that he understood that the documents could not be permissibly disclosed. While waving around the second document referenced above, he said: "The jury could not get this at all. You guys could not get this at all. This is *exclusive paperwork*." (Video at 27:20). Whitehead also indicated that he intended to make the discovery materials he was reading from available for purchase online:

> And all of this paperwork, we will have it on the Patreon,[5] Bishop's Patreon, where you can go on and you'll be able to see the paperwork. So what I'm showing you, the media—not the Daily News, not the New York Times, not NBC, not CBS, not World News, not CNN—nobody has this paperwork. And this paperwork is going to be the reason why this case will be reversed and overturned, right? And you guys have been destroying my life because the jury was not able to see this paperwork.[6]

(*Id.* at 14:25).

---

[5] Patreon is a website that allows online "content creators" to charge for subscriptions and products, and could be used to sell documents.

[6] Similar remarks appear elsewhere in the Video. (*See e.g.* Video at 17:40 ("This is his statement, and this will be posted, alright? And like I said, no other media outlet has this.")).

**4. The Defendant's False Statements About His Finances, Including to the Probation Office and the Court**

Just as the defendant lied to lenders, the Andersons, and Belmonte about his finances, it appears he has also lied to the Court, the Probation Office, the IRS, and the Nassau County Family Court.

The defendant has repeatedly held himself out as a wealthy and successful real estate investor—to the public, his community, the Andersons, Belmonte, lenders, the Probation Office, and the Court. (PSR ¶¶ 20, 34-35, 128 ("The defendant reported that for over the last 20 years, he has worked in real estate, specifically investment properties"); Tr. 1064, 1066 (defendant's testimony that he is a real estate investor)). He testified that he has two accountants, including one who has worked with him for years and who takes care of his finances. (Tr. 1125). The defendant reported that he "received income from speaking engagements as a visiting pastor at other churches" prior to his arrest. (PSR ¶ 127). The defendant stated in his sentencing submission that his "source of income…for close to 20 years" was "public facing" and in "investing." (Def. Mem. at 28). The defendant stated that he and his church spent $25,000 on school supplies for children in 2023, $20,000 for food for those in need in or about 2022, and donated money to "a number of homeless and battered women's shelters." (Def. Mem. at 15, 17). He also told the Probation Office that he has "purchased vehicles for some of his parishioners when they needed assistance." (PSR ¶ 123).

Inconsistent with the above representations about his wealth, the defendant reported bank account balances of $181.54 and $0 to the Probation Office. (PSR ¶ 130). In tax years 2017, 2018, and 2019, the defendant reported annual incomes of $5,280, $8,634, and $12,260, respectively, to the IRS. (PSR ¶ 138). To the Nassau County Family Court, he provided an annual salary of $22,880 in 2017. (PSR ¶ 139). He reported to the Probation Office that he was $64,000 behind on his child-

support payment obligations. (PSR ¶ 132). The defendant also has unpaid judgments against him that date back to 2022. (PSR ¶ 134).

The defendant told the Probation Office that he does not collect income from the church. (PSR ¶ 122). He reported owning two real properties—his residence in New Jersey and a multi-tenant dwelling in Connecticut—but both of these properties were purchased with fraud proceeds. (PSR ¶¶ 130, 131).The defendant declined to provide the Probation Office with financial information regarding his purported real estate investments. (PSR ¶ 128). And as discussed below the information defendant did give to the Probation Office was internally inconsistent—he provided one set of numbers when interviewed and a different, less favorable set of numbers when supplying a financial affidavit for purposes of Probation's determination of a recommended fine. (*See infra* § III).

### C. The Defendant's Remand

On or about May 20, 2024, the defendant was remanded pending sentencing, pursuant to 18 U.S.C. § 3143(a)(2). Under Section 3143(a)(2), the defendant's remand was mandatory in part because: (i) he was convicted of a crime of violence; (ii) there was not a substantial likelihood that a motion for acquittal or new trial would be granted; and (iii) an attorney for the Government had not recommended no incarceratory sentence for the defendant. 18 U.S.C. § 3143(a)(2)(A).

## DISCUSSION

A sentence of 151 months' imprisonment is necessary in this case in light of the nature, circumstances, and seriousness of the defendant's crimes, the needs to promote respect for the law and afford specific and general deterrence, the defendant's history and characteristics, and the applicable Guidelines range. *See* 18 U.S.C. § 3553(a). The defendant's complaints about the conditions of confinement at the Metropolitan Detention Center ("MDC") are outdated, false, unsourced, or not specific to the defendant, but in any event are largely irrelevant here, as he has

been detained only for a matter of weeks and will most likely be designated to a different facility after he is sentenced. As set forth below: (1) the applicable Guidelines range is 151 to 188 months' imprisonment; (2) regardless of the Guidelines calculation, a sentence of 151 months' imprisonment is appropriate in this case; (3) a fine within the Guidelines range is warranted here; (4) the Court should order restitution, forfeiture, and a special assessment; and (5) there is no basis for bail pending appeal.

## I.   The Applicable Guidelines Range is 151 to 188 Months

As explained below, the correct applicable Guidelines range in this case is 151 to 188 months' imprisonment. The Probation Office has reached a lower range, 121 to 151 months' imprisonment, in a calculation that the Government believes is correct *except* that it omits one enhancement—for Whitehead's abuse of his position of trust as a religious leader—that properly applies here.[7] The first subsection below outlines the complete Guidelines calculation; the second explains why an enhancement for abuse of trust is applicable; the third explains why the defendant's objection to the loss amount should be rejected; and the fourth explains why the enhancement for threats of violence applies.

### A.   The Guidelines Calculation

Whitehead's offense level under the Guidelines is calculated as follows:

Group One

1.   Pursuant to U.S.S.G. § 3D1.2(d), Counts One, Two, and Five are grouped because their offense level is determined largely based on the aggregate harm or loss. Count Four is added to this group, with a corresponding two-level increase for obstruction of justice

---

[7] The Government objected to the draft PSR's omission of an enhancement for Pauline Anderson's status as a vulnerable victim, but having reviewed the Probation Office's explanation for the omission of that enhancement (PSR at 43-44), the Government is persuaded that the enhancement does not apply.

discussed below, pursuant to U.S.S.G. § 3D1.2(c) and U.S.S.G. § 3C1.1 Application Note 8.

2. The Guideline applicable to Counts One, Two, and Five is U.S.S.G. § 2B1.1.

3. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.

4. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), 18 levels are added because the loss amount was at least approximately $7,285,000, which is more than $3,500,000, but not more than $9,500,000.

5. Pursuant to U.S.S.G. § 2B1.1(b)(10), two levels are added because the defendant intentionally used sophisticated means to carry out the offenses.

6. Pursuant to U.S.S.G. § 2B1.1(b)(17)(A), two levels are added because the defendant derived more than $1,000,000 in gross receipts from financial institutions.

7. Pursuant to U.S.S.G. § 3B1.3, two levels are added because the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of Count One.

8. Pursuant to U.S.S.G. § 3C1.1, two levels are added because the defendant willfully obstructed or impeded the administration of justice by making the false statements for which he was convicted on Count Four.

9. Accordingly, the total offense level for Group One is 33.

Group Two

10. Count Three is in its own group, because it constitutes a separate harm, pursuant to U.S.S.G. § 3D1.2(d).

11. The Guideline applicable to Count Three is U.S.S.G. § 2B3.2.

12. Pursuant to U.S.S.G. § 2B3.2(a), the base offense level is 18.

13. Pursuant to U.S.S.G. § 2B3.2(b)(1), two levels are added because the offense involved an express threat of bodily harm.

14. Accordingly, the total offense level for Group Two is 20.

15. Pursuant to U.S.S.G. § 3D1.4, Group Two does not affect the overall total offense level, because it is nine or more level less serious than Group One.

The resulting total offense level is 33. Whitehead has three criminal history points and is therefore in criminal history category II. The resulting Guidelines range is 151 to 188 months'

imprisonment. As noted above, the Probation Office agrees with this calculation except that they disagree about the application of the abuse-of-trust enhancement. (PSR ¶¶ 65-95).

**B.  The Defendant Abused His Position of Trust**

Section 3B1.3 calls for a two-level enhancement for a defendant who "abused a position of public or private trust…in a manner that significantly facilitated the commission or concealment of the offense." That enhancement applies to Whitehead's crime against Pauline Anderson because the fraud against her was significantly facilitated by the trusted position Whitehead held as her son's church leader.

The defendant was, as the Court knows, a pastor who led his own church. The trial record made quite clear that Whitehead's status as a religious leader—and as Rasheed Anderson's pastor, in particular—caused Ms. Anderson to trust him. (*See, e.g.*, Tr. 249 (Pauline Anderson testified: "I believed he—he had integrity, I believed him as the—as the leader of his church. I honestly felt he was trustworthy. I really believed he was a man of God."); Tr. 283 (Ms. Anderson trusted Whitehead because he was a bishop and because of his relationship with her son); Tr. 470-71 (Rasheed Anderson testified that he trusted the defendant because of their "really close relationship" and "spiritual bond")). That testimony, and other similar testimony, at trial readily established that Section 3B1.3 applies here. And as a legal matter, courts routinely apply this enhancement to religious leaders who trade on their positions to facilitate their criminal conduct. *See, e.g.*, *United States v. Dullum*, 560 F.3d 133, 140-41 (3d Cir. 2009) (affirming application of abuse-of-trust enhancement because "[t]hrough [defendant's] involvement with his church, he formally acted as a teacher, advisor, and counselor to" victims); *United States v. Hendricks*, 69 F. App'x 592, 596 (4th Cir. 2003) (affirming abuse-of-trust enhancement based on defendants' positions as "Pastor and Assistant Pastor"); *United States v. Lilly*, 37 F.3d 1222, 1227 (7th Cir.

1994) (enhancement applied to defendant where, as "the Church's pastor and spiritual leader, his congregation undoubtedly trusted him to further the Church's religious mission").

The Probation Office's arguments to the contrary are not persuasive. The PSR notes that Application Note 1 of Section 3B1.3 states that the position should be characterized by "professional or managerial discretion." (PSR at 42). But Whitehead, as the trial evidence made clear, *did* have professional and managerial discretion over his church, including his volunteer church employees, of which Rasheed Anderson was one. And there was a clear nexus between that relationship, which involved managerial discretion, and Pauline Anderson's willingness to trust Whitehead. Contrary to the PSR, Ms. Anderson did more than just "s[eek] advice" from Whitehead (PSR at 42)—she turned over her retirement savings to him, and she testified that the reason she trusted him enough to do so was his church leadership and his relationship with her son. And the Probation Office attempts to distinguish the cases cited above (PSR at 43), but the point of those cases is not that they present identical factual scenarios, it is that courts recognize that religious leaders may, under certain circumstances, be considered to hold positions of trust. The defendant's position of trust significantly facilitated his fraud—indeed, without it, he might not have succeeded in stealing from Pauline Anderson—and a two-level enhancement therefore applies.

### C.  The Probation Office Correctly Calculated the Loss Amount

The loss amount in this case is correctly calculated as $7,285,000, and includes the actual and intended losses that can be calculated for the counts of conviction and relevant conduct under the Guidelines. (PSR ¶ 54). The defendant's contention that $85,000—the actual loss suffered by Ms. Anderson and the specific loss amount for only one of the five counts—is the appropriate loss amount is wrong. (Def. Mem. at 8-9).

*First*, the Guidelines call for the inclusion of relevant conduct in the calculation of the loss amount. The defendant committed a pervasive, years-long fraud scheme, of which the charged frauds—most relevantly, Count Five—were just a part. In committing that fraud scheme, Whitehead used overlapping phony bank statements to commit a series of loan frauds against a series of different lenders over about a four-year period. The Court previously held that these interrelated frauds were admissible under Federal Rule of Evidence 404(b) because they were "highly probative of Defendant's knowledge, intent and modus operandi." (Dkt. 136 at 2-3). And while that analysis under Rule 404(b) is not identical to the analysis under the Guidelines, it is similar, and thus highly relevant here. In order for the related fraud schemes to count as relevant conduct under the Guidelines, they need only be "part of the same course of conduct or common scheme or plan as the offense of conviction," U.S.S.G. § 1B1.3(a)(2), which requires that they be connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*," *id.* at comment. n. 5(B)(i). "Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts." U.S.S.G. § 1B1.3(a)(2), n. 5(A). Here, all of the individual loan frauds that the Probation Office has treated as relevant conduct—*i.e.*, the defendant's frauds committed against ConnectOne Bank, Homebridge Financial Services, Bethpage Federal Credit Union, and FM Home Loans—were united by multiple common factors, including a single common perpetrator, a common purpose, and an identical *modus operandi*. As a result, they're all properly treated as relevant conduct under U.S.S.G. § 1B1.3(a)(2) and must be included in the loss amount calculation.

Tellingly, Whitehead's submission does not address "relevant conduct" under U.S.S.G. § 1B1.3(a)(2). Instead, he argues that "uncharged conduct" should not be included in the loss amount calculation because the Government "did not have to prove [that conduct] beyond a

reasonable doubt" and the defendant did not receive "the procedural or due process protections" with respect to such conduct. (Def. Mem. at 8). Here, even though the Government did prove much of the defendant's relevant conduct beyond a reasonable doubt at trial, that is not the standard. The Court need only find, by a preponderance of the evidence, that Whitehead defrauded ConnectOne Bank, Homebridge Financial Services, Bethpage Federal Credit Union, and FM Home Loans. *See, e.g.*, *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015) ("[F]actual findings at sentencing need be supported only by a preponderance of the evidence."). Based on the powerful evidence presented at trial as to the defendant's fraud scheme and the same or similar manner by which he defrauded Fundera, Paypal, and each of the above entities, the preponderance standard is easily satisfied.

The defendant's unspecified due process claim fares no better. Sentencing is not trial, and the Supreme Court and the Second Circuit "have consistently held that the right of confrontation *does not apply* to the sentencing context." *United States v. Martinez*, 413 F.3d 239 (2d Cir. 2005) (citing many cases, including *Williams v. Oklahoma,* 358 U.S. 576, 584 (1959) ("[O]nce the guilt of the accused has been properly established, the sentencing judge…is not restricted to evidence derived from the examination and cross-examination of witnesses in open court.")); *United States v. Simmons,* 164 F.3d 76, 79 (2d Cir. 1998) ("Generally, sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy."); *United States v. Carmona,* 873 F.2d 569, 574 (2d Cir. 1989) ("[A]ll of the strict procedural safeguards and evidentiary limitations of a criminal trial are not required at sentencing."). In any event, here, the defendant did, in fact, have the opportunity to cross-examine multiple witnesses who testified about the defendant's relevant conduct.

*Second*, under the Guidelines, as a "General Rule," "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1), n. 3(A). Intended loss is widely used by courts, including courts in this Circuit, to determine the appropriate loss amount under the Guidelines. *See United States v. Bergstein*, 788 F. App'x 742, 747-48 (2d Cir. 2019) (quoting, *e.g.*, *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) ("[W]here the intended loss is greater than the actual loss, the intended loss is to be used.")); *United States v. Lacey*, 699 F.3d 710, 718 (2d Cir. 2012) ("[T]he court must apply the *greater* of the actual or intended loss amount" and joining "several of our sister Circuits" in holding that the "larger intended amount is a better 'measure for the defendant's culpability' than the actual loss."). The defendant's reliance (Def. Mem. at 8) on an outlier case from the Third Circuit, *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) is thus misplaced given the law in this Circuit. The defendant's citation to *United States v. Deutsch*, 987 F.2d 878 (2d Cir. 1993), is also unavailing because there, the Second Circuit did, in fact, recognize that "intended" or "actual" loss calculations were appropriate, but found that, as a factual matter, the District Court's intended loss calculation was speculative in light of the specific nature of the scheme. *Id.* at 882-83 (finding that the District Court mistakenly calculated the intended loss by totaling checks written by the defendant without taking into consideration the fact that the defendant's scheme involved replacing checks with higher values and so the replaced checks did not reflect the intended loss).

Accordingly, the Probation Office correctly calculated the loss amount here, by considering the intended loss for both the charged and relevant conduct that the Government proved at trial.

### D.  The Probation Office Correctly Applied a Two-Point Enhancement for the Threats of Physical Violence to Belmonte

The defendant also argues that he should not receive a two-point enhancement under U.S.S.G. § 2B3.2(b)(1) for committing an offense involving "an express or implied threat of death,

bodily injury, or kidnapping." (Def. Mem. at 9). In doing so, the defense claims that Whitehead's actions and statements to Belmonte should be interpreted as "a more general statement" that the defendant would not tolerate "being taken advantage of," rather than a "direct threat of harm" to Belmonte. (*Id.*). The jury rejected that argument, and the Court should as well. Whitehead's claims that he did not directly threaten physical harm are belied by the record. Whitehead expressly threatened physical, bodily harm to Belmonte in his words and actions, including when (1) he got into Belmonte's face, screaming and cursing, and appeared to want to crack Belmonte with his ring; (2) he told Belmonte he would "hurt" him if he did not receive the $5,000 he had demanded from Belmonte; and (3) he told Belmonte "there's guns in my church," effectively threatening to shoot Belmonte if he did not pay. (PSR ¶¶ 40-41, 43). The trial evidence fully supports this enhancement.

## II.  A Sentence of 151 Months' Imprisonment Is the Appropriate Sentence in this Case

### A.  Applicable Law

The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), and district courts are required to treat them as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After calculating the Guidelines, the Court must consider seven factors: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the purposes of sentencing discussed in the next paragraph, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statements by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants," and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 49-50 & n.6.

In determining the appropriate sentence, Section 3553(a) directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence for criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.  Discussion

Lamor Whitehead presented himself to the world as a religious leader, a preacher of the "prosperity gospel" whom God had made wealthy.[8] He appeared to relish being a public figure, regularly giving press interviews and touting his relationships with various celebrities and public officials. One interview and profile from before this case was filed described Whitehead's "bewildering, Waldo-like tendency to show up where you least expected him, flanked by legitimate VIPs."[9] He regularly went out in public in expensive designer clothes, driving a Rolls Royce SUV.[10] He lived in a mansion and claimed to be a real estate investor—and in fact owned a relatively large apartment building in Connecticut. These trappings of wealth and success— which aided and were a part of the defendant's frauds in this case—were phony. The defendant

---

[8] *See, e.g.*, Rebecca Davis O'Brien et al., "2 Charged in Mid-Sermon Robbery of Bejeweled Brooklyn Bishop," *N.Y. Times* (Sept. 28, 2022), https://www.nytimes.com/2022/09/28/nyregion/bishop-lamor-whitehead-arrests.html ("[Whitehead's] congregation adheres to what is known as the prosperity gospel, the idea that God rewards his followers in material ways.").

[9] Simon van Zuylen-Wood, The Story of the Bishop Robbed During His Church Service, New York Magazine (Dec. 5, 2022).

[10] *E.g. id.*

was living a lie. His extravagant lifestyle was a façade, funded by crimes for which he has now been convicted.

These were serious crimes that had real consequences. Victims lost real money to Whitehead. He has been sitting on millions of dollars in ill-gotten gains, including almost $6 million in fraudulently obtained loans and tens of thousands of dollars stolen from Pauline Anderson—none of which he has paid back. And he is utterly remorseless. Indeed, he has repeatedly made efforts, unlawfully, to avoid responsibility. He made false statements during the investigation, for which he was convicted. He brazenly and repeatedly perjured himself on the stand at his trial. And he gave substantially inconsistent information to the Probation Office about his finances, in an apparent effort to avoid paying a fine in this case.

Given all of this, and for the reasons discussed below, the Section 3553(a) factors support the imposition of a Guidelines sentence. Contrary to the views of the defense and the Probation Office, there is no basis for a downward variance here. The appropriate sentence—the sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing—is a prison sentence of 151 months.

1. **The Nature, Circumstances, and Seriousness of the Offenses and the Need for Just Punishment**

A 151-month, Guidelines sentence is necessary to reflect the nature and circumstances, and seriousness, of the offenses, and to provide just punishment for them. As an initial matter, each of the defendant's crimes was individually serious. Stealing from a parishioner—who entrusted the defendant with a substantial portion of her retirement savings because of his position as a pastor and his close, mentoring relationship with her son—is serious. Stealing from banks, via brazen, calculated fraud, is serious. Attempting to extort and defraud a businessman—even one who is himself an alleged criminal—is serious. And repeatedly lying to federal agents who are

investigating these crimes is serious, too. Any one of these crimes alone would merit substantial punishment.

But Whitehead single-handedly committed all of those crimes. That is one particularly striking aspect of his conduct: how wide-ranging it is. Whitehead did not just steal from fellow alleged criminals; he did not just steal from faceless financial institutions; he did not just steal from trusting parishioners. He stole from *all of them*. He stole *constantly*. And he did it all by himself. Even money he brought in "legitimately" was, in truth, a product of his frauds. It is not clear whether Whitehead made any income from his supposed real estate investment business, but to the extent he did, that income was a result of his crimes—he committed fraud to obtain financing to buy real estate investments. Whatever income Whitehead made from his church leadership, and his congregants' "seeds" and "tithes," was effectively the product of fraud as well. To the extent Whitehead received public attention and had followers, it was because of his flashy, expensive, luxury lifestyle—his mansion, his Rolls Royce, his expensive suits. All of those things, too, were funded by his crimes.

The duration of Whitehead's crimes also exacerbates their seriousness. These were not isolated incidents. Whitehead engaged in a pattern of criminal conduct spanning years. And he showed no signs of letting up. His attempts to extort and defraud Brandon Belmonte were stymied by the Government's involvement, not by anything Whitehead did. It stands to reason that but for the Government's intervention, Whitehead would have simply continued to defraud disparate victims indefinitely.

The financial, emotional, and spiritual harm caused by the defendant's crimes further highlights the seriousness of his offenses. (Ex. A (Victim Impact Statement of Pauline Anderson)). Like many other church parishioners who join a congregation, Rasheed Anderson first met the

24

defendant at a time when he was looking for purpose, spiritual guidance, and life advice. His mother, Ms. Anderson, first met the defendant after she had survived through pulmonary embolisms that nearly took her life, and was seeking spiritual support. Ms. Anderson, a full-time nurse, is the primary breadwinner in her three-person household, in which she cares for her elderly mother and sick sister. Ms. Anderson's serious medical condition led her to consider her own mortality, and she feared that if she was no longer living, her mother and sister would not have a place to live or adequate support. In this context, she gave her hard-earned retirement money, which she had saved over the course of decades, to the defendant. Financially, losing that money has put Ms. Anderson in debt and has put her life on hold for several years. As Ms. Anderson describes in her victim impact statement, she has been in turmoil since May 2021, and the defendant's criminal conduct has caused immeasurable pain and stress. Indeed, the harm caused by the defendant's fraud was palpable in the courtroom when both of the Andersons testified, and underscores the seriousness of the offense.

The seriousness of Whitehead's crimes, and the need for just punishment, necessitate a substantial sentence. Indeed, if the seriousness of the offenses were the only factor, the Guidelines would likely be too low, because they actually undercount the gravity of Whitehead's criminal conduct in at least three ways.

*First*, the Guidelines fail to fully account for the scope of Whitehead's culpability because they omit entirely any incremental punishment for Count Three, the attempted extortion conviction. That conviction is in its own group for Guidelines purposes and falls out of the calculation because it is less serious than Whitehead's other crimes. But that is not to say the extortion attempt here was not serious. Whitehead repeatedly threatened violence, including making a thinly veiled threat to shoot someone, in order to collect on a relatively meager debt. It

is difficult to understand how one human being could treat another the way Whitehead treated Brandon Belmonte. But it is all the more puzzling that Whitehead placed so much emphasis on, and made such grave threats about, a $5,000 debt. Extortion is a serious crime and in and of itself deserves substantial punishment. Yet Whitehead's extortion adds nothing to the Guidelines.

*Second*, the loss enhancement under the Guidelines falls short of fully accounting for Whitehead's culpability, because it omits various frauds for which an intended loss amount could not be calculated. There is no incremental loss associated with the attempted fraud from Count Two. Although Whitehead was convicted of that count, the trial evidence did not establish the value of the real properties Whitehead sought to steal from Belmonte. Similarly, the loss amount does not include intended losses relating to Whitehead's attempt to defraud Sunset Equity. (*See* PSR ¶ 52). Accordingly, there is little merit to the defendant's claim that the Guidelines loss amount as applied to his case *overstates* his culpability (Def. Mem. at 9-12); if anything, the reverse is true.

*Third*, as discussed in greater detail below, Whitehead perjured himself repeatedly on the stand at his trial. That is itself a serious crime, for which Whitehead can and should properly be held accountable at his sentencing. Yet it adds nothing to the Guidelines. Ordinarily, the Government would seek a two-level enhancement for obstruction of justice based on a defendant's trial perjury. But here, Whitehead already earned the two-level enhancement, for his conviction on Count Four, so his lies under oath at trial—despite being serious—add nothing to the Guidelines.

### 2. The Needs to Promote Respect for the Law and Deter Crime

The needs to promote respect for the law and to afford adequate specific and general deterrence necessitate a Guidelines sentence of 151 months in prison. These factors are especially weighty here, because the defendant has, at every opportunity, made clear that he does not respect

the law, and his recurring tendency to commit crimes and then deny responsibility for them shows there is a significant need for specific deterrence.

*First*, the defendant's criminal history and his offense conduct point to the need for the substantial sentence the Government is requesting, in order to deter him from committing future crimes. The defendant has been committing crimes consistently for at least 20 years in order to fund his opulent lifestyle, and he has been completely undeterred by arrests, convictions, and even lengthy prison terms.

- In 2002, at the age of 23, the defendant stole a Mercedes from a car dealership by lying and using the name Ronald Richardson. He then lied to law enforcement when asked who owned the car and attempted to bribe the arresting officer in exchange for his release. (PSR ¶ 90).

- About a year later, in 2004 and 2005, the defendant committed a sprawling fraud by using numerous stolen identities in order to obtain car loans and to other purchases. (PSR ¶ 91).[11]

- The defendant was arrested in 2006, at which time he was driving a Range Rover that he had purchased using a fraudulently obtained loan. (PSR ¶ 92).

- The defendant was sentenced initially to 1 to 3 years' imprisonment for numerous counts of identity theft and 16 months to 4 years' imprisonment for grand larceny and fraud. (PSR ¶ 91). He was sentenced to one year of imprisonment for criminal possession of the Range Rover. (PSR ¶ 92).

- The defendant served a lengthy incarceratory term and was released from prison on parole in 2013, when he was 34, at which time he established his church, Leaders of Tomorrow International Ministries, a role he prepared for while incarcerated. (PSR ¶¶ 91, 92, 122). In 2017, the defendant was discharged from parole at the age of 38. (PSR ¶¶ 91-92).

- A year later, in 2018 and through 2022, the defendant began his scheme to defraud lenders, specifically: Fundera and Paypal in 2018, Homebridge Financial Services in 2019, Bethpage Federal Credit Union in 2021, FM Home Loans in 2021, ConnectOne Bank in 2021, and Sunset Equity in 2022. (PSR ¶¶ 46-52).

---

[11] The defendant maintains that he was also wrongfully convicted in connection with his large-scale car-loan fraud, and that he "would have been fully exonerated." (Def. Mem. at 10). Apart from this self-serving conclusion, however, the defendant offers no proof that his conviction should or could have been overturned. The defendant also notes that this conviction was "quite remote in time" (*id.*), but fails to address the fact that soon after he was discharged from parole, he began reoffending.

- In 2020 and 2021, the defendant defrauded Ms. Anderson. (PSR ¶ 16).

- In 2022, the defendant attempted to extort and defraud Mr. Belmonte. (PSR ¶¶ 17, 18).

- In 2022, the defendant lied to the FBI. (PSR ¶ 19).

- In 2024, the defendant lied under oath at trial to the jury and to the Court. (PSR ¶ 62).

In light of this history, Whitehead presents a substantial recidivism risk, particularly given that his life appears to have been funded by fraud, and it is not clear that he will have a source of legitimate future income. There is a significant need for specific deterrence here, and a sentence longer than the (subsequently reduced) eight-year state sentence he previously received is necessary to achieve the deterrence that Whitehead's prior convictions and sentences have not achieved.

*Second*, the defendant's complete lack of remorse for his crimes shows that the Court's sentence must promote respect for the law. *See United States v. Brodsky*, 675 F. App'x 59, 62 (2d Cir. 2017) ("Lack of remorse is a legitimate factor under § 3553(a)."); *Watts v. United States*, No. 21-2925, 2023 WL 2910634, *3 (2d Cir. Apr. 12, 2023) (district court's sentence in a fraud case was unreasonably low where, among other things, the court minimized the defendant's history of violating the securities laws and excused his lack of remorse). The defendant has, as noted by the Probation Office, "not taken responsibility or shown remorse for his actions." (PSR at 48). And his sentencing submission fails to address the nature, circumstances, and seriousness of his many crimes. (Def. Mem. at 27-28). In fact, not only has Whitehead expressed no concern for his victims—he views himself as the victim in this case. That has been true since he was charged. In March 2023, Whitehead gave an interview in which he dismissed this case as an "attack on a black man," and a "political attack," in which he was "collateral damage." (PSR ¶ 64(a)). Even after his conviction, he continued to promote the narrative that it was this case, and not Whitehead himself, that was wrong. He went on a press tour following his conviction, in which he decried his purported

28

mistreatment at the hands of the FBI, the prosecution, and the Court. (*See* PSR ¶¶ 64(b)-(c); Dkt. 198; Dkt. 203). In Whitehead's own mind, this case is the fault of everyone but himself. And there is no indication he cares about any of his victims, or any of the millions of dollars he has stolen, at all.

Perhaps that should not come as a surprise. It is of a piece with how Whitehead has responded to every other setback in his life. It was evident from the lengthy text message exchanges between Whitehead and Eric Adams shown at trial: Adams recognized, astutely, that Whitehead constantly blames everyone but himself for his problems. (*E.g.* GX 610 at 1-5). That is also how Whitehead has responded to prior interactions with criminal authorities. After the prior fraud case in which Whitehead did prison time after losing at trial, Whitehead tried the same approach he has employed here. He claimed that he was framed, because "the cop couldn't get him to cooperate with them and turn on his friend." (PSR ¶ 92). Whitehead did the same thing in connection with 2018 harassment charges, in a case in which he allegedly "put his hands around the neck of his ex-wife…and applied pressure," and "also put his hands around his son['s]…neck and applied pressure." (PSR ¶ 93). Whitehead dismisses that case, too, as an example of how his ex-wife "tried to destroy him," and "filed a false child abuse case against him." (PSR ¶ 105).

This complete inability to take responsibility, and utter lack of remorse, should concern the Court. The fact that it is a pattern—the fact that this defendant has repeatedly committed serious crimes and repeatedly cast the blame for them on everyone but himself—makes clear the risk that he will commit other crimes again. *Cf., e.g.*, *United States v. Latulas*, No. 21-1792, 2022 WL 16828372, at *2 (2d Cir. Nov. 9, 2022) (affirming upward variance where the defendant's "complete lack of remorse and failure to accept any responsibility," coupled with a lengthy criminal record, indicated that there was a "likelihood" that he would reoffend).

*Third*, Whitehead's conduct in this case illustrates the need for a substantial sentence to specifically deter him and promote respect for the law. There is, of course, nothing wrong with a defendant's insistence on his innocence. The defendant was and is entitled to contest the Government's proof, and to dispute the charges. What he was not entitled to do was fight the case by taking the stand and lying under oath. But that is exactly what he did. There should be no penalty at sentencing merely for going to trial; but for the defendant's perjury, a substantial penalty is warranted. The defendant's willingness to repeatedly lie under oath, to try to trick a jury into acquitting him, merits a substantial increase in his sentence in order to promote respect for the law and accomplish deterrence.

On the stand, the defendant lied just as readily as he had to his victims. Some of those lies were, while important, not centrally relevant to the case. For instance, the defendant testified repeatedly that his accountant filed his tax returns for him, on his behalf. (Tr. 1126-27, 1178-79). He insisted on it: he claimed, for instance, that he did not know whether he earned $0 or $1,000,000 in tax year 2019, because his taxes were never filed and, in any event, "my accountant files my taxes." (Tr. 1181-82). In fact, Whitehead claimed that he did not file taxes for tax years 2017 through 2022 because he was "a victim of identity theft and I cannot file." (Tr. 1172-73; *see also* Tr. 1203 (reiterating on redirect)). That was all false. The defendant filed tax returns for tax years 2017, 2018, and 2019. The defendant signed them. He did not use an accountant—there is no paid preparer on any of them. They were filed in paper, using envelopes with the defendant's own return address on them.[12]

---

[12] The Government received copies of these tax returns pursuant to a Tax Order after the trial had ended, and produced them to the defense. The Government can provide them to the Court upon request.

Some of the defendant's lies were more central to the case. He asserted that he had never had any conversations with Ms. Anderson, about money or anything else. (*E.g.* Tr. 1076). But Ms. Anderson's and Mr. Anderson's testimony, and phone records, proved otherwise. And he testified that he did not submit the fraudulent loan applications, send or receive emails about them, or doctor any bank statements. (*E.g.* Tr. 1125-28). The jury saw those for the lies they were, and convicted Whitehead for the exact conduct he had falsely denied.

The defendant's right to defend himself does not extend to a right to commit new crimes to try to obstruct the case against him. This perjury, which as noted above is completely unaccounted for by the Guidelines, deserves serious sanction.

Through its sentence, the Court has the opportunity to send a message to the victims and to the community about the seriousness of the defendant's crimes and the consequences for committing crimes and engaging in a life of fraud. Importantly, the Court has the ability to recognize the harm caused by the defendant and to deter other members of the community from emulating the defendant and committing similar crimes by imposing a significant sentence.

### 3.  The History and Characteristics of the Defendant

Like many defendants, Whitehead touts his purported good deeds and the support of his community, including by submitting letters of support that describe the defendant's "good works," "integrity," "trustworthy[iness]," and "character." (Def. Mem. at 14-18 & Exs. 1-2).[13] The letters of support describe the defendant's criminal conduct as "inconsistent with his character," a

---

[13] The Government notes that it cannot confirm the veracity of Whitehead's statements about his background, his purported good deeds, or the extent of his actual involvement in these deeds. The defendant has significantly inflated his community service in the past and there are certain aspects of his personal history that have been publicly questioned for their accuracy.

"misunderstanding," or an aberration. (*Id.* at 18, Exs. 1-2). That is a recurrent argument in

sentencings in cases involving white-collar crime. As Judge Marrero once astutely observed:

> [The defendant's sentencing] argument falls into a pattern advanced
> by a subset of the white collar criminal. This category encompasses
> a select class: distinguished, reputable, highly esteemed model
> citizens such as [the defendant]. The list of their achievements and
> virtues is long and impressive. At home, they are good family men
> and women, caring spouses, loving parents, loyal and reliable to
> friends. At work, they are looked up to as outstanding professionals
> and business partners. To their community's charities and public
> causes they are generous patrons and sponsors. And as worshipers
> they are devout, often rising as leaders of the congregation.
>
> Yet, for all of their outward rectitude, these otherwise good people
> suffer a fatal flaw: they sometimes lead a double life. Somewhere at
> the core, in a distorted dimension of the soul, the public image they
> present is as false as the lies they tell to sustain the appearances of
> an exemplary life. And somehow, for reasons that always defy
> reason, they fall into crime, doing wrongful deeds that seem
> aberrational, selfish and greedy acts that, when caught, they claim
> are entirely out of character with their otherwise law-abiding lives.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60

(2d Cir. 2010).

Whitehead led this same double life: the persona and reputation he carefully crafted,

including through his church leadership, was a key facilitator of his crimes. His fancy clothing and

cars, his mansion, his church, his sermons—these were all tools of the trade. Whitehead's apparent

wealth and success built credibility with lenders and businessmen, and helped him to gain the trust

and respect of parishioners and members of the community, so that he could exploit and defraud

them. Indeed, the Court saw the defendant's two sides during trial: his loving support of Rasheed

Anderson for months up until he obtained Pauline Anderson's money, and his scathing text

messages to the Andersons when asked to return the money; his initial text messages to Ms.

Anderson that appeared to be respectful, and his later explosive and threatening messages; his

attempted extortion of Belmonte and threats to harm him, and his later amicable conversations

with Belmonte. The Court also saw the defendant's two sides as he took the stand—he was calm and charismatic on direct examination, but aggressive and angry, shouting and obfuscating, during cross-examination.

Given these two sides, this double life, it is no surprise that Whitehead still has followers who will tout his good qualities. Having seen how he presented himself to his victims, and to the jury, it makes sense that some people still view Whitehead as a pillar of the community with "exceptional character" (Dkt. 221-1 at 5), or "a person of integrity, reliability, generosity," who is "compassionate, trustworthy, and kind" (*id.* at 8). These are people who only see one side of the defendant. And as a result, their letters—like the defense submission itself—are most notable for what they leave out. They fail completely to grapple with the seriousness of Whitehead's crimes, or the extent to which they were facilitated by the exact public persona on which the defense relies in seeking leniency. That is the precise species of argument that Judge Marrero correctly rejected in *Regensberg*, because it "goes only so far," and "is flawed by what it omits." *Regensberg*, 635 F. Supp. 2d at 308.

### 4.  The Applicable Guidelines Range

The applicable Guidelines range is among the factors the Court must, by statute, consider. And while the Court cannot presume that a Guidelines sentence will always be reasonable, "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Bryant*, 976 F.3d 165, 181 (2d Cir. 2020). Indeed, while a sentence outside of the Guidelines is not presumed to be unreasonable, a Court imposing such a sentence "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)).

33

The defendant urges the Court to discard the applicable Guidelines range altogether and exercise exceptional discretion to impose an extremely lenient sentence of supervised release. (Def. Mem. at 10-12). The defendant claims that the average sentence for "fraud offenses" for defendants in criminal history category II was 24 months (*id.* at 30)—but notably, this "average" does not take into account the number of counts of conviction in this case, the $7.2 million loss amount, the defendant's ongoing and repeated schemes to defraud, the defendant's commission of frauds since 2002, the defendant's lies to agents, to the jury, and to the Court, and the defendant's attempted extortion of Belmonte. Nor does it focus on wire fraud offenses, as opposed to other forms of fraud, for example, those set forth in Title 18, Chapter 47, of the U.S. Code (*i.e.*, access device fraud, the misuse of government seals, unlawful possession of identification information).

The defendant also points to so-called "Shadow Guidelines," recommendations drafted almost a decade ago by the Criminal Justice Section of the American Bar Association. (Def. Mem. at 10-12).[14] This argument is bizarre on its own terms, because the application of the "Shadow Guidelines" would not necessarily result in a lower sentencing recommendation in this case—the defendant's own "Shadow Guidelines" calculation (Def. Mem. at 12) is incorrect in multiple respects, as it fails to properly account for the total loss, the defendant's culpability, or victim impact, which are the three main drivers of sentencing recommendations in that framework.[15] But

---

[14]*See* Final Draft, A Report on Behalf of The American Bar Association, Criminal Justice Section, Task Force on The Reform of Federal Sentencing for Economic Crimes (Nov. 10, 2014), available at: https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes .pdf (last visited June 7, 2024).

[15] The "Shadow Guidelines" recommend a ten-level increase for actual losses of more than $5,000,000, which would apply here; they continue to incorporate certain enhancements that apply under U.S.S.G. § 2B1.1(b); and they call for a six-to-ten-level increase for "Highest culpability," as determined by "culpability factors" that are uniformly aggravating in this case, including motive (here, greed), the correlation between amount of loss and the defendant's gain (here, virtually 1:1), the degree to which the offense was organized and sophisticated (here, it was), whether the

at any rate, the "Shadow Guidelines" are inapplicable. The Court is required by law to consider the actual Guidelines. *See* 18 U.S.C. § 3553(a)(4)(A). But the Court need not consider the "Shadow Guidelines"—which were never adopted by the United States Sentencing Commission despite several updates to the Guidelines since 2014—at all. The Government is not aware of any cases in this District in which a court has considered these now-outdated, draft suggestions, and the Court should decline to consider them here.

### 5.  The Defendant's Attacks on the Conditions of Confinement at the MDC are Irrelevant or Unfounded

Whitehead was first remanded on May 20, 2024 (Dkt. 214). At the time of the defendant's sentencing submission, he had been incarcerated for two weeks. And as defense counsel knows, it is highly unlikely that the defendant will be detained at the MDC for the duration of his sentence because he will be designated to another facility. Nevertheless, the defense attempts to rely on conditions of confinement at the MDC to justify a time-served sentence and release pending appeal. (Def. Mem. at 26). But the defendant's claims relating to the MDC are false, unsupported, unrelated to the defendant, and/or outdated.

*First*, many of the cases Whitehead cites are decades old and simply stand for the uncontroversial proposition that harsh conditions of pre-trial confinement can "in appropriate cases" permissibly justify a downward variance. (*See id.* at 20 (collecting cases from the 1990s and early 2000s supporting that proposition)). But that proposition is not in dispute here.

*Second*, the more recent cases Whitehead relies on are inapplicable because they focused on the difficult conditions of confinement during the height of the COVID-19 pandemic (*see id.* at 21 (discussing *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. 2021)), or because they focused

---

defendant initiated the offense (here, he did), and whether the defendant took steps to mitigate harm (here, he did not). *See id.*

on health risks an elderly and infirm defendant would face if detained at the MDC while awaiting sentencing in the context of a bail motion, not a sentencing (*see id.* at 22 (discussing *United States v. Chavez*, 22 Cr. 303 (JMF) (S.D.N.Y.)).

*Third*, certain of the defendant's complaints about the MDC are false. For example, the defendant claims that shortly after he entered the MDC, the facility went on lockdown because an operable firearm was recovered within an inmate's cell. (*Id.* 25-26). The Government has conferred with BOP counsel and confirmed this claim is false. No firearm, let alone an operable firearm, was found in an inmate's cell at the MDC.

*Fourth*, other claims Whitehead makes about MDC are simply irrelevant. He asserts that in "the fall and winter it is cold in the facility and inmates are not given sufficiently warm clothing or blankets" (*id.* at 23), but as noted above, Whitehead's detention at MDC began in May of this year, and will in all likelihood end this summer, when he is designated to another facility soon after his sentencing proceeding next week.

*Fifth*, a number of Whitehead's claims about the conditions at the MDC do not support leniency in his particular case. He claims, without any support or citation, that the MDC's medical department is understaffed and medical treatment is sometimes delayed (*id.* at 23), but he told the Probation Office he was in good health, and he only arrived at the MDC a few weeks ago. He complains of the lack of programming at MDC (*id.*), but as just noted, he will not be at MDC for long. To be sure, a number of courts have recognized, and the Government has acknowledged, that there are serious issues at the MDC. And the MDC is making efforts to address, and in some cases has already addressed, complaints discussed in the defendant's submission. But the defendant has not been at the MDC for long, and will not remain there for long. The conditions of his brief confinement pending sentencing do not justify the extraordinary leniency he seeks.

**III.  A Fine Within the Guidelines Range Is Warranted**

The Court should also impose a fine within the Guidelines range of $35,000 to $350,000. The motive for Whitehead's crimes was undoubtedly financial, and the forfeiture and restitution do not fully account for the millions of dollars in financial losses caused by crimes that are relevant conduct here. A significant financial penalty should be imposed.

The statutory factors courts consider before imposing a fine, in addition to the Section 3553(a) factors, include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden the fine will impose on the defendant and any of his dependents; (3) any pecuniary loss inflicted on others by the defendant's offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the Government of any imprisonment. 18 U.S.C. § 3572(a). The Guidelines provide that district courts "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). The Guidelines make clear that the "amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* § 5E1.2(d) (setting forth Guidelines factors to consider in imposing fine). The defendant bears the burden of demonstrating that he cannot afford to pay a fine. *See United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001); *United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010).

The factors are for the most part covered by the analysis of the Section 3553(a) factors above. The defendant imposed substantial pecuniary loss on others, and that pecuniary loss will not be recouped via forfeiture or restitution—much of it flows from relevant conduct for which forfeiture and restitution will not be ordered.

The Probation Office recommends no fine, in a change from the draft first disclosure of the PSR. Initially the Probation Office stated that it intended to recommend a fine, but then the

defendant submitted a financial affidavit, and the Probation Office now "believe[s] that the defendant does not have the ability to pay a fine." (PSR at 54). This belief appears to have been influenced by a financial affidavit that is substantially inconsistent with representations the defendant made to the Probation Office during the presentence investigation but *outside* the context of the financial affidavit. (*Compare* PSR ¶ 130 (the defendant reported that he owed $1.9 million on his mansion and that it was worth $2 million, while Zillow.com provided an estimated value of $2.229 million) *with id.* ¶ 129 (defendant's financial affidavit claims the mansion is only worth $1.6 million); *compare id.* ¶ 131 (defendant reports the "fair market value" of his Connecticut property is $5.5 million) *with id.* ¶ 129 (defendant's financial affidavit claims the Connecticut property is worth $3.5 million). More to the point, the trial in this case showed that the defendant's representations cannot be trusted. Given his willingness to lie to everyone else, the Court can fairly presume that he would lie to the Probation Office to get out of paying a fine. Throughout this case the defendant has continued to live in his mansion, live his extravagant lifestyle, and fund his defense. He has not shown that he cannot afford a fine, and the relevant statutory factors favor imposing one here.

## IV.  The Defendant Must Pay Restitution, Forfeiture, and a Special Assessment

Consistent with the Probation Office's recommendations, the defendant must be ordered to pay restitution on Count One in the amount of $85,000, forfeiture in the amount of $90,000, and a special assessment of $500. (PSR at 47).[16]

---

[16] The Government intends to provide the Court with proposed restitution and forfeiture orders at sentencing.

## V.  There Is No Basis for Bail Pending Appeal

Under 18 U.S.C. § 1343(b)(1), a defendant who has been sentenced to a term of imprisonment shall be detained pending appeal unless the Court finds: (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released"; and (2) "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in" reversal, an order for a new trial, a non-incarceratory sentence, a reduced sentence less than the expected duration of the appeal process. 18 U.S.C. § 3143(b)(1). Under 18 U.S.C. § 1343(b)(2), if the defendant "has been found guilty of an offense" described in 18 U.S.C. § 3142(f)(1)(A)-(C), [17] is "sentenced to a term of imprisonment," and "has filed an appeal or a petition for a writ of certiorari," he must be detained. 18 U.S.C. § 1343(b)(2).

In remanding the defendant last month (Dkt. 214), the Court held that attempted extortion constitutes a crime of violence under the Bail Reform Act. As a result, if the Court sentences the defendant to a term of imprisonment, his continued detention pending appeal remains mandatory under 18 U.S.C. § 3142(b)(2). (*See* Dkts. 198, 203, 211). Even ignoring Section 3142(b)(2)—as the defendant's request for bail pending appeal largely does[18]—there would be no basis to release the defendant pending appeal. The defense has not identified any appellate issue that will raise "a

---

[17] Subparagraph (A) of Section 3142(f)(1) includes "a crime of violence," which is defined for these purposes as "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another; (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or (C) any felony under chapter 77, 109A, 110, or 117." *Id.* § 3156(a)(4).

[18] Whitehead briefly acknowledges that the Court already determined that he was convicted of a crime of violence, before turning to the heart of his argument, which is that his release is justified by the existence of "substantial questions" on appeal. (*See* Def. Mem. 26). He argues in passing that the conditions of confinement at MDC constitute "exceptional reasons" for release under Section 3145 (*id.*), an argument that the Court has already rejected in this case.

substantial question of law or fact" likely to result in reversal, a new trial, or a non-incarceratory sentence. Instead of offering any specific "substantial question of law or fact," Whitehead simply asserts that if "any of the matters raised in [his] Rule 33 motion…were to be resolved in [his] favor then it is likely that a new trial would be ordered." (Def. Mem. at 27). But that is true for *every* post-trial motion. If the defendant were correct, then by definition every defendant who made a post-trial Rule 33 motion could satisfy the "substantial question" standard to obtain release pending appeal. That is not, and cannot be, the standard. And as set forth in the Government's opposition to the post-trial motions, Whitehead's motions under Rules 29 and 33 are meritless. (Dkt. 195). There is thus no basis for bail pending appeal.

## CONCLUSION

For the reasons set forth above, a sentence of 151 months' imprisonment and a Guidelines fine would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Dated:        New York, New York
              June 10, 2024


                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney


              By:    /s/_____
                     Jessica Greenwood
                     Jane Kim
                     Derek Wikstrom
                     Assistant United States Attorneys
                     (212) 637-1090 / 2038 / 1085