Bishop Lamor Whitehead
Reg. No. 36692-510
FCI Fairton
cPO Box 420 Fairton, NJ 05320

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,
Respondent,
V. CASE NO. 22-CR-692 (LGS)
BISHOP LAMOR WHITEHEAD,
MOVANT .

---

MOTION FOR RECONSIDERATION OF RULE 29 AND 33

Application **DENIED**, in light of the notice of appeal filed at Dkt. 234, which is "an event of jurisdictional significance" that "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *United States v. Rodgers*, 101 F.3d 247; *accord United States v. Cosme*, No. 13 Cr. 43, 2024 WL 3445425, at *1 (S.D.N.Y. July 17, 2024). Because this Court lacks jurisdiction, this motion is denied pursuant to Rule 37(a) of Federal Rules of Criminal Procedure.

The Clerk of the Court is respectfully directed to mail a copy of this Order to Defendant, and to terminate the motion at Dkt. 254.

Dated: January 16, 2025
New York, New York



LORNA G. SCHOFIELD
**UNITED STATES DISTRICT JUDGE**

Preliminary Statement

Trial began on February 26, 2024 the Government's witnesses were 1. Bradley Thornton, senior manager of sales at fundera. 2. Matthew Talley Witness for paypal. 3. Philp Schild, Homebridge financial services. 4. Jeffery Burris Wells Fargo. 5. Pauline Anderson count 1. 6. Rasheed Anderson . 7. Zachary Chromiak Bank Of America . 8. Alexander Loizias, FBI . 9.Angel Fernadez Brandon Belmonte's Driver . 10. Deleassa Penland SA. 11. Micah Friedman FBI. 12. Richard Busick FBI

The defense elected to present a case and called Bishop Lamor Whitehead who testified as a witness. Defendant also sought to call Brandon Belmonte alleged Victim counts 2 and 3 of the indictment, Attempt Wire fraud and Attempt Extortion.

The Government moved to preclude Victim -2 Mr. Belmonte from testifying in front of the jury based on the belief that he would invoke his privilege against self- incrimination. On March 5, 2024, Mr. Belmonte Victim-2 testified outside the presence of the jury. On the basis of Mr. Belmonte's testimony which was an invocation of his fifth amendment right not to incriminate himself to all substantive questions Mr. Belmonte was not permitted to testify before the jury.

At the final pre-trial conference, Bishop Whitehead stated his intention to call six witnesses in addition to Mr. Belmonte. The district court granted the government's motion to exclude two of the witnesses on the grounds of relevance , including Dino Tomossetti, And Marc Kaplan precluding him under federal rule of evidence "(FRE)" 403 because his putative testimony lacked sufficient probative value to outweigh the risk of wasting time or confusing the jury and under FRE 608 (b) as improper extrinsic evidence offered for impeachment. On March 7, Defendant Rested.

March 11,2024 , the government and the defendant delivered their summations, and the government delivered a rebuttal summation. After several hours deliberation, the jury reached a verdict. Defendant was found guilty on all counts, wire fraud , attempted wire fraud, attempted extortion and making false statements to the FBI. On March 25, 2024, Defendant filed Rule 29 arguing that a verdict of acquittal should be entered on all counts because the evidence at trial does not sufficiently Support the jury's verdict. Defendant also filed Rule 33, argues that a new trial is justified based on : 1. the lack of sufficient evidence at trial, 2. the lack of evidence of chain of custody of recordings made by Brandon Blmonte 3. the denial of the ability to call Brandon Belmonte as a witness, 4.The denial of the ability to call Marc Kaplan and Dino Tomassetti as witnesses, 5.the denial of the motion for a mistrial and 7. the denial of the opportunity to re-argue the motion to suppress also called a "motion to controvert". The rule 33 motion was denied because the District court ruled none of the proffered reasons justifies a new trial. District court denied the rule 29 and rule 33 motion on June 21, 2024 after the defendants June 17,2024 sentencing.

Bishop Whitehead was remanded on May 20,2024 where the District Court ruled that attempted extortion was a crime of violence and is mandatory detention.

On June 17, 2024 Bishop Lamor Whitehead was sentenced to 108 months (9 years ) in federal prison. Whitehead is currently serving that sentence at FCI Fairton in New Jersey.

Jurisdictional Statement

Legal Standard

When evaluating a motion for reconsideration in a criminal case , such " will generally be denied unless the movant can point to controlling decision or data that the court overlooked in the initial decision or order." D. conn. L. Civ. R. 7 (c) 1: see Virgin Atl. Airways LTD . V. Nat'l mediation Bd., 956 f.2d 1245, 1255 (2d.cir 1992) (explaining the three grounds for granting reconsideration are (1) '" intervening change of controlling law , (2) "the availability of New evidence or (3) A "need to correct a clear error or prevent manifest injustice") (quoting 18 c. Wright, A. Miller E. Cooper, fed . Practice & Procedure, 4478 at 790).

The standard for granting a motion (for reconsideration is strict,and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked matters in other words , that might reasonably be expected to alter the conclusion reached by the court. Shrader V. CSX Transp. Inc. 70 f. 3d 255, 247 (2d cir 1995).

Movant Whitehead respectfully avers that he will satisfy the requirements for reconsideration under Rule 29 and Rule 33 Motion. However he will give this honorable court the opportunity to reconsider its previous order denying Whitehead on his Rule 29 and Rule 33 Motions. There are the existence of substantial issues that will result in acquittal under Rule 29 and a new trial under Rule 33 by this Court. The issues are : 1.New Evidence/Brady Violation 2. Erroneous Jury Instruction 3. Constructive Amendment/ Defective indictment (crime of Violence) 4.Admissibility of evidence, 5. Insufficiency of Evidence, 6.Confrontation Clause
6. Prosecutor misconduct 7. sentencing issues

Argument

Bishop Whitehead meets the 3 prongs of reconsideration.

Respectfully, Whitehead asserts that to meet all requirements for a motion for reconsideration, he presents that there is controlling case law to purported crime of violence which proves a constructive amendment and defective indictment. In particular count 3 for the conviction of attempted hobbs act extortion. The controlling law that this court overlooked is the supreme court's holding in the United States v. Taylor, 596 u.s.845 (2022). which have greatly affected the court's decision within rule 29 and 33 on june 21, 2024. see (exhibit A)

Within prior motions litigated the government had conceded on a number of occasions to the elements clause of the theory that attempted extortion being a crime of violence is not satisfied. the government relied solely on the residual clause. There are two approaches for analyzing

whether an offense is a crime of violence under the residual clause by using the categorical approach under for which the courts must decide whether in the ordinary case the conduct Encompassed by the elements of the offense presents a substantial risk that physical force may be used (Traditionally used in case involving prior conviction enhancements, to avoid apprendi issues) or the conduct specific approach, where defendants conduct in the charged crime actually involved physical force (Traditionally used in current offense cases like this one). Respectfully this court overlooked a flurry of case law striking down the crime of violence under the residual clause as unconstitutionally vague (Johnson v. United States 576 U.S 591(2015) Sessions v. Dimaya, 584 U.S 148 (2018), United states V. Davis 588 U.S 445 (2019), and the supreme court's statutory interpretations of a identically worded residual clause as precluding a case specific approach (Davis, at 454), The second circuit held that, while it would make "Abundant sense" to consider an arrestee actual conduct during the charged crime courts must apply the categorical approach.

Here in count 3 of the indictment attempted Hobbs Act extortion Whitehead did not use violence as all parties and the court agreed (Tr.1366). Nor is this count a crime of violence, as the elements of the offense do not always require the government to prove beyond the reasonable doubt as an element of its case the use, attempted use, or threatened use of force. United States V. Taylor, 596 U.S at 850. As the court reasoned in Taylor, merely because "some" cases of attempted hobbs act robbery involved the use, attempted use, or threatened use of force "Not all do". Id. at 854. In this case here as well by the courts adopting that attempted hobbs act extortion under the residual clause the court allowed the government to constructively amend the indictment from a non violent crime of attempted hobbs act extortion to a crime of violence of substantive and completed hobbs act extortion.

To prove extortion under the hobbs act, the government must prove that the defendant obtained "Property" from another with his consent, induced by wrongful use of actual or threatened force, violence or fear 18 U.S.C 1951 (B)(2).

However, due to this court overlooking United states V. Taylor showing that attempted hobbs act did not have the same elements of completed hobbs act, this court erred and allowed the theory of attempted extortion being a crime of violence which allowed a constructive amended indictment which is deemed defective. This defective indictment was used by this court to also erroneously charge the jury incorrectly on the elements of attempted extortion as a crime of violence.

The District Court's Denial Of Defendant rule 29 and 33 is completely contrary to the indictment, and jury instructions. See (exhibit A1 defendants indictment) see (exhibit A2 jury instruction) the district courts states in its ruling;

"The evidence was sufficient to support the jury's guilty verdict on count 3. Count 3 charged the defendant with attempted extortion by using threats of force to attempt to attain $5,000 from a business owned by Brandon Belmonte. See superseding indictment Dkt 63 at 6. Whoever in anyway or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by extortion or attempts or conspiracies sole to do, or commits or

threatens physical violence to any persons or property in furtherance of a plan or purpose to do anything in violation of this section "Violates federal law. 18 U.S.C 1951 (A) extortion requires the obtaining of property from another, with his consent induced by wrongful use of actual or threatening force, violence or fear or under color of official right. Id. 1951 (B)(2) as stated above attempt "Requires proof the defendant (A) had the intent to commit the object crime and (B) engage in conduct amounting to a substantial step towards its commission. Farhane, 634 F.3d at 145.
The government introduced sufficient evidence to prove each of these elements beyond a reasonable doubt".

Respectfully there's a lot of errors to unpack here. Within this course, the decision to deny defendants rule 29 motion specifically to count 3 of the indictment is incorrect and based on things that never exist within a decision and the jury instruction.
Let me explain;
1) The courts state that the defendant violated the section federal law 18 U.S.C 1951 (A); if you look at the superseding indictment exhibit A1 count 3 the defendant was charged under 18 U.S.C 1951 (B)(2) and 18 U.S.C 1951 (B)(3).

2) The district court gives the definition of extortion under 18 U.S.C 1951 (b)(2) "extortion requires the obtaining of property from another, with his consent, induced by wrongful use of actual or threatening force violence or fear or under color of official rights. This is the statute that congress enacted as the official statute with the correct elements of completed Hobbs Act extortion which is a crime of violence.

The district court applied this law to deny the rule 29 motion however this court overlooked a constructive amendment and a defective indictment. The government constructively amended the indictment to read differently and the indictment is in complete contrast to the charged crime that this district court determined its decision. For example the indictment for count 3 reads From in or about february 2022 through in or about april 2022 in the southern district of New York and elsewhere , Lamor Whitehead , the defendant, Knowingly and Willfully committed and attempted to commit extortion, as that term is defined in 18 U.S C 1951 (b) (2), By obtaining and attempting to Obtain money and property from another person, with his consent which consent was and would have been induced by the wrongful use of actual and threatened force , Violence and fear, and thereby would and did obstruct, delay and affect commerce, as the movement of articles and commodities in commerce, as that term is defined in 18 U.S.C 1951 (b)(3) to wit, Whitehead used threats of force to attempt to obtain $5,000 from a business located in part in the Bronx, new york and owned by victim-2.

The District's Court's decision and the indictment are completely different which is a major violation of Whiteheads constitutional rights. The government also added the words "Attempting To" within a well sealed congressional statute under 18 U.S.C 1951 (b)(2). As we compare the Indictment to the Judge's Order ( District Courts Ruling), There is No "Attempting To" Mention within the courts description of 18 U.S C 1951 (b)(2).

If you analyze the court's decision it says that the "defendant violated federal law under 18 U.S C. 1951 (a) and if this court now cross-exam or cross reference this document with the superseding indictment you will see no such charge within the indictment. The Charge of 18 U.S.C 1951 (a) Never existed in the defendants indictment however this statute was used as a basis for denial of defendants Rule 29 Motion.

The court Decision explains the proof requirements of "Attempt" however if we compare the Decision with the Jury instructions (see Exhibit A-2) at page 1235-36 starting at line 13, you will not see no such "Attempt" charge to the jury of what the decision states: "(a) had the intent to commit the object crim and (b) engaged in conduct amounting to a substantial step towards its commission. Farhane, 634F. 3d at 145. "This statement was in the court's decision, and ruled on June 21st, 2024. However, this court charged the jury with two completely different elements, on March 11, 2024, during the jury instructions." See Exhibit A2.

How can the courts charge the jury to incorrect and erroneous elements of the crime "attempt Hobb's Act extortion." Then, place different elements of attempt within the decision of Rule 29 and Rule 33 that was never presented to the jury. The elements that this Court based its decision on were not the same elements that the jury found the Defendant guilty of. The jury never considered any attempt elements charged by this court.

The district court ruled in the Rule 29 legal standard "Rule 29 allows the Defendant to move for a judgment of acquittal after verdict based on the interface of evidence." (Fed. R. CRIM p.29(c)). A Defendant challenging the sufficiency of the evidence bears a heavy burden. The Court must determine that upon the evidence, given full play to the right of the jury to determine the credibility, the weight, the evidence, and then draw justifiable inferences of fact, a reasonable mind might fairly complete beyond a reasonable doubt. "United States vs. Landesman, 17F.4th 298, 219(2nd Cir. 2021)"

This determination requires the court to review the evidence in its totality, draw all permissible inferences in favor of the government, and does not require the government to "negate every theory of innocence." (Id.). The verdict must ... be upheld if any rational tier or fact could have found an essential element of crime beyond a reasonable doubt. (See Judge's Decision, Exhibit A).

It is impossible for the Defendant to be convicted of counts 2 and 3. Respectfully, I would like to point to counts 2 and 3 of the Government's opposition. The government in its opposition, on page 6, states "The Defendant motion for a judgment of acquittal should be denied. The Defendant claims that the evidence was insufficient on each of the five counts. His arguments against sufficiency are united by two recurring themes; first, on count after count, the Defendant ignores the parts of the trial evidence that are harmful to his arguments, but the jury was entitled to credit. Second, he rehashes factual arguments that he made to the jury and that the jury rejected. His sufficiency challenges fail. (Let's say that the government's position is correct, which I do not believe.)"

As to the case law in Zongo, it is fatal to the government's argument and shows that it is a clear error and manifest injustice of the district court's decision.  In Zongo, the court instructed the jury for "Attempted wire fraud" that: (1) the Defendant knowingly and willfully participated in a scheme to defraud by materially false and fraudulent pretenses with specific "intent to defraud" through the "use of interstate wire," (2) that the defendant took a substantial step in an effort to bring about or accomplish the scheme.

The "use of interstate wires" is the tried element to substantive wire fraud.  The Second Circuit clarified in United States v. Castilla (36 F.4th (2nd Cir. 2022)) that "we have adopted a generic definition of attempt that conforms to the views set forth in the model penal code as the Federal law of attempt within the second circuit (See United States V. Manley, 632 F.2d 9078, 987 (2nd Cir. 1980)(This court ... has adopted a view set forth in ... America Law Institute's model penal code ... that requisite elements of attempt are an intent to engage in criminal conduct and the performance of acts which constitute a 'substantial step' towards the commission of the substantive offense.")"  See also, Tabb (949 F.3d at 86 (Generic attempt is the presence of criminal intent and the completion of a substantial step towards committing the crime (quoting Sui. 250 F.3d at 115)).

This generic definition of attempt requires proof that the defendant had the intent to commit the crime (United States V. Crowley, 318 F.ed 401, 407 (2nd Cir. 2003) and Wayne-LaFave Substantive Criminal Law 11.3(a) (3rd ed. 2021)(The mental state required from the crime of attempt, as it is customarily stated in the cases, is an intent to commit some other crime.)). Under the generic definition, the crime of attempt requires that the defendant have intended to commit each of the essential elements of the substantive crime (Collier V. United States, 989 F.3d, 212, 221 (2nd Cr. 2021) and LaFave(ibid.), noting that "because intent is needed for the crime of attempt, crimes that are defined in terms of acts causing a particular result cannot be attempted unless the defendant specifically intended to bring about that result.").

Attempted wire fraud should have incorporated the three elements of wire fraud, which are the following: (1) A Scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme (See Zongo instruct for attempt, SUPRA). The court conceded that there were three elements to attempt wire fraud.  The district court stated within the jury instruction, after the court omitted the third element for count two (See Page. 1233, lines 6-13).  Further, within the trial transcript (page 1239, line 5-10), the district concedes that there are three elements to attempt wire fraud.

The court states: "with respect to counts one, two, and five, which charge wire fraud and attempted wire fraud, it is sufficient to establish venue if the government has proven that any of the wire communications you found to satisfy the 'third element of the offense, use of interstate wires,' were transmitted to, from, or through the Southern District of New York."  This shows that the district court made a clear error and manifest injustice as to Count 2.  This shows that under the government's applicable law argument within the original opposition, it would be impossible to find the defendant guilty on Count 2 beyond a reasonable doubt of all three elements of attempt wire fraud.  However, because the court only gave the jury two of the elements (thus,

leaving out one of the essential elements), the entire instruction becomes invalid (See Zongo, SUPRA).

Also within the District Judge's Court decision, it states that the evidence was sufficient and named three elements of wire fraud including the third element of "use of the wires to further the scheme," but after naming the elements, the court did not charge the jury to find guilt of all three elements.  This raises the fact that the evidence showing that the defendant committed the alleged crime, with respect to all three statutory elements, is non-existent or so meager that no reasonable jury could find guilt beyond a reasonable doubt (See United States v. Jiau SUPRA).

The government further states on Page 7 "Applicable law: which is the key to Bishop Lamor Whitehead acquittal."  The government states "To prevail on an insufficiency of evidence claim under Rule 29, a Defendant bears the heavy burden of showing that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.  (United States vs. Mensah, 515 F. App'x 59, 61 (2nd Cir. 2013) quoting United States v. CaraCappa, 614 F. 3d 30, 43 (2nd Cir. 2010)."  The Court must uphold the Jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (United States V. Persico, 645 F. 3d, 85, 105 (2nd Cir. 2011) quoting Jackson V. Virginia 443 U.S. 307, 319 (1979)."  A judgment of acquittal is available under Rule 29 "only if the evidence that the Defendant committed the crime alleges is non-existent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. (United States V. Jiau 734, F.3d 147, 152 (2nd Cir. 2013) quoting United States V. Espaillet, 380 F.3d 713, 718 (2nd Cir. 2004)."

The applicable law that the government wants the court to apply was fatal and proves that Bishop Whitehead should be acquitted for counts 2 and 3 of this indictment.

The government points out three essential arguments that is fatal because they are impossible to prove:

(1) Rule 29, a Defendant bears the heavy burden of showing that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt.
(2) The Court must uphold the Jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
(3) A judgment of acquittal is available under Rule 29 "only if the evidence that the defendant committed the crime alleged is non-existent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

Within the court's denial, pertaining to count 2, the Court states "the evidence was sufficient on count 2, which charged attempt wire fraud."  (See superseding indictment, DKT 63 at 5.)  As stated above, "the elements of wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme. (Jabar, 19F 4th at 76.)"

The defendant's position is: "How can the courts deny Rule 29 under elements of law that was not charged to the jury.  The decision states: 'that wire fraud had three elements.'  However, the

trial jury was instructed by the court to only two elements for attempted wire fraud." (See Exhibit A.2 - Jury Instructions)  The court denied Defendant's Rule 29 based on an element "use of the wire to further scheme."  However, this essential element was never charged to the jury for Count 2.

The government argument and, respectfully, the court's decisions are all erroneous and impossible to deny Rule 29 motion.

The Court charged the jury; on trial page 1233 lines 6-13 (See Exhibit 2) the court states: "In order to prove 'a Defendant guilty of attempt, here attempted wire fraud, the government must "PROVE" the following TWO "ELEMENTS" beyond a reasonable doubt: first, that the Defendant intended to commit a crime, here the crime of wire fraud, and second, that the defendant willfully took some action that was a substantial step in an effort to bring about or accomplish the crime.'"

This court omitted an essential and crucial part of the elements for Attempted Wire Fraud, in particular, "defrauding through the use of interstate wires." (See United States v. Zongo, U.S. Dist. LExis 79653 (S.D. NY May 23, 2017.  Quoting United States v. Bouyea, 152 F.3d 192 (2nd Cir. 1998), United States V. Farhane, 634 F. 3d 127 (2nd Cir. 2011)).

The government cites within their opposition applicable law under Rule 29 and Rule 33, which affirms the violation by this district court and which overlooks United States v. Taylor (SUPRA). Within Taylor the district court deemed that extortion was a crime of violence.  The district court also overlooked United States v. Zappola (646 F.2d 48, 52-54 (2nd Cir. 1981)), by allowing an informant to be protected by the privilege of invoking the Fifth Amendment. Brandon BelMonte, the informant in Zappola, while acting for the government was not subject to prosecution and not covered by the privilege.  This court overlooking Zappola affected the denial of the merits of Rule 29 and Rule 33 in this case.

The government conceded in their opposition on page 6 (Doc 195) that Brandon BelMonte was operating under the direction of the FBI.  Quoting directly from page 6 (Doc 195), it states: "Thereafter, as charged in Count Two, the defendant attempted to defraud Belmonte.  Belmonte was acting at the direction of the FBI at the time, and agreed to wear recording devices to meetings with the defendant, and also created recordings of certain communications with the defendant himself."  This court excluded Belmonte from testifying, and this court also cited United States v. Deutsch, 987 F.2d 878 (2d Cir. 1993) when excluding Belmonte's testimony. The Deutsch case law was erroneously cited because Brandon Belmonte was looked at as a victim instead of an informant (Zappola SUPRA).

If the court would have allowed the informant, Brandon Belmonte, to testify, the defendant would have been granted Rule 29 and Rule 33, which would have acquitted him on all charges. Because the informant was linked to every court motion, whether it was motion in limine, suppressions motions for the search warrant, chain of custody, and just personally being connected.  Brandon Belmonte was the sole affiant to all of the search warrants.  Him being an

informant affected this entire case.  If the courts would have not overlooked United States vs. Zappola, Bishop Whitehead would have been granted Rule 29 and Rule 33 relief.  How did the court overlook United States vs. Zappola?  Within the court's decision of Rule 29 and Rule 33, this court denied the motion based on the case law using United States vs. Zappola (677, F.2d, 264, 269 (2nd Cir. 1982)).   The court ruled using Zappola that "Despite Defendant's argument to the contrary, even if Defendant believed the money was owed to him, and even if the jury credited that belief, the jury could reach the same verdict because a defendant's claim to the property is immaterial to a conviction for attempted extortion.  'Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim of right to {2024 U.D. Dist. LEXIS 18} the property.'  United States V. Zappola, 677 F.2d, 264, 269 (2nd Cir. 1982)."

Despite differing case citation dates, the quoted case from 1982 is the same case under United States vs. Zappola (664 F.2d, 48, 52 (2nd Cir. 1981)).  It is just an extension into 1982.  Ergo, this court was aware that a government informant has no protection of the privilege of the 5th Amendment, and the court also based its determination denying the motion Rule 29 and Rule 33 under a completed extortion: a crime of violence and NOT an attempted extortion, which is not a crime of violence; again, as per Zappola (1982).  Every motion in limites is based off of Belmonte being a victim and not an informant.  The government supplemental motion in Limites #3, on February 23, 2024, stated that it "seeks to prohibit the defendant from calling (victim 2) to testify in front of the jury because (victim 2) through his counsel indicated his intention to invoke his 5th Amendment privilege against self incrimination."  A district court has a discretion to prevent a party from calling a witness solely to have that witness invoke that privilege against self incrimination in front of the jury (United States vs. Deutsch SUPRA).  This decision, based on Brandon Belmonte bringing a victim and not an informant, shaped the denial of Rule 29 and Rule 33.  This court also granted a motion in limites #4 that seeks to preclude anticipated testimony of witnesses: Dino Tomassetti and Andrew Lichtenstein.  Specifically, the government sought to preclude either witness from testifying that victim 2 did not own the properties for which victim 2 sought defendant's assistance.  The government's motion is granted because such testimony is not relevant or probative under rule 4.01.  Count 2 of the superseding indictment relates to these properties, and charges the defendant with attempted wire fraud. The court stated that Victim 2's actual ownership of the properties is irrelevant to the charge and lacks any probative value.

At jury instructions (Exhibit A.2) page 1235-1236 starting at line 13, this honorable court stated on record, "to meet its burden of proving that the defendant attempted extortion, the government must establish beyond a defendant wrongfully obtained or attempted to obtain the property of another; second, the defendant obtained or attempted to obtain this property with the victim's consent but compelled this consent by the wrongful use of the threat of force, violence, or fear, including fear of injury or fear of economic loss or harm; third, as a result of the defendant's actions, interstate commerce on an item moving in interstate commerce was or would have been delayed, obstructed, or affected in any way or degree."

Count three charged Whitehead with "attempted Hobbs Act extortion," however, the elements that this court instructed to the jury with were the elements of "Hobbs Act extortion," which is a crime of violence," and substantive completed extortion." This court added the phrase "or attempted to."

The instructions for "Attempted Hobbs Act Extortion," which is a NON-VIOLENT crime, should have contained the following three elements: (1) the the defendant intended to commit Hobbs Act Extortion; (2) that the defendant took a 'substantial step' to bring about or accomplish the crime; and (3) that interstate commerce was delayed, obstructed, or affected in any way or degree." (See Dervishaj V. United States, US. All. Lexis 20741 (2nd Cir. 2024)). This court did not state the elements of ATTEMPTED Hobbs Act extortion at all.

This court erred in not charging the jury to the essential elements of the crime change of Attempted Hobbs Act extortion, which violates Rule 29 and this court should be in acquittal.

Furthermore, this court states in the transcript (Exhibit A.2., P. 1236, lines 18-25) that "as to the interstate commerce 'REQUIREMENT' it's NOT NECESSARY for the government to PROVE THAT COMMERCE ACTUALLY WAS AFFECTED by the defendant's conduct or that the defendant INTENDED or ANTICIPATED that his actions would affect interstate commerce. It's enough for you to find that the defendant's conduct POSSIBLY could have affected interstate commerce. The government needs to PROVE only a VERY SLIGHT or POTENTIAL effect on interstate commerce."

The elements of attempted HOBBS ACT extortion do "require" an "intent" and a "substantial step" to commit and delay obstruction, or affect "interstate commerce." Based on this court's instruction on count three, the jury relied on erroneous elements for attempted Hobbs Act extortion. See United States v. Mensah (515 F. App'x 59, 62 (2nd Cir. 2013)), which quotes United States V. CaraCappa (Supra).

In United States V. Green (16, Crim. 281, 2021 U.S. Dist Lexis 121151, 2021 WL 2667129 at *7 (S.D. N.Y., June 29, 2021) aff'd sub a&m & United States v. Johnson (No. 21-1896, 2024, U.S. App LEXIS 1617, 2024, WL254118 (2nd Cir. January 24, 2024)), the cases rejected reconsideration of Rule 29 ruling where the court instructed jury because "it's well settled that juries are presumed to follow the instructions they are given and THERE IS NO basis here to find that presumptions inappropriate." However, in this instance, there exists cause to find that THERE IS a basis to find that presumptions are inappropriate.

To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the heavy burden of showing that no rational Trier of fact could have found all of the elements of the crime beyond a reasonable doubt. In this instance, there is no way that the defendant could have been found guilty with all the elements of the charged crime not being correct and the courts charged the jury to use incorrect elements of Attempted Hobbs Act extortion. Further, juries are presumed to follow their instructions (See Zafiro V. United States, 506 U.S. 534, 540, 113 S. Ct

933, 122 L.Ed 2d 317 (1993)) and United States V. Pinto-Thomas, 18 Crim 579, 2019, U.S. Dist LEXIS 46206, 2019 WL 1460613, at *4 (S.D. NY) (Jan 15, 2019)).

INSUFFICIENCY OF THE EVIDENCE. (Rule 29)

Legal Standard.

"The Court of Appeals reviews preserved claims of insufficiency of the evidence de novo.  But even under de novo reviews, defendants face the heavy burden, because the Court of Appeals must view evidence in the light most favorable to the government crediting every inference that the jury might have drawn in favor of the government.  Ultimately, a judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Capers, 20 F. 4th 105, 113 (2d Cir. 2021); U.S. v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012).

The case at bar presents substantial legal sufficiency claims.  Whitehead can show a substantial question on appeal as to the sufficiency of the evidence against him on each count.

In regards to the insufficiency of the evidence of the Anderson fraud, the government failed to prove intent with respect to the wire fraud conviction on Count One.  To convict a defendant of wire fraud, the government must prove beyond a reasonable doubt, inter alia, an intentional scheme to defraud, i.e., that a defendant knowingly made false misrepresentations to the alleged victim.  Gatto, 986 F.3d at 113.  It is not enough that a "defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims." U.S. v. Guadagna, 183 F. 3d 133, 129, 32-33 (2d Cir. 1999) (insufficient where government failed to establish that defendant made material misrepresentations at the time he placed a call to victim).  And the government must show more than "deceit."  Id.

Here, there was insufficient evidence of intent. The government offered testimony that Whitehead made indirect promises to Ms. Anderson that he would help her buy a home.  But it offered no proof that he made material misrepresentations at the inception of the atypical financial arrangement between Ms. Anderson, her son, and Mr. Whitehead.  And any evidence that Whitehead later became aware that his agreement had the potential to harm Ms. Anderson and made any misleading promise is not enough as a matter of law to convict him for wire fraud.  Id. at 129; see also U.S. V. Starr, 816 F.2d 94, 98 (2d Cir. 1987) (explaining that the government must "at a minimum, prove that the defendants contemplated some actual harm or injuy to their victims").

There was also insufficient evidence of attempted wire fraud and extortion.  Mere preparation to commit a crime is not enough to show attempt; rather, a substantial step requires the government to prove that the defendant engaged in actual "conduct planned to culminate in the commission of the substantive crime." U.S. v. Farhane, 634 F.3d 127, 145 (2nd Cir. 2011). Here, there was scant evidence that Whitehead took a substantial step towards committing attempted wire fraud.

Whitehead's representation that it would be easy to lift a stop-work order because of his relationship with Mayor Adams was, at most, a collateral misrepresentation meant to convince Belmonte of an ability to move the housing project forward. The actual benefit of the bargain was Whitehead's efforts to help move the housing project forward, regardless of the efforts he might use to lift the stop-work order.

Here, the government offered no evidence that Whitehead proceeded further than mere talk. Nothing in the record reflects that Whitehead took any substantial step, for example, by actually asking Mayor Adams to lift a stop-work order. U.S. V. Davis, 689 F.3d 179, 189 )(2d Cir. 2012). (2d Cir. 2012) (reasoning that the defendant took a substantial step toward committing robbery when he "arrived at the DeLeon home ready to commit robbery"). This defeats the conviction because the government never proved a substantial step--even when construing all the facts in their favor.

Also, in respect to the attempted extortion conviction, the government failed to show sufficient evidence of Whitehead's intent to attempt to extort Belmonte. To show attempted Hobbs Act extortion, the government must prove that Whitehead intentionally attempted to deprive the "property right from anote." U.S. v. Gotti, 459 F.3d 296, 324 (2d Cir. 2006). In rejecting Whitehead's sufficiency argument, this Court reasoned that Whitehead's claim to the $5,000 was immaterial because a conviction could be sustained even if the defendant believed he had a lawful claim to the property (ECF doc. 233: 12). The evidence must show that the defendant knowingly sought to deprive another's property. See Gotti, 459 F.3d at 324. Even so, Whitehead's vague and unspecified statement that he would "harm" Belmonte, taken out of context, is not a specific threat that counts as a substantial step toward extortion. Cf. U.S. v. Didonna, 66 F.3d 40, 46-47 (1st Cir. 2017) (repeated threats that the defendant would put the victim out of business, or expose embarrassing information to ruin business, among others, were not sufficient for attempted Hobbs Act extortion).

With respect to Count Four, there was also insufficient evidence of making false statements. The evidence that Whitehead lied to the FBI about his cell phone is too weak to sustain a conviction. To prove a false statement under 18 U.S.C. SS 1001, the government must prove that the defendant knew that his statement to the FBI was "false or fictitious and fraudulent." U.S. v. Banki, 685 F.3d 99, 117 (2d Cir. 2012).

The agent here testified that he asked Whitehead if he had another phone that the agent could "call" Whitehead on. Whitehead's answer responded to the agent's question relating to making a phone call, not possessing a phone. This distinction is important for knowledge and willfulness. Specifically, the agent did not ask Whitehead if he had another phone for the purpose of seizing it under the warrant, which had already been successfully executed. And when the agent did, in fact, obtain another warrant to seize the second phone, Whitehead gave him the phone without issue. Thus, Whitehead's response to the agent's vague question does not show any intent to deceive the agent.

With respect to Count Five, there was improper admission of pattern evidence to show identity. The jury was tainted with respect to Whitehead's wire fraud conviction for a false loan application. Although evidence reflecting other bad acts may be introduced at trial to prove, inter alia, identity, the admission of such evidence must be relevant, part of a clear pattern, and carefully balanced with the potential for unfair prejudice. U.S. v. O'Connor, 580 F.2d 38, 41-44 (2d. Cir. 1978) (testimony of other similar bribes was not relevant evidence of common plan or scheme and was "prejudicial because it might lead a jury to convict because it thought the defendant's character was such that he frequently committed crime").

Here, as in O'connor, the introduction of numerous records of uncharged fraud in the records of at least five banks to boulder the charged crime resulted in undue prejudice and was irrelevant and cumulative to proving Whitehead's identity in the charged fraud. See U.S. v. Beasely, 809 F. 2d 1273, 1280 (7th Cir. 1987) (reversing where "extensive use of other-crime evidence to show intent weighed heavily" and prejudicially against the defendant). Under the circumstances, where Whitehead testified and his credibility was essential to the case, this Court's limiting was insufficient to cure the substantial prejudice to Whitehead from this improper, and extensive, uncharged-crimes evidence directly reflecting on his honesty. Beasely, 809 F.2d at 1280.

This evidence must have been offered for a proper purpose, be relevant and material to "an issue in dispute," and its probative value must outweigh its prejudicial effect. U.S. v. Scott, 677 F.3d 72, 81 (2d Cir. 2012). It also must not "confuse the issues, mislead the jury" or be "needlessly...cumulative." Fed. R. Evid. 403.

Here, the evidence of uncharged fraudulent loans was irrelevant and minimally probative. The single loan application that Whitehead was charged with falsifying contained Whitehead's name, social security number, date of birth, address, account numbers, and other identifying information. Coupled with the banker's testimony, supporting bank records, and Whitehead's follow-up call, the government introduced ample evidence of knowledge and identity such that prior uncharged conduct was barely probative and severely prejudicial. See U.S. v. McCallum, 584, F.3d 477, 475 (2d Cir. 2009)("We are at a loss to understand how the court or the government could believe that the prior convictions were necessary to prove [the defendant's] intent and knowledge and that they pass muster under Rule 403").

Nor was the uncharged-crime evidence harmless in this case, which was founded entirely on credibility, where Whitehead testified on his own behalf, and where his convictions hinged on the jury's resolution of competing accounts. Chapman v. California. 386 U.S. 18 24 (196) (error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). Indeed, on this record, this error tinted the jury's verdict on every count.

For instance, Pauline Anderson, whose son negotiated on her behalf, had no written contract with Whitehead, and any representation that Whitehead promised to help her find a house to live in was based almost entirely on her and her son's testimony, and the jury's resolution of

their credibility. yet this court (1) precluded Whitehead from calling witnesses who could testify to the Andersons' credibility and (2) allowed overwhelming evidence of uncharged frauds to diminishing Whitehead's evidence -- wholly unnecessary for the stated-purpose of proving identity or knowledge--devastatingly portrayed Whitehead as an incredible witness who had a propensity to commit fraudulent crimes. Such evidence was "propensity evidence in sheep's clothing," McCallu, 584 F.3d at 475, and by impermissibly diminishing Whitehead's credibility, infected the whole of this trial.

Given the enormous credibility stakes here, a short limiting instruction could not cure the prejudice that "substantially influenced the jury." McCallu, 584 F.3d at 478; Scott, 677 F.3d at 78-79("A jury hearing this testimony would conclude that [the defendant] was a person with a propensity to engage in wrongful, criminal or otherwise unusual behavior"). Moreover, the district court's limited statement that the evidence was not "inflammatory," see ECF doc. 136, was an insufficient assessment of the Rule 403 balancing test. Scott, 677 F.3d at 84. Accordingly, permitting evidence of uncharged fraud was prejudicial and an abuse of discretion.

Rule 33(a) of the Federal Rules of Criminal Procedure allows the Federal Court to vacate any judgment and grant a new trial if the interest of justice so requires. Eberhart V. United States. 126 S. Ct 403, 163 Leo 2014, 546 US 12. In Eberhart: the District Court granted the motion for a new trial citing all three grounds raised by the PETITIONER. The judge concluded that "none of these concerns standing alone or in pairing would cause me to grant a new trial but that taken together, they 'persuade me that for interest of justice requires a new trial.'"
New Evidence.

In order for this Honorable Court to understand the sequence of events leading up to Whitehead's arrest and conviction, a story must be told. In the beginning, Whitehead was Pastor for eleven years and his sever led to his ownership of his own church in Brookly, New York, of which he became Bishop.

Bishop Lamor Whitehead was a pillar to his community, a father to three children, a donor to the community, and most importantly, an example to many who followed him.

Until December of 2021, when Whitehead was introduced by a friend of his to a Mr. Brandon Belmonte renting out Bishop's Lamborghini to renters. After the introduction to Belmonte, Whitehead did not like Belmonte's disposition. A few days later, Belmonte reached out to Whitehead via InBox on Instagram apologizing for his disposition of and display of anger and arrogant demeanor. Belmonte, in an attempt to reconcile the situation, requested for Whitehead to bring his car to Belmonte's alleged auto-body shop in the Bronx, New York, if he ever needed fixing. Belmonte further stated that, "I see that you're into real estate and that you're very connected." Unfortunately for Whitehead, he did not fathom that Belmonte was a confidential informant for the FBI since 2013. (See Exhibit A.3, October 26, 2023, Pg. 9, and 10 Lines 18-24). Also, Belmonte was under federal investigation since 2019 himself which led to his arrest and indictment in August of 2023. He was indicted for conspiracy to commit wire fraud; insurance fraud scheme; making false bank statements to send to vehicle financing lenders;

and having straw buyers finance vehicles illegally.  See Exhibit A.4 (Belmonte's indictment.)
This information was not known to Whitehead at that time.

At the end of February of 2022, Whitehead's wife's car was in an accident.  Whitehead called
Belmonte and he said that he will send a tow-truck to pick up the car and that he will replace it
with a rental car.  Belmonte sent the tow-truck and provided a Cadillac Escalade as a rental,
however, the SUV was inoperable.  Two days later, Whitehead called Belmonte and asked him
to change the SUV because it was inoperable.  Belmonte stated that he will be picking it up on
that day.  Belmonte showed up two weeks later.  Whitehead told Belmonte that his wife needed
her car because they just had a new-born baby (three months old), and Whitehead could not
keep taking his wife to places in his own car.  Belmonte noticed that Whitehead was highly
upset.  Belmonte apologized and stated that he will reimburse Whitehead.  In March of 2022,
Belmonte still did not finish Whitehead's wife's car.  Whitehead went to the shop in the Bronx to
check on the car.  Belmonte stated that he was waiting for the car parts to arrive, and that when
the car parts got there, he would finish repairing the car.  Further, in Belmonte's attempt to gain
Whitehead's trust, he stated, "I own two apartment complexes in the Bronx," and he also stated
that he owned property in Connecticut and Philadelphia and that he wanted to see the ones in
the Brox and Connecticut to be able to buy more in Philadelphia.  Bishop asked Belmonte to
email him the information of the properties.  Belmonte emailed Whitehead some information
about a property that he claimed to own in Connecticut.  Whitehead asked Belmonte to send
him that information about a property in 3160 Villa Avenue, which is a 66-unit apartment
complex in the Bronx, New York.  Due to Belmonte's reluctance to send the full information
involving the financial obligations of the property, which is the income and expenses and
rent-roll, Whitehead got upset and asked Belmonte to stop wasting his time, and Whitehead
inquired about his wife's car.  At the beginning of April of 2022, Belmonte returned Whitehead's
Wife's car, and it was inoperable.  The car was smoking and it was unaligned.  Obviously, the
car was not fixed.  So, Whitehead took the car to another body shop for repairs.  After
Whitehead contacted Belmonte and complained about his wife's car, Belmonte stated that he
would reimburse Whitehead for all expenses and they both agreed on $5,000.  In the following
weeks, Belmonte asked Whitehead for his Zelle account in order for him to send the $5,000.
However, Whitehead noticed that Belmonte was lying about sending the money.

On April 23, 2022, Belmonte called Whitehead on facetime and they began to argue about the
$5,000.  Unbeknownst to Whitehead, he did not know that the FBI Special Agent Thomas Ford
was in Belmonte's back seat of the car recording the argument that led to Whitehead getting
charged for attempted extortion.  Belmonte kept ranting about Mayor Eric Adams.  He was
stating that he wants to meet the mayor.  Belmonte knew that Whitehead was a friend of the
Mayor through photographs on Instagram.  The argument escalated and Whitehead continued
to ask about the money and Belmonte kept stalling and making up lies.  Belmonte finally stated,
"Look, I'm going to give you the money, but can I meet the mayor?"  Whitehead ignored him for
a third time, and Belmonte further stated, "I want to do real estate with you but when can we sit
with the Mayor?"  On the day prior to this incident, April 22, 2022, Whitehead did not know that
Belmonte had met with FBI agents and Assistant United States Attorneys Hagan Scotten, Celia
Cohen, FBI Special Agents Stefano Braccini and Jacob Balog.  Ultimately, Whitehead was

arrested on December 19, 2022. The arrest was utterly based on Belmonte's information. During court proceedings, Belmonte's statements involving his cooperation were included. After Whitehead went through the material, he learned about a plethora of belmonte's lies and fabrication involving Whitehead. Including statements from the agents and the prosecutors directing Belmonte on how to fabricate the case against Whitehead and how to target the Mayor of New York City, Eric Adams. Recently, in September of 2024, Whitehead learned that there was a sting operation against Mayor Eric Adams. See Exhibit A.5--Mayor Eric Adams indictment (S.D. of NY). This indictment clarifies that in April of 2022, the Mayor was the target of the sting operation for wire fraud, straw donors, bribery for stop work orders, etc. Through Mayor Adam's indictment, we can all learn that the target was always Mayor Adams through Whitehead; specifically, Adam's charges from April 21, 2022. This further clarifies why Belmonte kept ranting about meeting the Mayor on April 23, 2022. For example, let us view the particular dates in the charged indictment against Mayor Adams from 2022: Specifically, January 1, 2022, and January 11, 2022. We will find that there are no allegations between those dates and April 21, 2022. The reason for the Mayor's indictment going silent in between those dates for virtually four months is because the government was working on furthering the investigation against Mayor Adams through and by their corrupt confidential informant, Belmonte, who in turn attempted to obtain information about Mayor Adams through an innocent man named Bishop Lamor Whitehead. The irony of the government is that U.S.A. Damian Williams falsely declared Belmonte -- during a press release -- a "bullied businessman." This was stated on December 19, 2022, the day Bishop was arrested. The government always knew that Belmonte never owned a body shop, or any other legitimate business whatsoever. The government also knew that Belmonte never owned any property in the Bronx. See Exhibit A6 (page 1).

(Belmonte meeting with U.S. Attorney on May 4, 2022.)
Belmonte, the agents, and prosecutor's statements found in the papers relevant to Belmonte's meeting. For example, it states: "Belmonte advised that he is currently in the process of buying 3160 Villa Avenue in the Bronx, which has a 66-unit building on the property." In the same papers, Belmonte stated to AUSA Hagan Scotten, AUSA Celia Cohen, FBI SA Stefano Braccini, FBI SA Jacob Balog, and FBI SA Thomas Ford that: "Belmonte advised he owned a luxury car rental business called VIPAuto. He started by buying one Bentley back in 2016/2017 time frame. He rented that car out and made a few thousand dollars. After this, he grew the business to 42 cars. He stated he owned a few of the cars, leased most of his fleet, and some were sub-leased from other private individuals. Around May or June of 2021, Belmonte stated he closed down the rental business because it was attracting bad clientele." Whitehead would like to point out to this honorable Court that the luxury rental car business called VIPAuto that is found in the statement is the same company that Belmonte was indicted for by the Eastern District of New York through the investigation that began from January 2019-December of 2021 by the FBI, which shows that the government knew that he was not a legitimate businessman but a con man. Even knowing this, the government continued to maliciously prosecute Whitehead targeting the Mayor of New York City. This is the reason why Belmonte states that he closed his business down around May or June of 2021. Because he knew that he was committing multiple crimes through the company, VIPAuto. In the papers regarding Belmonte's

meeting with the government, found in Exhibit A-6 Page 2 (May 4, 2022 meeting), Belmonte further stated in that document that: "Once the properties are acquired, Adams will be able to help them with prices, stop work orders, provide money from the city for construction or city contracts. Belmonte also stated that Whitehead told him they could turn some of the properties into homeless shelters and make them free market. Belmonte is under the understanding that according to Whitehead, Adams will be a silent partner. By paying consultants, they will secretly be paying Adams. Paying and LLC will hide who the money is going to. (See Exhibit A-6, Page 3, Belmonte's May 4, 2022 Meeting with the Government) USA Damian Williams knew that this was all lies. But yet, still called Belmonte a "bullied businessman." The FBI also knew that he was lying. See Exhibit A-9 (Belmonte's statements where FBI SA Thomas Ford stated: "SA Ford Advised Belmonte that he should structure the conversation as stating that the LLC would only be started to signify the business partnership between Belmonte and Whitehead). This shows that the FBI and the government knew that paying Mayor Adams through an LLC was a lie by Belmonte. However, the lie was encouraged by FBI SA Ford. Further, in Exhibit A-6 Page 3 (Belmonte's interview on May 4, 2022), found also in Exhibit A-8 (pages 1-2 - Belmonte April 22, 2022 Meeting with U.S. Attorney), the government stated: "Approximately one week ago, Whitehead visited Belmonte and again engaged with Belmonte about the desired real estate deal. Whitehead claimed he would FaceTime with Adams. Whitehead then called Adams via FaceTime. Adams told Belmonte that Whitehead engaged in big things in real estate, they [Adams, Whitehead, and Belmonte] should all meet up, and Belmonte should do business with Whitehead. Following FaceTime with Adams, Whitehead told Belmonte to sell Whitehead the building, so he could receive city government money by transitioning the building into affordable housing or a homeless shelter, then sell the apartments on the open market at regular market value." Please take note that Whitehead's phones were confiscated during the investigation. Phone records reveal that Whitehead never had FaceTime with the Mayor on that date, let alone that Belmonte had FaceTime with the Mayor on that date. But the government maliciously pursued the case against Whitehead, even knowing that everything that stated during his interviews were all lies. The government diligently targeted the Mayor through Whitehead. The government in the Southern District of New York gave Belmonte fraudulent direction to commit crimes targeting Mayor Eric Adams.

In Belmonte's meeting, AUSA Hagan Scotten stated (Exhibit A-6, Page 3(last page of Belmonte's May meeting)), "AUSA Scotten proposed a way forward suggesting that at the next meeting between Belmonte and Whitehead, Belmonte ask Whitehead to ask Adams to lift the stop work order that currently exists on the Villa Avenue property."

USA Damian Williams, AUSA Celia Cohen, AUSA Hagan Scotten, FBI SAs: Stefano Braccini, Jacob Balog, and Thomas Ford, all knew that Brandon Belmonte never owned the property on Villa Avenue and that he had no authority to give anyone, including Whitehead or the Mayor, to remove a stop work order or any other legal matters regarding that property. Not to mention, there was not a stop work order during that time on that building. This is the reason why we needed to call Dino Tomassetti, who is the "actual" owner of the Villa Avenue property, who had also stated to Whitehead's private investigator (Beau Dietl & Associates) that he had never heard of Brandon Belmonte and does not know him. If this Honorable Court would have

permitted Mr. Tomassetti to testify, he would have attested to this fact.  This Court denied Whitehead's motion to call Mr. Dino Tomassetti to testify.  Therefore, the jury was deprived of true facts regarding the Villa Avenue property.  The testimony from Tomassetti would have established that this case was fraudulent against Whitehead and that the real target was Mayor Eric Adams.

In Exhibit A-8, which details the meeting between the government and Belmonte, the above mentioned members of the government documented the following statement by Belmonte: "When Whitehead visited Belmonte, the two discussed business ventures, including Belmonte's father's construction business and a 102-unit residential building being constructed in the Bronx, New York.  Whitehead requested Belmonte sell the building to Whitehead, due to Whitehead's close relationship with New York City Mayor Eric Adams."

This statement further clarifies who in fact was the "actual" target of this investigation through more lies of fictitious businesses that never existed.  Again, this is who USA Damian Williams called, "a bullied businessman."  (See Exhibit A-18)

Please take note that Mayor Eric Adam's indictment goes cold and silent from the dates of April 21, 2022--July 8, 2022.  The reason for that is because the investigation against Mayor Adams was targeted through Whitehead by using the "notorious businessman," Brandon Belmonte. Specifically, Belmonte's meeting with the government on April 22, 2022, and Belmonte's contact along with FBI SA Ford who was sitting in the back seat of the vehicle on April 23, 2022.  April 28, 2022, Belmonte again called Whitehead and he stated that he will bring the $5,000 on the next day, April 29, 2022, which is one day prior to Whitehead's birthday.  The FBI met with Belmonte approximately one mile away from Whitehead's residence.  At that meeting, the FBI gave Belmonte the $5,000 to give to Whitehead, and they placed a wire or a recording device on Belmonte's person.  Eventually, Belmonte went to meet Whitehead at his residence. Belmonte paid Whitehead the $5,000 as reimbursement to Whitehead.  After that Belmonte stated: "how much do we have to pay the Mayor under the table?"  Whitehead responded with, "I have never paid any government official anything at any time.  We have to do things legally, because if we don't do things legally, that's when we get in trouble."  See Exhibit A-8 (Page 7 - Whitehead's statement found in the search warrant)

On May 4, 2022, Belmonte sat down with the entire staff of the Southern District at their office. At that meeting, he seemed to reiterate similar information as to the prior meeting.  Just to highlight a portion, it was stated, "Belmonte believes Whitehead is to acquire several properties in the NYC area and bring them to Adams and see where they can make some money." Belmonte also reiterated in the meeting that, "Mayor Adams would be a silent partner by paying consultants that would secretly be paying Mayor Eric Adams."  See Exhibit A-6 (Page 3 - April Belmonte Meeting).  These statements are reiterations of the meeting on April 22, 2022 in which the government had already recognized to be false.  However, they still maliciously continued with the investigation targeting Mayor Adams through Whitehead by the notorious confidential informant Brandon Belmonte.  On that date, May 4, 3033, Belmonte used two of his personal phones to record conversations between him and Whitehead.  On that date, according to the

government, Belmonte recorded one conversation with Whitehead. That conversation was based on frivolous talk. According to the government, that particular recording was turned in on either May 5th or 6th of 2022. On May 5, 2022, Belmonte was again wearing a wire issued by the FBI for the purpose of recording Whitehead. Whitehead met Belmonte near Belmonte's home to discuss purchasing the Villa Avenue property in the Bronx. That conversation was officially recorded by the FBI. Later that same day, May 5, 2022, Belmonte called Whitehead on FaceTime. Belmonte recorded that conversation informally on his own account. That particular recording was not turned into the FBI until 19 days later, on May 24, 2022, according to the FBI. Since that particular recording was done and obtained informally on Belmonte's own account, we can assume that the actual date of that recording cannot be confirmed. This particular informal recording made on Belmonte's own account was the recording used by the FBI SA Ford to obtain a search warrant for Whitehead's cell phone on June 7, 2022, and executed on June 8, 2022. On June 7, 2022, FBI SA Ford went in front of the federal judge and lied on the affidavit to obtain the search warrant. SA Ford stated that he, himself, had recorded the FaceTime call that Belmonte actually informally recorded on May 5, 2022. There were a total of nine search warrants that SA Ford obtained. He made false statements in every search warrant. This is why the FBI Special Agent Thomas Ford, the lead investigator on this case, was not called by the government to testify at trial due to the false statements that he made to obtain the search warrants (See Exhibit A-9, point 11(Search Warrants), pages 7-8).

On May 12, 2022, Belmonte made two additional informal recordings in a conversation with Whitehead on his own initiative by using two different phones. According to the FBI, those recordings were turned in on May 16, 2022. the two conversations involved frivolous talk. On May 18, 2022, Belmonte made one additional informal recording in a conversation with Whitehead on his own initiative. According to the FBI, that particular recording was also turned in on May 24, 2022, together with the informal recording from May 5, 2022. Assuming that the informal recording from May 5, 2022 was actually done on that date, then why was it turned in "after" the two informal recordings made on May 12, 2022, which were turned in on May 16, 2022. This entails that the dates when all of the recordings were actually made are questionable. See court documents/chain of custody papers, and trial transcripts at pages 728-740, where the defense pressed an FBI agent to confirm that, "with respect to the recordings created outside of his presence, he could not confirm whether the recordings had been altered, or were 'deep fakes.'" These are the recordings that were admitted into evidence by this Court and introduced to the jury as depicted in Whitehead's motion in limine No. 5, which was denied by this Court.

On June 8, 2022, the FBI went to Whitehead's residence to execute the search warrant. However, Whitehead was going for his usual walk in the morning, and the FBI noticed him and they got out of the car and stopped Whitehead. The FBI explained to Whitehead that they had a search warrant for his cell phone. Whitehead had his phone in his hand at the time and the FBI retrieved it. Whitehead asked them, "What is this about?" FBI SA Ford stated, "We need information." Whitehead asked, "information about what?" Whitehead further stated that he did not want his neighbors seeing that, so all the parties moved closer to Whitehead's residence. Whitehead made that request for his own safety because he had cameras outside his

residence. FBI SA Ford stated that they also had a search warrant for Whitehead's Church. Whitehead asked, "Why is there a search warrant for my church?" FBI SA Ford further stated that there were forty agents in front of Whitehead's church and that they will be kicking the door in. Whitehead asked them to allow him to call someone so they could let them in to avoid them from having to break down the door to the church. Whitehead further asked, "What is this all about?" FBI SA Ford stated, "it's not about you, we want the Mayor, Eric Adams." Whitehead stated, "What are you talking about?" FBI SA Ford stated, "We want information on the Mayor." Whitehead responded, "What are you talking about?" FBI SA Ford stated, "Come on, if you don't help us, we will make your life a living hell." Whitehead responded, "I don't know what you're talking about, call my lawyer." During this ordeal, Whitehead went into his home on many occasions attempting to call someone from the church. However, since it was 5:30AM, no one was answering. In one of those trips that Whitehead made in and out of his phone, FBI SA Ford stated, "come on man, work with us, it's not about you, we want the Mayor." Whitehead repeated, "I don't know what you're talking about, call my lawyer." FBI SA Ford stated, "You don't want to do this, we're looking into the Mayor, and you need to work with us. Do you have another cell number that I can reach you?" Whitehead responded, "No, call my lawyer." FBI SA responded, "You're going to be sorry that you did not work with us." After that talk, they left, they also searched the church and did not find anything illegal there.

On June 27, 2022, FBI SA Ford returned to Whitehead's residence with a new search warrant to search his home looking for a second cellular phone. However, Whitehead told the agent that the phone was right there on the desk. Approximately eight agents and Agent Ford entered the house, retrieved the phone, and then Agent FOrd asked Whitehead to unlock the phone and further stated, "If you don't unlock the phone, I will throw you on the ground and make you unlock the phone." Please take note that Mayor Adams' indictment again went cold from July 11, 2022 -- November 21, 2022, the reason for that is because of what follows.

After Belmonte informed FBI SA Ford about Whitehead having guns at his church, the FBI did not find any. In one of the recordings that the FBI SA Ford submitted into the evidence, had a peculiar conversation between Belmonte and a gang-member who is unknown to Whitehead. In that conversation, Belmonte stated: "This Bishop, he thinks he all that, driving around with all his jewelry, AS IF HE CAN'T GET ROBBED."

Some days after that recording, and after Belmonte had the church searched for guns, on July 24, 2022, Whitehead and his wife were robbed during Sunday service at the church while the service was being watched by the world on a live-streaming network. The robbers targeted Whitehead and his wife only. The robbers only stole the particular jewelry that they were wearing, which was of great value.

On September 26, 2022, Belmonte and his attorney were required to turn over Belmonte's phones. And on September 28, 2022, two of the three armed robbers who robbed Whitehead and his wife at this church were apprehended and arrested by Federal authorities. Herein, Whitehead respectfully requests that this Honorable Court review the recording where Belmonte made the robbery statement, and also review the search warrant involving Belmonte's

statement that Whitehead had guns at the church.  On September 20, 2022, Belmonte and his attorney made a proffer agreement with the government.  See Exhibit A-3 (Oct 26, 2023, Page 8, Lines 15-17)

Mr. Brandon Belmonte has an "extensive history" of criminality.  Whitehead hired the investigation team of Beau Dietl & Associates, 489 Fifth Avenue, 16th Floor, New York, NY 10017.  This office has revealed to Whitehead relevant papers pertaining to the notorious confidential informant for the FBI, who is currently facing multiple federal charges.

Just to highlight some information, Belmonte defrauded over 25 victims for an estimate exceeding five million dollars.  He has convictions for: identity theft, forgery, larceny, passing bad checks, making false statements, illegal sale of liquor, numerous traffic violations, assault, and he has more than $859,000 in open adverse judgments against him and other co-defendants in five separate judgments and over $260,000 in the states of Connecticut, New Jersey, and New York.  He was also charged with violating a domestic violence order of protection in New Jersey in 2023.  His civil litigation suits from 2012 to the present.  He has been party to at least 23 instances of civil litigation.  13 cases resulted in judgments against him, five cases were dismissed, two resulted in settlements, and three are active. See exhibit A-10 - executive summary prepared by Beau Dietl & Associates on conman Brandon Belmonte.
Here are some of the statements from Belmonte's victims:
(1) Benjamin Isaacov: "BB (Belmonte) stopped paying back.  After Googling, Benjamin saw BB was a scammer.  Benjamin went to BB's house.  BB had a very fancy car.  Maybe a bentley.  BB came out with these dogs, started threatening, "Guys with guns" came to Benjamin's office the following few days.  In the end, Benjamin got half his money back but is still out $150,000. (Exhibit A-11)"

(2) Justin Almazan: "Justin said BB has been scamming people, along with his supposed father, since the early 2000s.  But Justin stated, 'He definitely, 100% being protected by the FBI.' (Belmonte scammed Justin for $120,000)."

ALMAZAN (2): "One time, BB was in a car in New York, on FaceTime with Justin.  With a bald man whom he referred to as his 'best friend.'  This man was with the FBI.  Justin says BB is 'well connected,' and that's why BB can go around stealing from people all over the country without legal consequences.  At the same time, BB was showing off to Justin his luxury Audemar's Piguet watch that he'd just bought 'probably with my money.'"

ALMAZAN(3): "Justin recalls that while he was waiting to get paid, going back and forth with BB who was acting like a buddy, BB drew Justin's attention to Bishop Whitehead, asking if Justin remembered the cleric that got robbed on live video.  BB then said: 'that BISHOP HAS GOT SOMETHING COMING TO HIM BECAUSE he's a bad guy.'"

ALMAZAN(4): "He might have said this in July or August 2022.  The timing is what makes Justin wonder if BB scammed him and ran to the FBI to protect him from Justin because he's going to help on the Bishop situation."

ALMAZAN(5): "Justin later met people that own Carrio Motors car dealership in Miami, FL. They said BB stole a Lamborghini and another vehicle on finance.  Justin feels they don't want to get involved with the FBI."

ALMAZAN(6): "Justin called the FBI and made complaints about BB -- three times until somebody called him back.  The agent who called seemed dismiss--you're probably not going to get the money back, etc.  (Justin can share communications with theFBI, the complaint, etc" (Exhibit A-10 & A-12- Justin Amazan)

(3) Robin Eshaghpor: "On June 19, 2023, while Robin was arguing over text with BB (infra),  BB actually sent Robin a copy of the Adams/Whitehead New Yorker article to boast of how important and connected he was.  Robin felt that BB was trying to puff himself up as a big deal in real estate, someone you don't want to cross.  Robin countered that he was not intimidated, and BB is a "nobody."  To which, BB texted back, 'I'll give you like five FBI Agents as well as a U.S. Attorney.  You can call to ask about me." (Exhibit A-13)

(4) Motty: (Brandon Belmonte stole over $20,000 and threatened that if Motty called the FBI, they will not do anything because he is an informant for them: here is a conversation between Motty and Belmonte): "Motty: I told him i'm going to go to the cops.  I said there's a larger... I basically applied a lot of pressure to him.  I told him that I was calling the feds.  I gave him a timeline and at one point he got really pissed at me and he's like, 'I know some guy in the FBI,' he threw some names out.  'I did a sting operation there.'  Or he didn't say that he was more so 'I know the guy we're buddies.  I see him all the time.  You don't know what... like he was threatening me.  I don't know if he specifically said protection, but he threw the guy's name around saying that he knows him and that good luck trying to, BECAUSE HE CAN GET ANYTHING HE WANTS OUT OF THE FBI.  Something along those lines.  And I am currently working WITH THE GOVERNMENT AS A CONFIDENTIAL INFORMANT AND HAVE MY OWN GOVERNMENT ISSUE ID number that whoever you spoke to in the FBI can easily look it up. You put it into an account that opened."

MOTTY(2): "B.B.: It was done voluntarily for the FBI and it was done voluntarily because I'm the victim here because I put all the hours to the store and I put in all the money and lost every, expletive, penny.  Marc was paying someone whatever.  And whoever you spoke at the FBI will see this because I have assigned papers.  My own cousin loaned Marc, okay, and second, I'M WORKING WITH HOMELAND SECURITY CRIMES right now.  I HAVE A FAKE NAME AND FAKE IDENTITY SET UP AND ALREADY BROUGHT THE US GOVERNMENT FBI COUNTERTERRORISM TASK FORCE A $56 MILLION FRAUD CASE AND I'M BRINGING THEM ANOTHER $36 MILLION ONE.  I did this entire case.. He sends me this link to some archive.  I'm only [inaudible at 00:10:14]." (See Exhibit A-12, and please see the actual text message in Exhibit A-14)

Brandon Belmonte also known as Victim #2 in Whitehead's indictment, and the person Whitehead in turn knows as the "notorious confidential monster," did not only make a career in

damaging hundred's of people's lives, he utterly annihilated Whitehead's life with his evil and false information.  He even had the audacity to impersonate a Homeland Security Agent as shown in his indictment, it states: "on another occasion, in or about August 2021, BELMONTE submitted an insurance claim to Insurance Company B, claiming that a vehicle leased in his name had been hit by another vehicle in the parking lot of a store.  Following that claim, BELMONTE spoke to representatives of Insurance Company jB, including on or about August 17/18 2021, during which conversations BELMONTE, among other things, falsely represented that VIP was not his business, that he was not involved in the vehicle rental business, that he worked for the United States Department of Homeland Security, and that he had reported the accident to the store." (Exhibit A-4, Page 4, Point 17)

During Whitehead's trial, Angel Fernandez, who was Belmonte's driver, testified that he saw an altercation between Whitehead and Belmonte at Belmonte's body shop (Tr. Pages 849-850). Fernandez stated that, "he saw Whitehead cursing at Belmonte, and believed that Whitehead was going to jump on him or hit him."

The big question is, how can Fernandez testify in favor of Belmonte about the government when Fernandez himself was Belmonte's victim of a scam virtually two months prior to Whitehead's indictment on October 31, 2022?  Fernandez filed a lawsuit against Belmonte in Hudson County. (See case #: HUD SC-000774-22.)

The government knew this information, however, they withheld it and precluded Whitehead from cross-examining Fernandez in pertinence to this lawsuit.

Not only did Belmonte impersonate a Federal agent when scamming Motty on November 11, 2019, eh was charged for impersonating a Federal agent, as charged in his indictment, particularly, as stated in the indictment, on August of 2021 (See Exhibit A-4 for Belmonte's indictment).  Motty's text messages (as shown in Exhibit A-15), on Nov. 11, 2019; and also see Belmonte's criminal indictment filed in the Eastern District of New York dated August of 2021 -- Homeland Security Impersonation (Exhibit A-4).

Whitehead would like to add a short statement from one more victim named Avi Rubin:
(5) Avi Rubin: "Attached are Avi Rubin's records of communication with the FBI, with an agent named Chris Merriman.  BB never boasted to Avi of his connections to the FBI.  This is just to support the pattern of the FBI seemingly ignoring or overlooking BB's criminal activity."  (See Exhibit A-16)

Ironically, at Whitehead's trial, the government refused to call their star, Brandon Belmonte as a witness.  However, Whitehead's attorney's subpoenaed him.  The government, in turn, motioned the Court to refute Belmonte's testimony.  The government's motion was granted and Belmonte testified in the absence of the jury.  The government had made clear that Belmonte would be pleading the Fifth Amendment to "every" question that he would be asked.  That is exactly what took place.  In the absence of the jury, the following questions and answers were stated (See Exhibit A-17, Lines 519-524).

The dialogue is as follows:

Q: Did Lamor Whitehead try to extort you for $5,000?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Can you tell us--did there come a time that you went to the United States Attorney's Office?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Can you tell us how do you know Mr. Lamor Whitehead?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did Lamor Whitehead try to get you to loan him $500,000 and promised you favors with the Mayor of New York?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did you tell the FBI that the Mayor of New York told you to do business with Lamor Whitehead because he can do big things?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Have you owned any multi-unit buildings in the Bronx in 2022?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Were you ever the owner of 3150 Villa Avenue?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did Lamor Whitehead ever tell you that he could remove a stop work order by calling the Mayor and getting it removed?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Was this a sting operation with the FBI against the mayor of New York?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did you tamper with any of the recordings when you were recording Mr. Whitehead for the FBI?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did you have any proffer agreements for working with the FBI?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Did the FBI tell you to make these recordings?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: What was the target of this investigation?

A: On the advice of counsel, I'm invoking my Fifth Amendment right not to answer the question.

Q: Do you have a cooperation agreement with respect to the case in the Eastern District (Belmonte's case)?

A: On the advice of counsel, I'm invoking my FIfth Amendment right not to answer the question.

Q: Sure, did Lamor Whitehead ask you for the $500,000 in exchange for a stake in real estate and promised you favors with the Mayor?

A: On advice of counsel, I'm invoking my Fifth amendment right not to answer the question.

PROSECUTOR EXAMINATION:

Q: Mr. Belmonte, with respect with your interactions with Lamor Whitehead, are there any substantive questions to which you would not invoke your Fifth Amendment rights?

A: No ma'am.

DUE TO THE STAR OF THIS CASE BEING ALLOWED TO PLEAD THE FIFTH AMENDMENT, WHITEHEAD WAS DEPRIVED FROM BRINGING OUT THE TRUTH TO THE LIGHT IN FRONT OF THE JURY.  This is the reason why Whitehead is presenting this "new evidence" herein.  Whitehead maintains his innocence.  He remains the "fall guy" when in fact Mayor Eric Adams was always Damian Williams' target.  Whitehead feels like he is in a movie from circumstances that occurred in the early 1900s, WHERE HE IS BEING CALLED "NEGRO." Apparently, USA Damian Williams is an African-American face used as representative for the government to target successful African-American men.  This should be reviewed in its totality and Bishop Lamor Whitehead should be exonerated and be released immediately.

On December 19, 2022, Whitehead was indicted and arrested. During a press conference released on that date, it was stated (See Exhibit A-18): "U.S. Attorney Announced Arrest of Lamor Whitehead for Fraud, Extortion, and False Statements:

Damian Williams, the United States Attorney for the Southern District of New York, and Michael J. Driscoll, Assistant Director in Charge of the New York Field Office of the Federal Bureau of Investigation ("FBI"), announced today the unsealing of an indictment charging Lamor Whitehead with defrauding one of his parishioners out of part of her retirement savings, attempting to EXTORT AND DEFRAUD A BUSINESSMAN, and lying to the FBI.  Whitehead was arrested this morning and will be presented in Federal Court today before United States Magistrate Judge Gabriel W. Gorenstein.  The case is assigned to United States District Judge Lorna G. Schofield.

U.S. Attorney Damian Williams said: 'As we allege today, Lamor Whitehead abused the trust placed in him by a parishioner, BULLIED A BUSINESSMAN for $5,000 then tried to defraud him of far more than that, and lied to Federal agents.  His campaign of fraud and deceit stops now."

In closing, the "BULLIED BUSINESSMAN" that USA Damian Williams is referring to and who he supported is the "NOTORIOUS" Brandon Belmonte.  Whitehead would like to close by adding just another small portion of Brandon Belmonte's indictment, it states: "As part of this scheme, BELMONTE and the Straw Buyers together with others, knowingly and intentionally submitted false information and fraudulent records to the Financial Institutions and the Lenders concerning the Straw Buyers' income and financial ability to repay the loans, including false earning statements and FALSE BANK ACCOUNT RECORDS." (See Exhibit A-4)

With this new information that Brandon Belmonte was an informant, the government violated Brady.

A "Brady Violation" requires a new trial where the government fails to disclose favorable evidence and the undisclosed evidence is material.  (See United States v. Rivas, 377F 3d. 195, 199 (2nd Cir. 2004) and United States V. Viertel (no. 01-cr-571), 2008 U.S. Dist. LEXIS 35346, 2008 WL 1944851 at *1 (S.D. NY April 30, 2008)).  Evidence is material when "there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, or would have put the case in such a different light as to undermine confidence in the

outcome." (Rivas 377 F.3d at 199; See also United States V. Amiel, 95 F.3d 135, 144-145 (2nd Clr. 1996))  The burden of proving that the government failed to disclose such evidence lies with the petitioner, and "conclusory allegations that the government suppressed or concealed evidence" are insufficient to satisfy the burden.  (See Harris V. United States, 9F Supp. 2d 246, 275 (S.D. NY (app) aff'd, 216 F.3d 1072) (2nd Cir. 2000))  "Petitioner sought a writ of Habeas Corpus and a new trial, Petitioner was not entitled a writ of Habeas Corpus on a new trial because he had not identified any newly disclosed evidence.  Judgment was vacated and remanded for a new trial because the disclosure of the fact that the informant brought the narcotics onboard the vessel might well have been viewed by the jury as a critical piece of suppressed evidence.

BRADY VIOLATION: United States V. Rivas 377 F.3d 195 (2004).  There are three components of a true Brady violation.  The evidence at issue must be favorable to the accused, either because it is exculpating or because it is impeaching: that evidence must have been suppressed by the state either willfully or inadvertently; and prejudice must have ensued. (See Stricklen v. Green, 527 U.S. 263, 281-282, 144 L. ed 2d 286, 119 S. Ct. 1936 (1995)). Impeachment evidence is evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness (See United States v. Avellino, 136 F. 3d 249, 255 (2nd Cir. 1998)).  Materiality of Brady evidence is established when there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case (See United States v. Bagley, 473 U.S. 667, 682, 87 L.Ed 2d 481, 105 S. Ct 3375 (1985)), or would have put the case in such a different light as to undermine confidence in the outcome (See Kyles v. Whitley, 514 U.S. 419 434-435 131 L.ed 2d 490, 11T s.ct 1555 (1995).  The omitted evidence is assessed in light of the entire record (See United States v. Aguies, 427 US 97, 112, 49 L.ed 2d 342. S.ct 2392 (1976)).

Under New Evidence:

When reviewing the prongs for reconsideration, just to refresh the Court's recollection, Whitehead brings the following issues in this motion for reconsideration for Rule 29 and Rule 33 relief: (1) New evidence of Brandon Belmonte not being a victim in this case; evidence of Brandon Belmonte fabricating evidence; evidence of Brandon Belmonte being a super-corrupt confidential informant who fabricated the case against Whitehead by committing multiple crimes himself which led to his own arrest and indictment in Federal court; evidence of Brandon Belmonte being a corrupt con-artist who cheated, potentially, hundreds of people; and how can the Mayor's indictment not be relevant when Whitehead showed this Court evidence that the notorious Brandon Belmonte and the DOG were targeting Mayor Eric Adams and that Whitehead was the "actual victim" or the "fall-guy," during the entire investigation and proceedings.  Also, all of the search warrants contained statements regarding the Mayor

Confrontation Clause violates Rule 33: Legal Standard.

The Second Circuit reviews challenges under the Confrontation Clause de novo.  See United States v. Vitale, 459 F.3d 190, 195 (2nd Cir. 2006).  In General, "the confrontation clause

guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." Coy v. Iowa, 487 U.S. 1012 (1988).

In particular, this Court excluded the testimony of Brandon Belmonte, also known as Victim-2 throughout the proceedings. However, today it is finally expressly known that he is and was also the star "confidential informant" who pleaded his Fifth Amendment while testifying in the absence of the jury. This Court excluded Belmonte from testifying, and this Court also cited United States v. Deursch, 987 F.2d 878 (2nd Cir. 1993). However, at the time that this Honorable Court made that Ruling, this Court only knew the star informant as Victim-2, and all motions were ruled on as Belmonte being Victim-2, when Belmonte was a criminal.

Whitehead would like for this Honorable Court to take a different view into who Belmonte truly is and what role he truly played in the proceedings of this case. The Second Circuit made clear in United States v. Zappola, 646 F.2d 48, 52 (2nd Cir. 1981) that: "The victim of an extortion plot could not claim the Fifth Amendment against self-incrimination concerning matters in which he had acted in an undercover capacity for the government because there were no legitimate fears of prosecution." And, "A government informant was protected from criminal prosecution for conduct engaged in during the course of that agency. The witness should have been required to respond to some carefully phrased limited questions by defense counsel concerning matters taht arose during his agency with the government. Thus, he cannot legitimately invoke the privilege against self-incrimination as to questions of limited scope dealing solely with those activities."

Respectfully, Whitehead avers herein that he was improperly barred from confronting his accuser, Brandon Belmonte, when after permitting the government to introduce extensive conversations between the two, the Court granted the government's motion to preclude the defense from calling and questioning Belmonte on Fifth Amendment ground.

It is fundamental to a fair trial that the Sixth Amendment guarantees a criminal defendant the right to obtain witnesses in his favor. (Washington V. Texas, 388 U.S. 14, 15-23 (1967), including the right to confront witnesses, Pointer v. Texas, 380 U.S. 400, 403 (1965), and cross-examine them. Alvarez v. Ercole, 763 F.3d 223, 229-30 (2nd Cir. 2014))

In view of these critical protections, when a witness's invocation of a Fifth Amendment self-incrimination-claim conflicts with a defendant's Sixth Amendment rights, the claim should be "closely scrutinized." (U.S. v. Bowe, 698 F.2d 560, 566 (2nd Cir. 1983)) Witnesses are not entitled to blanket prosecution; rather, the protection reaches answers only that "in themselves would support a federal criminal conviction" and courts must conduct a "particularized inquiry...as to each of the posed question." (U.S. v. Zappola, 646 F.2d 48, 52-54 (2nd Cir. 1981), Internal quotation citation omitted.) Moreover, it is well-established that a witness cannot invoke the privilege against self-incrimination when acting as an informant.

Here, Whitehead was unable to confront Belmonte, the government's primary witness against him; this Court permitted Belmonte to invoke a blanket Fifth Amendment privilege to all

questions posed by the defense, without any specific analysis about whether each answer could possibly incriminate him.  Trial counsel asked many specific questions about the scope of Belmonte's relationship with the FBI and his conduct undertaken as an informant for the government (Tr. 520-524).  This Court accepted Belmonte's blanket Fifth Amendment invocation and the majority of the questions were plainly not protected by the privilege (Zappola, SUPRA, at 646).

Precluding Belmonte as a witness also violated Whitehead's confrontation rights.  A confidential informant's out-of-court statements in recordings are admissible if offered for mere context, bnot for their truth (U.S. v. Burden, 600 F.3d 204, 224-25 (2nd Cir. 2010)).  But statements offered for their truth violate the confrontation clause, where, as here, a defendant is precluded from cross-examining an unavailable witness (U.S. v. Logan, SUPRA).

Despite this Court's limiting instructions, many of Belmonte's statements in the recordings could not have been considered for anything other than their truth.  For example, Belmonte repeatedly brought up the fictitious stop-work order that was never mentioned by Whitehead except for a response that it would be easy to deal with.  Such statements cross the border from context to truth (See Burden, at 600 F.3d 224-225), and unlike many cases permitting recordings for their context (e.g. U.S. v. Barone, 913 F.2d 46, 49 (2nd Cir. 1990) - observing that the defendant chose not to call the informant as a trial witness), here, Whitehead vigorously sought to cross examine Belmonte.

Ergo, WHITEHEAD's ARGUMENT IS PRESERVED.

After speaking with Belmonte's counsel, the government moved to preclude his testimony, arguing that "the defense should not be permitted to call (Belmonte) solely for his anticipated invocation." (ECF Doc. 148 at 1)  Contrary to the government's cherry-picked misrepresentation that defense counsel sought to have Belmonte testify just to invoke the fifth in front of the jury, defense counsel explicitly argued in opposition that Belmonte should "testify and plead the Fifth in front of (the Court), outside the presence of the jury," because the government "should not be allowed to invoke the Fifth on behalf of a private citizen in order to frustrate a defendant's attempts to exercise his confrontation rights." (ECF Doc. 151 at 1)

Subsequently, at the hearing, defense counsel asked a number of individual questions specifically so that the court could rule on the prosperity of Belmonte's invocation (Tr. 519-25).  While the court ruled that "Belmonte's relevant testimony consisted only of the invocation of the privilege" (Tr. 525).  In Whitehead's motion for a new trial, counsel argued again that Belmonte's innovations were improper because the questions were not incriminating. (ECF Doc. 182 at 8.)  Accordingly, Whitehead preserved his improper invocation argument.  And, moreover, the trial court passed on the question that Whitehead intends to raise on appeal.

To the extent that if the government argues forfeiture, see U.S. v. Olano, 507 U.S. 725, 733 (1993)(disguising a waiver and forfeiture), it would be wrong.  To avoid forfeiture at trial, a party must "offer some argument or development of its theory." (U.S. v. Griffiths, 47 F.3d 74, 77 (2nd

Cr. 1995)).  Defense counsel plainly challenged Belmonte's invocation, which the court ruled on. Trial counsel need not chase rainbows to preserve her argument.  In any event, the argument is thus preserved.

Belmonte's testimony was relevant and material with the fact that Belmonte was the alleged victim in the case of Belmonte's largely testimonial statements were the lynchpin in the government's case against Whitehead.

The extreme unfairness to Whitehead on this record is patent.  The government declined to grant immunity to Belmonte, vigorously sought to introduce his recording as crucial to their case, barred Whitehead from introducing any evidence challenge Belmonte's credibility, and finally, invoked Belmonte's right against self-incrimination to preclude any substantive examination or confrontation, which was particularly egregious because, as the government knows, Belmonte's conduct while acting as an informant was not subject to prosecution and not covered by privilege.  See U.S. v. Zappola, 646 F.2d 489 52-54 (2nd Cir. 1981).  Many of the questions that counsel asked Belmonte during the hearing would have been relevant to the crimes charged, corroborated Whitehead's own testimony or challenged Belmonte's credibility.  For example, Belmonte invoked when asked how he knew Whitehead and when he first met him (Tr. 520). That testimony would have been relevant.  Why Belmonte approached Whitehead about the real estate deal (his experience) and Belmonte's understanding of Whitehead's local connections (including counsel members, senators, and the Mayor) would have directly refuted the government's narrative that Whitehead intentionally misrepresented his relationship with Adams--a key element of the wire fraud count.  Thus, Belmonte's testimony would have corroborated Whitehead's own testimony that he lacked the requisite intent (Tr. 1110-13). Moreover, Whitehead's experience and connections materially benefitted Belmonte, not the merely collateral stop-work order (U.S. V. Starr, 816 F.2d 94,98 (2nd Cir. 1987)).  Importantly, even if Whitehead's relationship with the mayor was complicated, Whitehead did have over six years of personal text messages with the Mayor -- significantly more than the average New York City resident.  Additionally, with respect to the attempted extortion charge, Belmonte's testimony would have given the jury an opportunity to assess whether, based on their prior relationship, Whitehead's statement was intended as a threat, or just a general statement about why other people have not taken advantage of him. (GX 101-T: "God has been good to me...Nobody's gonna take nothin' from me.  And that's what people.  They, oh you a Bishop...I will hurt you. Don't play with me.").  Further, Belmonte could have testified that he did indeed "promise" Whitehead the five thousand dollars (Tr. 1113 & Tr. 524 - asking if Belmonte thought Whitehead attempted to extort him).

Whitehead should have been allowed, at the very least, to question Belmonte's credibility, as trial counsel ably argued.

Belmonte was indicted in August of 2023, before Whitehead's trial began, with massive vehicle financing and insurance fraud scheme that ran back to January of 2019 *U.S. v. Belmonte, S.D. NY, 23-cr-313, doc. 1 (indictment).  Belmonte proposed the fictitious stop work orders and real estate deals (at the government's direction) to Whitehead years later in April of 2022.

Belmonte's credibility--including his personal interest and motive to frame Whitehead or attempt to elicit statements that appeared incriminating so as to garner favor on his own pending criminal charges-certainly presented an acutely relevant credibility issue for the jury, which would have informed their interpretation of the context and meaning of the words on the recordings (See Davis v. Alaska, 415 U.S. 308, 316 (observing that "the partiality of a witness" including "possible biases, prejudices, or ulterior motives," is "always relevant as discrediting the witness and affecting the weight of his testimony"). Below, counsel proposed many questions about Belmonte's relationship with the FBI, including whether he made promises to the FBI about Mayor Adams and doing business with Whitehead (Tr. 521). These questions were indisputably relevant to the jury's ability to assess the context in which Whitehead's recorded statements were made, his intent and meaning in making them, and the way the meaning might have been distorted by those with an interest to do so.

On another note, the exclusion of defense witnesses deprived Whitehead of a fair trial. Whitehead is guaranteed the right to present a defense under the Fifth Amendment's due process clause and the Sixth Amendment's compulsory process clause (Rosario v. Kuhlman, 839 F.2d 913, 924 (2nd Cir. 1988)). White a defendant's right to introduce evidence is not absolute, any restriction must not be "arbitrary or disproportionate" (Williams V. Lord, 996 F.2d 1481, 1483 (2nd Cir. 1993)). Although, a district court has discretion to exclude collateral evidence (U.S. v. Scopo, 861 F.2d 339, 345 (2nd Cir. 1988)), it abuses its discretion when excluding relevant evidence that supports the defense.

The exclusion of Kaplan and Tomassetti violated Whitehead's right to present a defense. For example, a key component of Ms. Anderson's testimony was her understanding of the mortgage process used to establish her expectations in transferring money to Whitehead. But Kaplan could have testified to her contemporaneous knowledge not only for impeachment purposes, but also to shed light on her expectation about the money provided to White head (See Tr. 956-57, which explains the basis for testimony). Because the government sought to prove Whitehead's intent entirely by circumstantial evidence, Ms. Anderson's testimony regarding her understanding of Whitehead's representations were directly relevant (See U.S. v. Gatto, 986 F.3d, 104, 113 (2nd Cir. 2021)).

Likewise, as to the attempted wire fraud, Tomassetti would have offered testimony that Belmonte did not own the subject properties. The court excluded Tomassetti's testimony as irrelevant, agreeing with the government that factual impossibility was no defense (ECF Docs 148 at 2-3 and 157 at 2-3). But the testimony was relevant to disprove the government's case-in-chief. To prove attempted wire fraud, the government had to prove that Whitehead took a substantial step toward obtaining property (See Gatto SUPRA at 113). Looking into the stop-work orders and the ownership status of the property -- two acts not taken by Whitehead -- would have been relevant to show that Whitehead did not go beyond mere preparation of the purported crime. Thus, Tomassetti's testimony went directly to the relevant background of an attempt-crime.

The district court failed to acknowledge all of the new evidence pertaining to Mayor Eric Adams, the informant Brandon Belmonte, and the malicious prosecution of the government. Bishop Lamor Whitehead spelled out within the reconsideration motion the maliciousness of United States Attorney Damian Williams who has now just resigned. Bishop Lamor Whitehead placed a roadmap with proof within the initial motion showing that from Damian Williams on down to the FBI, the various parties covered up that Brandon Belmonte was a con-man informant and never a victim.

Every motion in this court proceeding was predicated and decided based on the government's theory. And the district court blocked the Defendant from calling Brandon Belmonte as a hostile witness because of this reason as well. Under Zappola (Supra), Belmonte's conduct while acting as an informant was not subject to prosecution and not covered by privilege of invoking the Fifth Amendment.

However, the government withheld the true evidence and identity of Brandon Belmonte as an informant and placed him as a victim to the Courts. The district court ruled on Motion in Limine on February 23, 2024 in error using "A district court has the discretion to prevent a party from calling a witness solely to have [the witness] invoke the privilege against self-incrimination in front of the jury." (United States v. Deutsch, 987 F.2d 878, 883, 884 (2nd Cir. 1993) accord United States v. Cavigliano, 659 F. App'x 65, 67 (2nd Cir 2016) (summary order). There was a ruling on the recording motion in Limine on February 22, 2024, stating that the recordings could be for context but not the truth. However, there was never any ruling by this court that gave an order for the text messages from Brandon Belmonte to be used at trial for the context but not for the truth. This court allowed these statements to be admitted in front of the jury, which violated Whitehead's sixth amendment right to due process.

When deciding whether to exclude the witness, a district court must weigh whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice in accordance with Rule 403 (See Deutsch SUPRA). In order to aid in that determination, a court may first hear the witness's testimony outside the presence of the jury to determine whether the testimony has any probative value or consists only of the invocation of the witness's privilege against self-incrimination (See as e.g., id. ("After determining that Berube's testimony would consist only of irrelevant information and the invocation of his privilege against self incrimination, the district court did not permit the defendant to call him (Cavigliano, Supra, at 67; United States v. Guzman, 332 F. App'x 665, 666-667 (2nd Cir. 2009) (summary Order)).

If Defendant determines to call victim-2 to testify, Victim-2 (Brandon Belmonte) shall first testify outside the presence of the jury so that the court can determine whether the probative value of his testimony is substantially outweighed by its potential for unfair prejudice. The subpoena for Brandon Belmonte was squashed due to this ruling.

This was the district court's ruling oppose to not knowing that Brandon Belmonte was an informant and United States v. Zappola applies with states: "Defendants challenged their United

States District Court for the Southern District of New York convictions for conspiring and attempting to extort money in violation of the Hobbs Act (18 U.S.C. SS. 2 and 1951(a)). Defendants argued that the district court erred in quashing a subpoena of one of the victims of the attempted extortion on the ground that he was entitled to invoke his U.S. Constitutional Amendment V privilege against self-incrimination. The victim of an extortion plot could not claim the Fifth Amendment against self-incrimination concerning matters in which he had acted in an undercover capacity for the government because there was no legitimate fear of prosecution.

The Court reversed the defendant's convictions for conspiracy and attempting to extort money in violation of the Hobbs Act (18 U.S.C. SS 2 and 1951(a)).

Finding that the district court in quashing a subpoena of one of the victims of the attempted extortion on the ground that he was entitled to invoke his U.S. Const. Amend. V privilege against self-incrimination, the District Court declared the witness unavailable under Fed. R. of Evidence 804(a)(1) because the witness refused to testify out of fear of criminal prosecution. However, the witness could not have had a legitimate fear of prosecution as to the questions of limited scope concerning matters in which he had acted in an undercover capacity for the government.

If a government informant was protected from criminal prosecution for conduct engaged in during the course of that agency, the witness should have been required to respond to some carefully phrased, limited questions by defense counsel concerning matters that arose during his agency with the government.

A government informant is protected from criminal prosecution for conduct engaged in during the course of that agency. A witness who is protected in this manner cannot reasonably fear prosecution with respect to his activities as a government agent. Thus, he cannot legitimately invoke the privilege against self-incrimination as to questions of limited scope dealing solely with those activities.

Here, in Bishop Lamor Whitehead's case, every motion that was ruled on throughout the case was based on the theory of Brandon Belmonte being a victim. However, he was an informant. The district court overlooked this controlling decision (ala U.S. v. Zappola, Supra) that an informant does not have the privilege of invoking the Fifth Amendment. What is more, Bishop Lamor Whitehead, through the newly discovered evidence of Brandon Belmonte, and through the Mayor, Eric Adams's indictment establishes that not only was Brandon Belmonte wanted as a Federal informant against Mayor Adams, he was never a victim in the case of Bishop Lamor Whitehead. The evidence shows that he was actually the con-man informant. None of the new evidence was discoverable because the government hid his information by stating that Brandon Belmonte was a victim and that this indictment against Bishop Lamor Whitehead is actually an investigation against Mayor Eric Adams based on Adams's indictment. Thus proven, the evidence and the information, if properly presented to the jury, would have given them reasonable doubt for the entire case and would have affected the integrity of the government. The entire case would have, then, been acquitted. Moreover, if this information would have

been turned over, this case would not have survived the pre-trial motion practice. The government violated the Defendant's due process, and the defendant was unable to argue the search warrant suppression motion correctly, Motion in Limine Motions, Rule 29, Rule 33, etc. All motions throughout pre-trial and post-trial would have been argued differently with this newly discovered evidence.

The applicable legal principles are well settled. A court of appeals reviews a district court's denial of a motion for a new trial under Rule 33 for abuse of discretion (See United States v. Gil, 297 F.3d 93, 101 (2nd Cir. 2002)). A district judge's ruling is given deference because the judge presided over the trial and is in a better position than an appellate court to determine the probable effect of new evidence (See United States v. Gonzalez, 110 F.3d 936, 943 (2nd Cir. 1997)). However, a new trial motion, such as Bishop Whitehead's, invokes the equally well settled rule that the government's failure to disclose evidence that is materially favorable to the defense violates due process. As per Brady, (Brady, Supra, at 87). "There are three components of a true Brady violation: the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching: that evidence must have been suppressed by the state, either because it is exculpatory, or because it is impeaching: that evidence must have been suppressed by the government either willfully or inadvertently: and prejudice must have ensued." (See Also: Stricklen v. Greene, 527 U.S. 263, 281-82, 144 L.Ed 2d 286 119 S.ct 1936 (1955) as Impeachment evidence as evidence "having the potential to alter the jury's assessment of the credibility of a significant prosecution witness.", United States v. Avellino, 136 F.3d 249, 255 (2nd Cir. 1998) as materiality of Brady evidence being established when there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, United States V. Bagley, 473 U.S. 667, 682, 87 L.ed 2d 481, 105 S.ct 3375 (1985) as to putting the case in such a different light as to undermine confidence in the outcome, Kyles V. Whitely, 514 U.S. 419, 434-35, 131 L.ed. 2d 490, 115 S.Ct 1555 (1995) the omitted evidence is assessed in light of the entire record, and United States v. Agurs 427, U.S. 97, 112, 49 L.Ed 2d 342, 46 S.ct 2392 (1976)."

Looking at invocation of the Fifth Amendment also can utilize United States v. Tutino (June 29, 1989). Therein, Tutino argues that Judge Leval improperly upheld Cafano's invocation of the privilege, thereby restricting the areas about which Canfano could be compelled to testify. Judge Leval's ruling was completely consistent with the law in this circuit. In United States v. Zappola (Supra), we held that an individual who has cooperated with the government has no bona fide fear of incrimination with respect to the subject of his cooperation and therefore, "cannot legitimately invoke the privilege against self-incrimination, as to questions of limited scope, dealing solely with those activities." However, the fact that an individual has cooperated with the government does not abrogate the person's Fifth Amendment privilege with respect to any and all questions relating to his cooperation. We indicated, in Zappola (Supra), the types of responses that are required.

The witness should have been required to respond to some carefully phrased, limited questions by defense counsel concerning the time and the place of the meetings. The person with whom he met, the fact that conversations were tape recorded, what the substance of the

conversations were, and who said what. Responses to questions concerning the purpose of the meeting on a summary of prior circumstances may not be required because such information may furnish a link in the chain of evidence needed to prosecute the witness. For criminal conduct, Judge Leval conducted the necessary particularized inquiry, and the Judge required Facano to testify about the tapes he made for the government. However, he correctly concluded that Cafano had a legitimate fear of prosecution other areas

The new evidence is not just to impeach the credibility of Belmonte as the district court ruled, however, the new evidence exposes Belmonte as the informant that he is.
..in other areas, such as his prior activities leading to his cooperation with the government. Accordingly, Cafano's invocation of the privilege was appropriate under Zappola. United States v. Gagnon 373 F.3d 230 July 1 2004 Reconsideration filed by the prosecution in the Second Circuit was reversed and remanded.

The leading supreme court case on this question, Roviaro v. United States 353 U.S. 53, 12 Ed. 2d 639, 77 S.ct 623 (1957), holds that where the disclosure of an informant's identity or of the contents of his communication is relevant and helpful to the defense of an accused, or is essential to the fair determination of a case, the informant's privilege must give way (353 U.S. at 60-61). The court explained that "no fixed rule with respect to disclosure is justifiable (id at 62). What is required is "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense" (id). Whether non-disclosure is erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informant's testimony and other relevant factors (See Rugendorf v. United States, 376 US 528, 534-35, 11 L.ed 2d 887 84 S. Ct825 (1964) and United States V. Lilla, 699 F. 2d 99 105 (2nd Cir. 1983), United States v. Ortega, 471 F.2d 1350, 1359 (2nd Cir. 1972) and cert denied, 411 US 448, 93 S.ct 1924, 36 L. Ed. 2d 409, 93 S. CT 1925 (1973)).

The defendant is generally able to establish a right to disclosure where the informant is a key witness or participant in the crime charged. Someone whose testimony would be significant in determining guilt or innocence. (See United States v. Russotti. 746, F.2d 945, 950 (2nd Cir. 1984), United States v. Roberts, 388 F.2d 646, 648-649 (2nd Cir. 1968), United States v. Price 783 F.2d 1132 (4th Cir. 1986), United States v. Barnes, 486 F.2d 770 (8th Cir. 1973).

In Robers, the informant introduced an undercover agent to the defendant and was present when the defendant and the agent negotiated and transacted two sales of heroin. The court, nothing that the informant was "present during all the significant events" (388 F.2d at 649). Within, it was found that he was obviously a crucial witness to the alleged narcotics transactions, and therefore, his whereabouts should have been revealed to the defense if properly requested. But disclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense (See U.S. v. Valenzuela, Bernal, 458 U.S. 858, 870-71, 73 L.ed 2d 1193, 102S, Ct 3440 (1982)(dictum) an United States V. Jimenez, 789 F.2d 167 (2nd Cir. 1986)). Within, it makes clear it is not sufficient to show that the informant was a participant in and witness to the crime charged. In

Jimenez, the informant was both participant and witness, but the district court's refusal to order disclosure of his identity was upheld on the ground that the defendant had failed to show that the testimony of the informant "would have been of even marginal value to the defendant's case" (789 F.2d at 170).

United States v. Tang Yuk 885 F.3d 57 (2nd cir. 2018) - Jury instruction call and text.

United States v. Biancofiori 2024 U.S. App Lexis 4668 Feb 28, 2024 - Biancofiore next argues that the district Judge's decision to admit evidence about non-testifying victims violated his rights under the confrontation clause.  But the clause does not require that victims testify; rather, it bars admission of "testimonial statements of a witness," who did not appear at trial (See Crawford V. Washington, 541 U.S. 36, 53-54, 124 S. ct 1354, 158 L.ed 2d 177 (2004), and the government generally did not offer testimonial statements from non-testifying victims.  Rather, the testimonial evidence showing that Biancofiore forced the victims into prostitution came from those who saw and testified at trial about his abuse of the victims, and from his own text messages, corroborated their actions.

The sixth amendment's confrontation clause provides that "the accused shall enjoy the right to be confronted with the witnesses against him" in a criminal prosecution.  U.S. Const. Amend. VI. A district court may violate the defendant's right to confrontation if it precludes an entire relevant area of cross-examination (United States v. Lonedog, 929 F.2d 568, 570 (10th Cir. 1991)).  But at the same time, "the confrontation clause guarantees an opportunity for effective cross-examination, not extent, the defense might wish "Delaware v. Fenstrer," 474 U.S. 15, 20 106 S. Ct. 292, 88 L.ed 2d15 (1985) (per curiam).

U.S. v. Gagnon, 470 U.S. 522, 526, 105 S. ct 1482, 84 L. ed 2d 486 (1955) - a criminal defendant's constitutional right to presence is rooted to a large extent in the confrontation clause of the sixth amendment.

2018 U.S. Dist. Lexis 158216: U.S. v. Silver, September 17, 2018.  A jury charge is in error if the "charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard." (United States v. Quattrone, 441 F.3d 153, 177 (2nd Cir. 2006)(quoting United States v. Doyle, 130 F.3d 523, 535 (2nd Cir. 1997)(internal quotation marks omitted).  A court must review the charge as a whole to determine whether a defendant was prejudiced and whether the charge "adequately reflected the law and would have conveyed a reasonable juror the relevant law." (United States v. Mulder, 273 F.3d 91, 105 (2nd Cir. 2001) (quoting United States v. Jones, 30 F. 3d 276, 284 (2nd Cir. 1994)(internal quotation mark omitted).  "An erroneous instruction, unless harmless, requires a new trial." (U.S. v. Bah, 574 F.3d 107, 114, (2nd Cir. 2009) (quoting Anderson V. Branen, 17 F.3d 552, 556 (2nd Cir. 1994).  An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have convicted if it had been properly charged Id. (Quoting Quattrone, 441 F.3d at 177).

Jury Instructions

We review a claim of error in jury instructions de novo, reversing only where viewing the charge as a whole, there was a prejudicial error (See U.S. v. Aina-Marshall, 336 F.3d 167, 170 (2nd Cir. 2003)(citing United States v. Tropeano, 252 F.3d 653, 657-58 (2nd Cir. 2001)).

In conducting this review, we examine the charges as a whole "to see if the entire charge delivered a correct interpretation of the law." (United States v. Bala, 236 F. 3d 87, 94-95 (2nd Cir. 2000)(citation omitted) See also United States v. Carr 424 F.3d 213, 218 (2nd cir. 2005). "An erroneous instruction, unless harmless, requires a new trial (Anderson v. Brannen,Supra).

Juries are presumed to follow their instructions "Zafiro v. U.S., 506 U.S. 534, 540, 113 S. Ct 933, 122 L.ed 2d 317 (1993)" in accord U.S., v. Pinto-thomas, 18 Crim, 579, 2019, LEXI 46206

Jury Instructions (See Exhibit A-2).  Legal Standard.

A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  United States v. Walsh, 194 F.3d 37(2nd Cir. 1999)(quoting United States v. Bok, 156 F.3d 157 (2nd Cir. 1998)).

The Second Circuit will vacate a conviction for erroneous jury instructions only if the instruction includes: (1) an error; (2) that it is plain; (3) affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings (U.S. v. Aguirre, 853 Fed. Appx. 748 (2nd Cir. 2021)).

The Second Circuit held that "in assessing the effect of the erroneous jury instructions on a defendant's substantial rights, an appellate court considers the weight of the trial evidence bearing on the omitted element and whether the omitted element was essentially uncontroverted.  An appellate court asks whether it can conclude, beyond a reasonable doubt, that a properly-instructed jury has returned the same verdict and in doing so, an appellate court considers only the evidence that was actually presented to the jury" (See U.S. v. Morales, 819 Fed. Appx. 53 (2nd Cir. 2020)).

The following statements by this Honorable Court will result in either a reversal, a new trial, or a vacate and remand.  This court stated:
(i) "I instruct you that each party had an opportunity or lack of opportunity to obtain the testimony of any of these witnesses." (Exhibit A-2, Trial Transcript at 1224, Lines 19-21).

Whitehead attempted to call Marc Kaplan, who would have testified and attested that he, himself, filled out the loan application for the Andersons and was the person who orchestrated that deal with regards to Count One.  Dino Tomassetti, who would have testified and verified that he was the actual owner of the 66-unit property on 3160 Villa Avenue in the Bronx, New York, involving a work-stop order.  He would have testified that Belmonte never owned that property and that that property did not have a stop work order at that time with regards to Count Two.  Brandon Belmonte, the star of this case, would have testified and verified who he is in fact, as explained in the "new evidence" section.  HE WOULD HAVE EXONERATED

WHITEHEAD FROM THE ENTIRE CASE, but especially, on Counts Two and Three.  Andew Lichtenstein, a real estate broker who knew Brandon Belmonte as a conman and virtually caused Andrew to lose his best client in a previous real estate deal with Belmonte.   He would have testified that Belmonte never owned any buildings or real estate in the State of New York.

This Honorable Court denied Whitehead from calling any of the above mentioned witnesses.  That gave the jury the impression that Whitehead chose not to present a defense by not calling these witnesses.

On trial page 1233, lines 6-13), this court stated:
(ii) "In order to 'prove' a defendant guilty of attempt, here attempted wire fraud, the government must 'prove' the following two elements beyond a reasonable doubt: First, that the defendant intended to commit a crime, here, the crime of wire fraud; and Second, that the defendant willfully took some action that was a substantial step in an effort to bring about or accomplish the crime."

This Court omitted an essential and crucial part to the elements for attempted wire fraud, in particular, "defrauding through the use of interstate wires" (See U.S. v. Zongo, U.S. Dist. LEXIS 79653 (S.D. N.Y. May 23, 2017) - quoting U.S. V. Bouyea, 152 F.3d 192 (2nd Cir. 1998), and U.S. v. Farhane, 634 F.3d 127 (2nd Cir. 2011)).

In Zongo, the Court instructed the jury for "attempted wire fraud" that, "(1) the defendant knowingly and willfully participated in a scheme to defraud by materially false and fraudulent pretenses with specific "intent to defraud through the use of interstate wires," that the defendant took a substantial step in an effort to bring about or accomplish the scheme."  The "use of interstate wires" is the third element to substantive wire fraud.  The Second Circuit clarified in United States v. Castillo, 36 F.4th 431 (2nd Cir. 2022) that, "we have adopted a generic definition of attempt that conforms to the views set forth in the Model Penal Code as federal law of attempt within the Second Circuit (See United States v. Manley, 632 F.2d 978, 987 (2nd Cir. 1980) - "This Court...has adopted the view set forth in... the American Law Institute's Model Penal Code... that the requisite elements of attempt are an intent to engage in criminal conduct and the performance of acts which constitute a "substantial step" towards the commission of the substantive offense;" and also United States v. Tabb, 949, F.3d at 86 - 'Generic Attempt is the presence of criminal intent and the completion of a substantial step toward committing the crime').  This generic definition of attempt requires proof that the defendant 'had the intent to commit the crime' (See U.S. v. Crowley, 318 F.ed 401, 407 (2nd Cir. 2003) and see also 2 Wayne R. LaFave, Substantive Criminal Law S.S. 11.3(a) (3rd Ed. 2021) - 'The mental state required for the crime of attempt, as it is customarily stated in the cases, is an intent to commit some other crime').  And under this generic definition, "the crime of ATTEMPT REQUIRES THAT THE DEFENDANT HAVE INTENDED TO COMMIT EACH OF THE ESSENTIAL ELEMENTS OF THE SUBSTANTIVE CRIME" (See Collier v.  United States, 989 F.3d 212, 221 (2nd Cir. 2021) and see also LaFave, Substantive Criminal Law S.S. 11.3(a) - nothing that 'because intent is needed for the crime of attempt,' crimes that 'are defined in terms of acts

causing a particular result' cannot be attempted unless the defendant specifically intended to bring about that result').

Attempted wire fraud should have incorporated the three elements of wire fraud, which are the following: "(1) a scheme to defraud; (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme" (See the Zongo instructions for the attempt, SUPRA).

At Tr. pages 1235-36 starting at line 13, this Honorable Court stated:
(iii) "To meet its burden of proving that the defendant attempted--committed 'attempted extortion,' the government 'must' establish beyond a reasonable doubt each of the following three elements: First, the defendant wrongfully obtained or attempted to obtain the property of another; Second, the defendant obtained or attempted to obtain this property with the victim's consent but compelled this consent by the wrongful use of threat of force, violence, or fear, including fear of injury or fear of economic loss or harm; and third, as a result of the defendant's actions, interstate commerce or an item moving in interstate commerce was or would have been delayed, obstructed, or affected in any way or degree."

Count Three charged Whitehead with "attempted Hobbs Act extortion," however, the elements that this Court instructed the jury with were the elements of "Hobbs Act extortion." This Court added the phrase "or attempted to." The instructions for "attempted Hobbs Act extortion" should have contained the following three elements: "(1) that the defendant 'intended' to commit...Hobbs Act extortion; (2) that the defendant took a 'substantial step'... to bring about or accomplish the crime; and (3) that interstate commerce was 'delayed, obstructed, or affected in anyway or degree.'" See Dervishaj v. U.S., U.S. All. LEXIS 20741 (2nd Cir. 2024). This Court did not state the elements of attempted Hobbs Act extortion at all. This Court further stated at Tr. page 1236, lines 18-25:

"As to the interstate commerce 'requirement,' it's 'not necessary' for the government to 'prove' that commerce actually was affected by the defendant's conduct or that the defendant 'intended' or anticipated that his actions would affect interstate commerce. It's enough for you to find that the defendant's conduct 'possibly' could have affected interstate commerce. The government needs to 'prove' only a 'very slight' or 'potential' effect on interstate commerce."

The elements of attempted Hobbs Act extortion do "require" an "intent," and a "substantial step" to commit a delay, obstruction, or affect "interstate commerce." Based on this Court's instructions on Count Three, the jury relied on erroneous elements for attempted Hobbs Act extortion.

Further on Tr. page 1240, Lines 1-15, this Court instructed:
(iv) "There's been evidence during the trial that the defendant previously engaged in conduct that is similar in nature to the conduct that is charged in this case. Let me remind you that the defendant is on trial only for committing the acts with which he's charged. Accordingly, you may not consider the evidence of similar acts as a substitute for proof that the defendant committed

the crimes charged.  You also may not consider this evidence as proof that the defendant has a criminal personality or a bad character.  This evidence was submitted for a more limited purpose and may be considered by you only for a more limited purpose, namely, as potential evidence of the defendant's identity, motive, opportunity, intent, knowledge, plan, and/or absence or mistake, and to provide background for the alleged offenses.  You may consider it for these purposes only."

However, on the same page, lines 19-20, this Court made the statement in regards to the similar acts evidence that:

"If you 'determine' that the defendant committed the acts charged and the 'similar acts as well.'"

The jury was not to "determine" similar acts.

In regards to the nine audio tapes that this Court admitted into evidence, seven of those tapes were created on Brandon Belmonte's own initiative.  The tapes were not authenticated, they had a question of reliability, they should have been inadmissible hearsay.  The tapes could have been digitally manipulated, tampered with, or altered.  The tapes had no authenticity for dates and times.  This Court instructed the jury on Tr. page 1242, lines 25 and page 1243 that:

(v) "The recordings were made in a lawful manner, and no one's rights were violated."

An FBI agent testified at trial that in regards to the audio tapes, he could "not" confirm whether the recordings had been altered. See Tr. 728-40.

These tapes dramatically influenced the jury.  Whitehead was prejudiced by the admission of the seven unauthenticated tapes.  The instruction led the jury to assume that the tapes were authenticated.

In Closing, this Court stated on Tr. page 1214, lines 10-13 that:
"We have jury instructions for you.  These are yours from now until you reach your verdict.  So, I suggest you put your initials on the front.  you'll be able to take them into the jury room with you." (See Exhibit B - Jury Instructions.)

Sentencing Error. Rule 33. Legal standard.

"When a defendant fails to object to an alleged sentencing error before the district court, the appellate court reviews for plain error.  Plain error exists when there is (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." (See U.S. v. Morales, 239 F.3d 113, 117 (2nd Cir. 2000)).

This court, during sentencing, ordered that Whitehead pay a consecutive special assessment of $100.00 upon each count in the indictment to which was convicted pursuant to 18 U.S.C. S.S. 3013, with a total consecutive amount of $500.00.  See Exhibit B - judgment in Criminal Case.

Accordingly, in compliance, Whitehead has satisfied this Court's judgment order upon completion of the payment on the five consecutive special assessments on October 09, 2024. See Exhibit C - BOP's inmate Financial Responsibility Receipt.

Whitehead has satisfied the judgment in the payment of unauthorized consecutive special assessments.  Whitehead hereby solely attacks the monetary aspect of the sentence, which violates the principle of the double jeopardy clause.  Furthermore, Whitehead "is not" challenging the enactment by Congress of special assessment under 18 U.S.C. S.S. 3013. Rather simply, Whitehead is challenging the "cumulative" punishment unauthorized by Congress through both, the imposition and execution of unlawful special assessment amount to double jeopardy, which may not be procedurally defaulted, waived, or consented to/or stipulated within the federal courts.

The above referenced defects should have been corrected by the federal courts, who have failed to notice, sua sponte, the fundamental violations resulting from the imposition and execution of the consecutive special assessment.

Wherefore, the imposition and collection of these consecutive special assessments, upon Whitehead's five convictions and sentences, with the first and second sentences running concurrent, pursuant to 18 U.S.C. S.S. 3013 against Whitehead, by this Court, were cumulative punishment unauthorized by Congress amounting to "double jeopardy" and constitute excessive fines and penalties and inflection of cruel and unusual punishment and unlawful seizure in violation of the Fourth, Fifth, and Sixth Amendments to the Constitution of the United States. "So says every federal court to have addressed the issue ruled double jeopardy." (See Rutledge v. United States, 517 U.S. 292, 302-303 (1996).

In Rutledge, the Supreme Court noted that, "as long as the 18 U.S.C.S.S. 3013 provides for a $50.00 special assessment on each conviction, a second conviction will always amount to a second punishment." Id. at 517 U.S. at 301.  The Supreme Court also pointed out that "second conviction has other collateral consequences, such as, its effect on parole eligibility, its possible future use under a recidivist statute, and social stigma." Id. at 301-303.  See Also, Ball, 407 U.s. at 856.

The Second Circuit has held that Rutledge explicitly rejected ('our practice') of combined sentences for two convictions.  Ruling that, the imposition of special assessment on each count would constitute impermissible double jeopardy.  Id. at 301, 307; see Underwood v. U.S., 166 F.3d 84 (2nd Cir. 1999).

Whitehead asserts that by this Court imposing $100.00 special assessments on each of the five counts in the indictment, it has in essence imposed a second conviction on these counts. "Thus, the second conviction even if it results in a greater sentence is an impermissible punishment." See Rutledge, 517 U.S. at 302.  Also See U.S. v Gore, 154 F.3d at 47 (2nd Cir 1997).

In a similar vein, the Supreme Court held in Ray v. U.S., 481 U.S. 736, 107 S. Cit. 2093 (1987), "that the concurrent sentence doctrine could not be applied where the trial court imposed a 'separate' Section S.S. 3013 assessment in each count. id at 737." See also U>S. v. Griffin, 844 F.2d at 656 (2nd cir. 1989).

The mere presence of $100.00 special assessment on each count "precludes application of concurrent sentence doctrine and since Whitehead's liability to pay the total of $500.00 depends on the validity of each of his five convictions, the sentences on Counts One, Two, Three, Four, and Five are "not" concurrent.

Moreover, since Whitehead has "paid" those consecutive special assessments and these monies have been mingled with the Treasuries of the United States, he has satisfied the judgment and his further imprisonment is barred. See U.S. v. Halper, 490 U.S. 435, 109 S. Ct. 1892 (1989).

Also, all assessments collected under 18 U.S.C.S. 3013 are paid into Crime Victims Fund, which makes disbursements to eligible state crime victim compensation programs 42 U.S.C. S.S. 10601 (b)(2). The assessment under U.S.C.S. S.S. 3013 is a punishment for purposes of applying- Assimilative Crime Act like punishment limitation, without regard to how it should be considered for purposes of invoking the rule of lenity. In practical effect, the assessment is indistinguishable from a criminal fine. The failure to pay the assessment like the failure to pay a fine can result in further imprisonment.

The cure for such a double jeopardy is not so simple as to return the funds back to Whitehead after he has completed all payments.

PROSECUTORIAL MISCONDUCT. Rule 33. Legal Standard.

"Prosecutorial misconduct is a 'heavy burden,' because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." See U.S. v. Banki, 685 F.3d 99, 120 (2nd Cir. 2012).

Whitehead respectfully asserts that he was denied his right to a fair trial when numerous assistant U.S. Attorneys made devastating statements during the entire proceedings of Whitehead's case. Namely, AUSA Hagan C. Scotten, LEAD ATTORNEY, AUSA Celia V. Cohen, AUSA Andrew Rohrbach, AUSA Jane Kim, AUSA Jessica Greenwood, AUSA Derek Wilkstrom, and the USA for the Southern District of New York himself, Damian Williams.

In specific, the above mentioned U.S. Attorneys stated that, (1) Brandon Belmonte was a victim in this case named "Victim-2."; (2) Brandon Belmonte was a "bully businessman."; (3) all the search warrants were based on Brandon Belmonte's false information, which was used and stated throughout the proceedings (See Exhibits A-6, A-7, A-8); (4) Brandon Belmonte provided false and fictitious information about stop-work orders, which were used and stated through the

proceedings by all of the above mentioned U.S. Attorneys.  See Exhibits A-6, A-7, and A-8 for the falsely stated "stop-work orders."

CONCLUSION

Wherefore, MOVANT Bishop Lamor Whitehead respectfully requests this Honorable Court, based on the foregoing, to grant Rule 29 and Rule 33 relief.  In the alternative, Whitehead further request that this Honorable Court hold an evidentiary hearing accordingly.  Whitehead further requests any and all other relief that this Honorable court deems just and proper.

Date: December 9,2024

Respectfully Submitted by,


_____


(Bishop Lamor Whitehead, Movant, pro se)

proceedings by all of the above mentioned U.S. Attorneys.  See Exhibits A-6, A-7, and A-8 for the falsely stated "stop-work orders."

CONCLUSION

Wherefore, MOVANT Bishop Lamor Whitehead respectfully requests this Honorable Court, based on the foregoing, to grant Rule 29 and Rule 33 relief.  In the alternative, Whitehead further request that this Honorable Court hold an evidentiary hearing accordingly.  Whitehead further requests any and all other relief that this Honorable court deems just and proper.

Date: December 9, 2024

Respectfully Submitted by,

(Bishop Lamor Whitehead, Movant, pro se)

EXHIBIT INDEX

[A] Order denying Rule 29 and Rule 33
[A-1] Bishop Lamor Whitehead's Indictment (S.D. N.Y.)
[A-2] Jury Instructions
[A-3] Belmonte's Production 1, 2, and 3
[A-4] Belmonte's Indictment (E.D.N.Y)
[A-5] Mayor Eric Adams Inditcment (S.D.N.Y)
[A-6] Belmonte's May 4, 2022 Statements
[A-7] Belmonte's Date of Entry: 05/12/2022
[A-8] Belmonte's April 22, 20222 Statements
[A-9] Search Warrants
[A-10] Investigative Report on Brandon Belmonte by the Office of Beau Dietl & Associats - 489 Fifth Ave., NY, NY 10017
[A-11] "BB" (Brandon Belmonte) - Belmonte's Victim Benjamin Isaacov Statement
[A-12] "BB" (Brandon Belmonte) - Belmonte's Victim Justin Almazan Statement
[A-13] "BB" (Brandon Belmonte) - Belmonte's Victim Robin Eshaghphor Statement
[A-14] "BB" (Brandon Belmonte) - Belmonte's Victim Motty Statement
[A-15] "BB" (Brandon Belmonte) - Belmonte's Victim Motty Text Message
[A-16] "BB" (Brandon Belmonte) - Belmonte's Victim Avi Rubin Statement
[A-17] Brandon Belmonte Pleading the Fifth Amendment Right at Trial/Transcript
[A-18] Press Conference/Press Release by USA Damian Williams Calling Brandon Belmonte a "Bullied Businessman."